**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NELSON WHITE, JR., et al.,** | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 11-7928** |
| | : | |
| **THE PNC FINANCIAL SERVICES** | : | |
| **GROUP, INC., et al.,** | : | |
| **Defendants.** | : | |

**M E M O R A N D U M**

STENGEL, J.                                              August 15, 2014

This is a putative class action brought by homeowners claiming violations of the Real Estate Settlement Procedures Act of 1974 (RESPA). Specifically, the plaintiffs claim the defendants carried out a "captive reinsurance scheme," which allowed for fees or kickbacks prohibited by section 8 of RESPA. I previously dismissed the plaintiffs' First Amended Complaint. The Plaintiffs failed to provide enough factual information to show that equitable tolling of RESPA's statute of limitations could be warranted. I allowed the plaintiffs to amend the complaint to include this information. The defendants again move to dismiss the Second Amended Complaint. I will deny their motions.

## I.      BACKGROUND[1]

### a.  Plaintiffs' Mortgages

Between January 2006 and December 2008, Nelson White, Jr., Lisa White, Charles Hightower, Colleen Hightower, Dan B. Johnston, Michelle B. Johnston, George G. Donald, Jr., Luz Garcia, Jill Crumpler, and Kevin Zielinski (collectively, the

---

[1] The facts are taken from the Second Am. Compl., Doc. No. 148, unless otherwise noted.

Plaintiffs) obtained residential mortgage loans from National City Mortgage (National City).

Because the Plaintiffs made down payments toward the purchase of their homes of less than 20%, they were required to obtain mortgage insurance from a private insurer selected by National City. National City had contracted with Mortgage Guaranty Insurance Corporation, Genworth Mortgage Insurance Corporation, Republic Mortgage Insurance Company, and Radian Guaranty, Inc. to provide such insurance.[2]

These primary insurers subsequently reinsured with National City's captive reinsurer, National City Mortgage Insurance Company, Inc. (NCMIC), pursuant to a "captive reinsurance arrangement." Under this arrangement, the primary insurers paid NCMIC a portion of the Plaintiffs' insurance premiums allegedly in exchange for NCMIC assuming some of the primary insurer's risk.[3] PNC Financial Services Group, Inc. (PNC) acquired National City in 2008 and became successor-in-interest to National City and NCMIC.

---

[2] I will refer to PNC, Mortgage Guaranty, Genworth, Republic, and Radian collectively as the "Defendants." I will refer to Mortgage Guaranty, Genworth, Republic, and Radian collectively as "Insuring Defendants." The Plaintiffs also sued PMI Mortgage Insurance Company, United Guaranty Residential Insurance Company, and Triad Guaranty Insurance Corporation, all of whom have since been dismissed as parties to this action. See Doc. No. 69, 119, 124.

[3] The point of the insurance arrangement and subsequent reinsurance arrangement was to protect the Defendants against losses in the event the Plaintiffs defaulted. The theory being that, given that their down payment was lower, the Plaintiffs were at a higher risk of default. See Jeff Horwitz, Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction, AMERICAN BANKER, Sept. 16, 2011 (Doc. No. 148, Ex. 4)("The alleged reinsurance kickbacks evolved from what was originally prudent practice. Bankers wanted to share in the profitable business of insuring mortgages against default."); Jeff Horwitz, Banks Took $6B in Reinsurance Kickbacks, Investigators Say, AMERICAN BANKER (Doc. No. 148, Ex. 5)("Mortgage insurance, often required for borrowers without sizable down payments, is a substitute for equity that serves to protect a loan's owner in the event of a borrower default. Banks typically choose the insurance carrier, but borrowers pay for the coverage in the form of higher net mortgage payments.").

### b.  Plaintiffs' Discovery of Their Claims[4]

The Plaintiffs all completed their loan transactions between January 11, 2006 and December 24, 2008.[5] They each continued to pay their mortgage premiums and never defaulted on their loans. On September 16, 2011, they received a letter from Kessler Topaz Meltzer and Check LLP (KTMC) indicating they may have possible legal claims against the Defendants. Before receiving this letter, the Plaintiffs claim they were unaware of their possible RESPA claims. They allege that any information they received regarding their loans, private mortgage insurance, and reinsurance did not give an indication that their loans were a part of an illegal kickback scheme. The Plaintiffs subsequently contacted the firm about those claims within three weeks of receiving this letter.[6] They each agreed to be represented by KTMC within the next seven months.[7]

The Plaintiffs then attempted to get further information about whether their loans were reinsured and, if so, what these reinsurance arrangements entailed. In each case, the Plaintiffs made several contacts to PNC, their private mortgage insurer, and/or their loan

---

[4] The dates asserted are approximate, according to the complaint.

[5] George Donald's loan transaction was completed on January 11, 2006. Kevin Zielinski's loan was completed on January 20, 2006. The Hightowers' loan transaction took place on January 27, 2006. Jill Crumpler's loan transaction took place on May 26, 2006. The Whites' loan transaction took place on December 29, 2006. Luz Garcia completed her mortgage loan transaction on January 8, 2008. Dan and Michelle Johnstons' loan transactions took place on December 24, 2008.

[6] The Whites and Johnstons contacted KTMC on September 22, 2011. Luz Garcia contacted KTMC on September 26, 2011. Crumpler first communicated with KTMC on September 28, 2011. George Donald contacted KTMC about his possible claims on September 30, 2011. The Hightowers contacted KTMC on October 5, 2011. Zielinski first spoke to KTMC on October 6, 2011.

[7] The Hightowers signed an agreement with KTMC on October 20, 2011. Mr. White signed an agreement with KTMC on September 26, 2011, and Mrs. White signed this agreement on November 2, 2011. The Johnstons signed their agreement with KTMC on February 12, 2012. Zielinski signed his agreement with them on February 17, 2012. Crumpler signed an agreement of legal representation on March 15, 2012. Donald signed an agreement to be represented by them on March 26, 2012. Garcia signed an agreement to be represented by KTMC on April 24, 2012.

servicer.[8] Each time they were given misinformation or no information at all.[9] Some were even told they were not entitled to this information.[10]

The Plaintiffs further allege PNC and/or National City's counsel refused to confirm that the Plaintiffs' loans were reinsured by National City's reinsurance program. It was only through information provided by counsel for the Insuring Defendants that the Plaintiffs were even able to determine that their loans were being reinsured as their mortgage agreements proscribed.

### c.  Plaintiffs' Lawsuit

---

[8] On November 2, 2011, Mr. White contacted PNC about the identity of his private mortgage insurance provider. He was told he would receive this information by mail within ten days. Mr. White never received this information. After three more calls over the next two months to follow up on his request and attempt to obtain more information, Mr. White was still unable to determine for certain the name of his private mortgage insurance provider and confirm that his mortgage insurance was reinsured. During one call, he was told Bank of America was his insurer; during a later call, he was told that this information was incorrect but that the identity of his private mortgage insurer was unknown.

Mr. Hightower called PNC on November 28, 2011 and was told he would receive information about his private insurance within 15 business days. After one month and two more phone calls, Hightower received a letter dated November 28, 2011. This letter did not identify his private mortgage insurer. Instead, it indicated that PNC would assume part of the risk of his private mortgage reinsurance and that he could opt out of this reinsurance if he signed a notice he had previously been sent. Hightower never received the previous notice or a "Reinsurance letter" referred to in the November 28, 2011 letter. Hightower called PNC twice more on December 28, 2011 and December 30, 2011 to try to find out the name of his private insurer and attempt to ascertain what notice he must sign, yet he was not able to obtain this information from PNC.

[9] On May 31, 2012, Garcia contacted her loan servicer and was told her loan could not have been reinsured. She was later informed by counsel for RMIC that she has private mortgage insurance through National City and that her loan was among those involved in the National City reinsurance program.

On August 12, 2012, Crumpler contacted PNC to ask if her loan was reinsured through National City; the representative was unable to give her any information.

[10] On February 24, 2012, Mrs. Johnston contacted PNC and asked for her mortgage insurance provider. She was told by the representative that she was "not allowed to give out that information." On August 21, 2012, she contacted Genworth, her private mortgage insurer. She was told again told that she could not be provided with information about the reinsurance of her loan.

Zielinski's wife contacted their loan servicer on March 9, 2012 and March 15, 2012 to inquire about whether their loan was reinsured by National City. The representatives knew nothing about what reinsurance was nor could offer any other information that might be helpful.

The Plaintiffs claim this reinsurance arrangement violated RESPA's prohibition on kickbacks because premium payments from the primary insurers to NCMIC were made in return for National City's referral of business.[11] According to the Plaintiffs, this arrangement also violated RESPA's prohibition on fee-splitting because it was only sham reinsurance: NCMIC accepted a portion of the Plaintiffs' insurance premiums but provided no service in return.[12] The Plaintiffs also assert a state-law claim for unjust enrichment.

The PNC and the Insuring Defendants each move to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.    STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) examines the legal sufficiency of the complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The factual allegations must be sufficient to make the claim for relief more than just speculative. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "[C]onclusory or 'bare-bones' allegations

---

[11] See 12 U.S.C. § 2607(a)(prohibits giving or accepting "any fee, kickback, or thing of value pursuant to any agreement or understanding . . . that business incident to or a part of a real estate settlement service . . . shall be referred to any person.").

[12] See 12 U.S.C. § 2607(b)(prohibits giving and accepting "any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service . . . other than for services actually performed.").

will no[t] . . . survive a motion to dismiss." <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009).

### III.    DISCUSSION

#### a.    Availability of Tolling RESPA Statute of Limitations

The Defendants again move to dismiss the Plaintiffs' RESPA claims as untimely under Rule 12(b)(6).[13] RESPA provides that an action under § 2607 must be brought "within...1 year...from the date of the occurrence of the violation." 12 U.S.C. § 2614. The "date of the occurrence of the violation" is the date the loan closed. <u>In re Cmty. Bank of N. Virginia</u>, 622 F.3d 275, 281 (3d Cir. 2010). The Plaintiffs' loans closed at the latest on December 24, 2008, over three years prior to the filing of this lawsuit on December 31, 2011. The Plaintiffs contend that their Second Amended Complaint cures the deficiencies in their First Amended Complaint and provides a basis for equitable tolling.[14]

---

[13] The Third Circuit permits a limitations defense to be raised by a motion under Rule 12(b)(6) where, as here, "'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" <u>Robinson v. Johnson</u>, 313 F.3d 128, 135 (3d Cir. 2002) (quoting <u>Hanna v. U.S. Veterans' Admin. Hosp.</u>, 514 F.2d 1092, 1094 (3d Cir. 1975)).

[14] Defendants suggest in passing that RESPA's statute of limitations is jurisdictional and thus cannot be equitably tolled.  Doc. No. 91 at 7.  Although the Third Circuit has not yet addressed this issue, the clear weight of authority both inside and outside this Circuit holds that RESPA claims may be equitably tolled. <u>See In re Cmty. Bank of N. Virginia</u>, 622 F.3d 275, 307 (3d Cir. 2010). <u>See also</u> <u>Barlee v. First Horizon Nat. Corp.</u>, CIV.A. 12-3045, 2013 WL 706091, at *4 (E.D. Pa. Feb. 27, 2013); <u>Riddle v. Bank of Am. Corp.</u>, CIV.A. 12-1740, 2013 WL 1482668, at *5-6 (E.D. Pa. Apr. 11, 2013); <u>Minter v. Wells Fargo Bank, N.A.</u>, 675 F. Supp. 2d 591, 594-95 (D. Md. 2009); <u>Marple v. Countrywide Fin. Corp.</u>, No. 07–4402, 2008 WL 9418768, at *6-16 (D.N.J. May 7, 2008); <u>Kay v. Wells Fargo & Co. N.A.</u>, C 07-01351 WHA, 2007 WL 2141292, at *3 (N.D. Cal. July 24, 2007); <u>Mullinax v. Radian Guar. Inc.</u>, 199 F. Supp. 2d 311, 326-28 (M.D.N.C. 2002); <u>Smith v. EquipCredit Corp.</u>, CIV.A. 01-CV-4326, 2002 WL 32349873, at *3 n. 2 (E.D. Pa. Oct. 4, 2002); <u>Celimar Solar v. Millenium Fin., Inc.</u>, CIV.A. 01-CV-4327, 2002 WL 1019047, at *2 (E.D. Pa. May 17, 2002); <u>Pedraza v. United Guar. Corp.</u>, 114 F. Supp. 2d 1347, 1351-54 (S.D. Ga. 2000); <u>Moll v. U.S. Life Title Ins. Co. of New York</u>, 700 F. Supp. 1284, 1286-88 (S.D.N.Y. 1988); <u>Kerby v. Mortgage Funding Corp.</u>, 992 F. Supp. 787, 791-98 (D. Md. 1998); <u>Lawyers Title Ins. Corp. v. Dearborn Title Corp.</u>, 118 F.3d 1157, 1166–67 (7th Cir. 1997); <u>contra</u> <u>Hardin v. City Title & Escrow Co.</u>, 797 F.2d 1037, 1039 (D.C. Cir. 1986).

The Plaintiffs argue that they are entitled to equitable tolling due to fraudulent concealment by the Defendants.  Allegations of fraudulent concealment must "state with particularity the circumstances constituting fraud or mistake" under the heightened pleading standard of Rule 9(b). FED. R. CIV. P. 9(b). See Byrnes v. DeBolt Transfer, Inc., 741 F.2d 620, 626 (3d Cir. 1984). The Plaintiffs must describe "the circumstances of the alleged fraud with precise allegations of date, time, or place" or otherwise use "some means of injecting precision and some measure of substantiation into their allegations of fraud," as to each defendant against whom tolling is sought.[15] Whether tolling is appropriate is generally not decided on a Rule 12(b)(6) motion "because the question of whether a particular party is eligible for equitable tolling generally requires consideration

---

Moreover, in holding that claims under the analogous Truth In Lending Act could be equitably tolled, the Third Circuit in Ramadan v. Chase Manhattan Corp., 156 F.3d 499, 500-05 (3d Cir. 1998), declined to follow the D.C. Circuit's reasoning in Hardin and cited with approval the Seventh Circuit's decision in Lawyers Title. In light of Ramadan, and finding no clear and unambiguous language in § 2614 to rebut "the well-established principle of law that equitable tolling doctrines are 'read into every federal statute of limitation,'" I find that Plaintiffs' RESPA claims may be equitably tolled. 156 F.3d at 504 (quoting Holmberg v. Armbrecht, 327 U.S. 392, 396-97 (1946)).

At oral argument, the Defendants argued that Congress has not altered the one year statute of limitations in RESPA, despite the recent claims made by borrowers like the Plaintiffs. From this "silence," the Defendants urge me to infer that Congress did not intend for the statute of limitations to be extend beyond one year. While this argument is somewhat persuasive, it runs contrary to Congress' recent decision to place RESPA enforcement in the hands of the newly-created Consumer Financial Protection Bureau (CFPB).

The CFPB was established by the Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act) in reaction to the recent sub-prime mortgage and financial crisis. Prior to July 21, 2011, RESPA was administered and enforced by the United States Department of Housing and Urban Development (HUD). See Dodd-Frank Act §§ 1002(12)(M), 1024(b)-(c), and 1025(b)-(c); 12 U.S.C. §§ 5481 (12)(M), 5541(b)-(c), and 5515(b)-(c); Regulation X, 24 C.F.R. § 3500. The CFPB, using its delegated Congressional authority, has been actively working to prosecute RESPA violations like those the Plaintiffs allege, violations that occurred several years ago. See Richard Cordray (Director of CFPB), Press Call on Enforcement Action Against Mortgage Insurers to End Kickbacks to Lenders, Apr. 4, 2013, available at http://www.consumerfinance.gov/newsroom/prepared-remarks-of-richard-cordray-on-enforcement-action-against-mortgage-insurers-to-end-kickbacks-to-lenders/. For this reason, I am not convinced that Congress clearly intended that one year limitations period to be a hard and fast rule.

[15] Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 172 n.10 (3d Cir. 2002) (citation and internal quotation marks omitted); In re Elec. Carbon Products Antitrust Litig., 333 F. Supp. 2d 303, 315 (D.N.J. 2004) (explaining that equitable tolling through fraudulent concealment requires "an affirmative act of concealment by each defendant") (emphasis added).

of evidence beyond the pleadings." <u>In re Cmty. Bank</u>, 622 F.3d at 301-02.

"Among the circumstances warranting equitable tolling are situations where 'the defendant has actively misled the plaintiff respecting the plaintiff's cause of action,' i.e. fraudulent concealment." <u>Forbes v. Eagleson</u>, 228 F.3d 471, 486 (3d Cir. 2000)(quoting <u>Oshiver v. Levin, Fishbein, Sedran & Berman</u>, 38 F.3d 1380, 1387 (3d Cir. 1994)).[16] Equitable tolling based on fraudulent concealment requires a plaintiff to prove "three necessary elements: (1) that the defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the validity of her claim within the limitations period; and (3) where the plaintiff's ignorance is not attributable to her lack of reasonable due diligence in attempting to uncover the relevant facts." <u>Cetel v. Kirwan Fin. Group, Inc.</u>, 460 F.3d 494, 509 (3d Cir. 2006).

### 1.  Active Misleading

The first <u>Cetel</u> factor requires a plaintiff to show that the defendant "engaged in affirmative acts of concealment designed to mislead the plaintiff[] regarding facts supporting" his claim.  <u>Forbes</u>, 228 F.3d at 487. The Third Circuit has stressed that a "plaintiff must show *active misleading* by the defendant." <u>Id.</u>  Absent an "affirmative duty to disclose," <u>Mest  v. Cabot Corp.</u>, 449 F.3d 502, 517 (3d Cir. 2006), "mere silence or nondisclosure is not enough," <u>Garczynski v. Countrywide Home Loans, Inc.</u>, 656 F. Supp. 2d 505, 516 (E.D. Pa. 2009)(citation and internal quotation marks omitted).

---

[16] Equitable tolling may also be appropriate where "the plaintiff in some extraordinary way has been prevented from asserting his or her rights [or] where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." <u>Oshiver</u>, 38 F.3d at 1387.  The Plaintiffs do not contend they are entitled to equitable tolling on these bases.

I previously found that the Plaintiffs plausibly alleged an affirmative act of concealment on the part of National City. I agreed with the reasoning in <u>Barlee v. First Horizon Nat. Corp.</u>, CIV.A. 12-3045, 2013 WL 706091 (E.D. Pa. Feb. 27, 2013), and <u>Riddle v. Bank of Am. Corp.</u>, CIV.A. 12-1740, 2013 WL 1482668 (E.D. Pa. Apr. 11, 2013). <u>Barlee</u> and <u>Riddle</u> found that the misrepresentations alleged by the Plaintiffs were not simply a rehashing of the RESPA violation itself.[17] The Plaintiffs' allegations that the mortgage documents actively misled them by indicating that their premium payments to the captive reinsurer were for actual services rendered, rather than kickbacks and unearned fees, were enough to show active concealment on the part of National City.[18]

I was not convinced, however, that the Plaintiffs plausibly pled active concealment on the part of the Insuring Defendants. In the First Amended Complaint, the Plaintiffs' allegations of concealment were confined to the form mortgage documents provided

---

[17] I rejected the Defendants' argument that <u>McCarn v. HSBC USA, Inc.</u>, 1:12-CV-00375-LJO, 2012 WL 5499433 (E.D. Cal. Nov. 13, 2012), and <u>Kay v. Wells Fargo & Co. N.A.</u>, C 07-01351 WHA, 2007 WL 2141292 (N.D. Cal. July 24, 2007), offered more persuasive reasoning. A misrepresentation is not required to violate RESPA sections 8(a) and 8(b). <u>See</u> <u>Marple v. Countrywide Fin. Corp.</u>, 2008 WL 9418768 at *11 ("[I]n the case of a RESPA violation, it is not the fraudulent act that provides the factual predicate for the claim; rather, it is the fee splitting that forms the basis of the claim."); <u>Williams v. Saxon Mortg. Services, Inc.</u>, CIV.A. 06-0799-WS-B, 2007 WL 2828752, at *4 (S.D. Ala. Sept. 27, 2007) ("[I]n the RESPA context, the violation occurs when fees are improperly accepted, split or shared.  Any fraudulent concealment or deception in the closing documents would not violate the statute."); <u>Pedraza v. United Guar. Corp.</u>, 114 F. Supp. 2d 1347, 1357 (S.D. Ga. 2000) ("RESPA can be violated without any misrepresentation at all.").

Courts within the Third Circuit have ruled similarly, while courts in the Ninth Circuit have ruled for the lenders. <u>See</u> <u>Cunningham v. M & T Bank Corp.</u>, No. 12-cv-1238, 2013 WL 5876337, at *5-6 (M.D.Pa. Oct. 30, 2013)("The Ninth Circuit cases largely line up with defendants' arguments *sub judice,* and the case law within the Third Circuit tends to favor plaintiffs' position.").

[18] The Plaintiffs contend National City falsely stated that premium payments to NCMIC were in exchange for a bona fide transfer of risk, when in reality no actual or commensurate risk was ever transferred. The Third Circuit has suggested in dicta that this sort of behavior may constitute an affirmative act of concealment.  <u>In re Cmty. Bank</u>, 622 F.3d at 307 n.24 ("[W]e note that the [defendants'] theory of fraudulent concealment—i.e., that fraudulent concealment requires some further act than...misrepresenting the nature of [settlement-service] fees—would effectively render equitable tolling in the RESPA...context a dead letter.").

them by National City. The Plaintiffs had not offered any information to show that the Insuring Defendants prepared these documents nor knew about the misrepresentations in these documents to show active concealment on their part.

To cure this deficiency, the Plaintiffs now plead that the misleading representations in the form documents can be attributed to all Defendants because the form mortgage documents were modeled on documents created by the Federal National Mortgage Association (Fannie Mae) and/or the Federal Home Loan Mortgage Corporation (Freddie Mac). In order for National City to have used this form language, the Insuring Defendants would have needed to certify annually that they are in compliance with Fannie Mae and Freddie Mac's approval requirements.

Fannie Mae and Freddie Mac require mortgage insurers, like the Insuring Defendants, to obtain and maintain approval as "qualified mortgage insurers" in order to continue to provide insurance coverage to homeowners whose loans may later be acquired by Fannie Mae and/or Freddie Mac.[19] These approval standards require the Insuring Defendants to obtain an independent actuarial opinion for each captive

---

[19] See Second Am. Compl., Doc. No. 148. Ex. 61, 86. At oral arguments, the Insuring Defendants argued that there was no indication in the complaint that the Plaintiffs' loans were actually sold to Fannie Mae or Freddie Mac or that actuarial opinions were obtained. I find these points to be irrelevant. The fact that the mortgage documents were modeled on those from Fannie Mae and Freddie Mac indicate that these loans *could* have been sold to Fannie or Freddie. By using these documents, the Defendants provide for this option in the future. The option to sell to Fannie and Freddie *in itself* adds value to the agreement between the parties. What is important is whether the Defendants collectively held themselves out as complying with the approval standards, certifying that the captive reinsurance scheme was in fact a legitimate transfer of risk. See Second Am. Compl., Doc. No. 148, Ex. 44 ("Government sponsored enterprises such as [Fannie Mae and Freddie Mac]… typically will not consider purchasing low down payment conventional loans unless the loans have mortgage insurance.").

10

reinsurance agreement showing that the premiums paid them actually serve as compensation for the risk they assume under FASB 113.[20]

The Plaintiffs argue that by submitting their annual certifications, the Insuring Defendants knew that the mortgage documents being used would indicate that the insurers were certified and that their captive reinsurance arrangements were compliant with FASB 113. They also allege that the insurers, like the banks, publicly maintained that they were compliant with regulations, even after some industry analysts and ratings agencies questioned the legitimacy of captive reinsurance deals. Under this theory, the Plaintiffs offer allegations of collusion between the Insuring Defendants and National City—allegations which they had not provided in their previous amended complaint to show active misleading by the Insuring Defendants.[21]

---

[20] See Second Am. Compl., Doc. No. 148, Ex. 16 at 10 of 17, 12 of 17.

[21] See Second Am. Compl., Doc. No. 148 at ¶¶ 219– 226. See also White v. PNC Financial Services Group, Inc., No. 11– 7928, 2013 WL 3090823, at *5 (E.D.Pa. Jun. 20, 2013)("Plaintiffs claim the Insuring Defendants colluded with National City "to conceal their collective violations of RESPA's anti-kickback provisions from Plaintiffs." Id. While actively colluding with National City to misrepresent Plaintiffs' mortgage documents may constitute an affirmative act of concealment…Plaintiffs make no such claim.").

The Insuring Defendants argue that the Plaintiffs should offer specific details that show that the Insuring Defendants were in agreement with National City and NCMIC to conceal these misrepresentations. At this stage, these details would not be necessary since I am required to draw all reasonable inferences in the light most favorable to the Plaintiffs.

Furthermore, to expect the Plaintiffs to have specific (damning) details showing that the Defendants actually agreed to fraudulent conceal their illegal scheme seems a bit of a preposterous expectation, in light of the facts they have presented. See In re Mercedez Benz Anti–Trust Litig., 157 F.Supp.2d 355, 368 (D.N.J. 2001)("Rule 9 does not require plaintiffs to plead facts that, by the nature of the alleged fraud, are within the defendants' control.")(citing In re Craftmatic Secs. Litig., 890 F.2d 628, 645 (3d Cir.1989)). When the Plaintiffs attempted to get information about the terms of *their own loans' reinsurance policies* from the Defendants—both PNC/National City and the insurers, they were met with vague answers and provided inaccurate information. The Plaintiffs have offered enough at this stage to offer an inference of collusion.

These allegations are enough to plausibly show active misleading by the Insuring Defendants.[22] Therefore, the Plaintiffs have established prong one of Cetel for both National City and the Insuring Defendants.

### 2.  Reliance/Inquiry Notice

The second Cetel factor requires the Plaintiffs to show that the Defendants' acts of concealment prevented them from recognizing the validity of their claims within RESPA's one-year limitations period.  460 F.3d at 509. To establish prong two, the Plaintiffs must show that they both were not on notice of a possible claim and that they relied on the Defendants' concealment in thinking they did not have a cause of action. See Forbes, 228 F.3d at 487; In re Processed Egg Products Antitrust Litig., MDL 2002, 2011 WL 5980001, at *3 (E.D. Pa. Nov. 30, 2011) (quoting Davis v. Grusemeyer, 996 F.2d 617, 624 (3d Cir. 1993)).

"[P]laintiffs have inquiry notice 'whenever circumstances exist that would lead a reasonable investor of ordinary intelligence, through the exercise of due diligence, to discovery of his or her injury.'" Cetel, 460 F.3d at 507 (quoting Mathews v. Kidder Peabody & Co., 260 F.3d 239, 252 (3d Cir.2001)). I previously found that the mortgage documents themselves did not put the Plaintiffs on inquiry notice.[23] I also rejected the

---

[22] See, e.g., Mullinax v. Radian Guar. Inc., 199 F. Supp. 2d 311, 330 (M.D.N.C. 2002).

[23] White v. PNC Financial Services Group, Inc., 2013 WL 3090823 at *6 ("Accordingly, I find that Plaintiffs have plausibly alleged their mortgage documents did not place them on inquiry notice of the instant claims.").

Defendants' argument that new articles about similar reinsurance schemes should have put them on constructive notice.[24]

In their First Amended Complaint, the Plaintiffs did not allege a date on which they did discover that they had a valid claim, to show that they were not on notice before the statute of limitations had run. They have cured this deficiency in their Second Amended Complaint. The Plaintiffs allege that they each became aware of their possible claims against the Defendants when they received the letter from KTMC on or around September 16, 2011.[25] Before this time, they were not given any indication that their loans were a part of a reinsurance sham.[26] Everything they had been provided about their loans assured them that the reinsurance arrangements were legitimate and/or in compliance with the applicable regulations.[27] At this stage of litigation, I am satisfied that

---

[24] Id. ("Whether these public documents provided Plaintiffs with constructive notice of their claims is a factual inquiry beyond the scope of PNC's motion.").

[25] PNC argues that the inclusion of this date does nothing to alter the Second Amended Complaint. PNC claims that all this date does is change the "unspecified time" noted in the First Amended Complaint to September 16, 2011. PNC fails to recognize, however, that the failure of the Plaintiffs to include this fact in their First Amended Complaint is much of why I dismissed their claims previously. Without this date, I was unable to assess their lack of notice and diligence within the limitations period. The inclusion of this date in the Second Amended Complaint is an important amendment.

[26] The Defendants argue that the Plaintiffs should have offered the Notice received from KTMC and circumstances surrounding their receipt of this Notice and subsequent retention of KTMC as counsel. The Plaintiffs counter that this information falls squarely within the attorney-client privilege. I agree with the Plaintiffs that such level of specificity is not necessary and could infringe on the protections of the attorney-client privilege.

[27] The Plaintiffs also argue that the CFPB's investigation of reinsurance kickback schemes in only the past several years support their argument for equitable tolling. While this is not to say that a statute of limitations period will be tolled until a government entity acts to prosecute statutory offenses, the fact that the federal government is just now beginning to investigate the sorts of "reinsurance shams" the Plaintiffs allege supports the idea that the scheme alleged was one reasonable diligence by a mortgagee would not have uncovered. See Forbes v. Eagleson, 228 F.3d 471, 489 (3d Cir. 2000)("[T]he mere fact that the government did not obtain an indictment before a time within plaintiffs' four-year statute of limitations period does not mean that the statute of limitations in this case should be deemed equitably tolled until the return of the indictment."); but see Cetel, 460 F.3d at 507 (explaining how the IRS's notice that certain VEBA plans were not approved served as "storm warnings" that would put the plaintiffs on notice). See also Second Am. Compl., Doc. No. 148, Ex. 48, 49, 64 (news articles discussing CFPB's recently commenced investigations into reinsurance schemes).

they have pled enough to show that they were not on notice of a possible claim during the limitations period.[28]

In addition, they have provided information to show that they likely could not have been on notice of a possible violation before KTMC's letter. The Private Mortgage Guaranty Insurance Disclosure statements, which the Plaintiffs received, stated that the Plaintiffs were required to have private mortgage guaranty insurance because the Plaintiffs were paying less than twenty percent of their home value on down payment. The Statement then goes on to explain that the reinsurance arrangement made on the Plaintiffs' loans would not increase their mortgage premiums nor affect their coverage.[29] It then goes further to explain what reinsurance is—that the reinsurance company receives a part of the insurer's premiums to take on part of the risk of the Plaintiffs defaulting. To a reasonable person, this information raises no specter of impropriety.

Absent any information to suggest otherwise, reason and reality indicate that the Plaintiffs justifiably relied on the Defendants' assurances that their mortgages were in compliance with applicable laws. As the Plaintiffs point out, a home purchase is a significant life event, full of anxiety and stress. Home buyers spend countless hours ensuring that they have undertaken the requisite inspections, filled out the right paperwork, and read the voluminous documents presented them. They rely on the advice of their real estate agents, lawyers, and financing agents to make sure that their home

---

[28] See Menichino v. Citibank, N.A., 12–cv–00058, 2014 WL 462622, at *3 (W.D.Pa. Feb. 5, 2014); Manners v. Fifth Third Bank, No. 12–0442, 2014 WL 465701, at *2 (W.D.Pa. Feb. 5, 2014)(finding that that the addition of the date plaintiffs received notice for attorneys about claims sufficient to overcome motion to dismiss in analogous cases).

[29] See Second Am. Compl., Doc. No. 148, Ex. 78–84.

purchase—the largest single transaction in which they will likely ever engage—goes right.

What the Defendants suggest the Plaintiffs should have done is to basically distrust anyone involved in the home buying process. To advocate that this be the standard behavior by home buyers would gum-up an already complicated process. To ask them to second-guess the information that has been provided them by those with more expertise in these sorts of dealings—to essentially undertake their own investigation into the legality of every part of their loan transaction simply because there may be some possibility that the transaction may be illegal—is unreasonable and unrealistic.

In light of the fact that the Plaintiffs were not on notice of a possible claim, the Plaintiffs have shown that they reasonably relied on the Defendants' concealment in thinking they did not have a cause of action.

### 3. Reasonable Due Diligence

The third prong of <u>Cetel</u> goes hand-in-hand with the second. Typically, Plaintiffs must show under <u>Cetel</u> that their failure to assert a timely claim was not attributable to their lack of reasonable due diligence in attempting to uncover the relevant facts. <u>See</u> <u>Cetel</u>, 460 F.3d at 509. "The due diligence prong is rooted in the notion of inquiry notice: that an injury accrues when a reasonable plaintiff under the circumstances would have discovered it." <u>In re Magnesium Oxide Antitrust Litigation</u>, No. 10–5943, 2011 WL 5008090, at *23 (D.N.J. Oct. 20, 2011).[30]

---

[30] <u>See also</u> <u>Menichino v. Citibank</u>, No. 2:12–cv–00058, 2014 WL 462622, at *3 (W.D.Pa. Feb. 5, 2014)("A plaintiff is on inquiry notice whenever circumstances exist that would lead a reasonable person, through the exercise of due diligence, to discover his or her injury.")(citations omitted).

The Plaintiffs failure to plead a tolling date in their First Amended Complaint was also a deficiency in establishing prong three of Cetel. Given that they have now established when they each discovered their possible claims on or around September 16, 2011, I am better able to assess whether their ignorance of their claims during the limitations period could be attributable to their lack of diligence.

In the Second Amended Complaint, the Plaintiffs offer more details about how and when they attempted to obtain more information about the reinsurance of their loans. The Defendants argue that this information cannot be used to show reasonable diligence because these actions occurred *after* the Plaintiffs received notice of their possible claims and *after* the limitations period had already run. While I agree that these acts in themselves cannot be used to show that the Plaintiffs were diligent during the limitations period, they help define what acts could have been reasonable acts of diligence, bolstering the Plaintiffs' argument that their lack of knowledge about their claims was not due to their own lack of diligence.[31] These acts show that even if the Plaintiffs had been diligent during the limitations period these would have been to no avail. The Plaintiffs have alleged that *none* of them were able to obtain information about the reinsurance of their loans, even after several inquiries to the Defendants or their loan servicers. They

---

[31] The Defendants continue to assert that the Plaintiffs should have been more diligent during the limitations period, yet they offer no specific actions the Plaintiffs should have taken that they did not which would have allowed their claims to be timely. Practically speaking, their arguments are academic ones. For the Plaintiffs to really have known that their mortgage reinsurance was in fact a sham, they would have needed to default on their mortgages. This seems quite an extreme step in order to reveal the Defendants' alleged scheme. See Jeff Horwitz, Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction, AMERICAN BANKER, Sept. 16, 2011 (Doc. No. 148, Ex. 4)("If defaults remained low, banks would pocket large premiums without paying any claims; if defaults were high, banks' losses would be capped at the amount of their small initial investments, plus the premiums paid by homeowners and passed along to them by their mortgage insurance partners.").

16

weren't even able to confirm that their loans were being reinsured. These facts support their contention that due diligence during the limitations period would have gotten them nowhere.

Like they did previously, the Plaintiffs argue that their participation in their loan transactions can constitute reasonable due diligence "throughout the time period in which they claim the statute of limitations should be tolled." Processed Egg Products, 2011 WL 5980001, at *13. As I explained in my memorandum dismissing the First Amended Complaint, the third prong of Cetel appears to contemplate the possibility that affirmative acts of diligence may be unnecessary in certain situations so long as the plaintiff's ignorance was not attributable to a lack of reasonable due diligence.[32] Other courts in this Circuit have found that a mortgagee's participation in his loan transaction as an act of diligence is enough to overcome a motion to dismiss.[33] See, e.g., Marple, 2008 WL 9418768 at *6; Barlee, 2013 WL 706091 at *5; Riddle, 2013 WL 1482668, at *10. I agree that this participation in their loan agreements and closings can be considered reasonable diligence under the circumstances, in order to overcome a motion to dismiss.

---

[32] Id. at *8 (explaining how prong three's phrasing in the negative leads to this interpretation and discussing Cetel, 460 F.3d at 509). See also Processed Egg Products, 2011 WL 5980001, at * 9; In re Elec. Carbon Products Antitrust Litig., 333 F.Supp.2d 303, 317 (D.N.J. 2004); Aspartame, 2007 WL 5215231, at * 6.

[33] The Defendants point to two "recently decided" cases from Judge Hornak in the Western District of Pennsylvania, which they claim support a dismissal of this complaint: Menichino v. Citibank, N.A., No. 12–0058, 2013 WL 3802451 (W.D.Pa. Jul. 19, 2013), and Manners v. Fifth Third Bank, No. 12–0442, 2013 WL 3802501 (W.D.Pa. Jul. 19, 2013). These cases, however, are not helpful. They address dismissal of the First Amended Complaint in both cases and offer reasoning similar to that which I offered in my dismissal of the First Amended Complaint in this case. Judge Hornak dismissed those complaints without prejudice, allowing the Plaintiffs to amend and cure factual deficiencies. Judge Hornak then later denied the defendants' motion to dismiss the complaint after it had been amended and had cured the factual deficiencies he found in deciding the first motion to dismiss. See Menichino v. Citibank, N.A., 12–cv–00058, 2014 WL 462622 (W.D.Pa. Feb. 5, 2014); Manners v. Fifth Third Bank, No. 12–0442, 2014 WL 465701 (W.D.Pa. Feb. 5, 2014).

The Defendants argue that allowing equitable tolling until a lawyer contacts plaintiffs about a possible RESPA violation, before doing any investigation of their own, would eviscerate the statute of limitations and essentially allow RESPA claims to be brought when the lawyer finally gets around to filing the lawsuit. The Defendants cite cases outside of this Circuit to support their argument. See Turner v. Bank of Am., N.A., No. 2:12–cv–1319–LDG (CWH), 2013 WL 321663 (D. Nev. Jan. 25, 2013); Salois v. Dime Sav. Bank, FSB, 128 F.3d 20, 26 (1st Cir. 1997); Valdez v. America's Wholesale Lender, No. C 09-02778 JF (RS), 2009 WL 5114305  (N.D.Cal. Dec. 18, 2009); Matudio v. Countrywide Home Loans, Inc., No. CV 09-02960 DDP (FFMX), 2010 WL 114185 (C.D.Cal. Jan. 6, 2010); McCarn v. HSBC USA, Inc., No. 1:12-CV-00375, 2012 WL 5499433, at *6 (E.D. Cal. Nov. 13, 2012).

I do not believe my denying a motion to dismiss in this case would have as sweeping an impact as the Defendants claim. In light of the facts presented—which would determine whether equitable tolling is permissible—it is plausible that the letter from counsel to the Plaintiffs could have been the first opportunity the Plaintiffs may have reasonably become aware of their claims. This determination is a factual one based on the circumstances of *this* case and may not necessarily be applicable to other cases with different facts.

In making this argument, the Defendants also imply that there was nothing to have prevented counsel from filing a lawsuit and sending the notice to the Plaintiffs prior to the time they did. This argument holds little weight. It is not the actions of counsel which determine due diligence but instead it's the actions of plaintiffs themselves. The

Defendants own reference to <u>Lawrence v. Florida</u> supports this point. 549 U.S. 327, 336 (2007)(explaining that it is the petitioner's actions that determine whether tolling is warranted not those of his attorney).

Overall, the Plaintiffs have cured the deficiencies in their pleadings to allow their case to go forward on the basis that their claims may be equitably tolled.[34] Whether the claims are actually subject to equitable tolling will require fact discovery. <u>See</u> <u>In re Cmty. Bank</u>, 622 F.3d at 301–02 (generally, equitable tolling should not be resolved at the 12(b)(6) stage).[35]

### b.      RESPA (Count I) – Rule 12(b)(6) Based on Statutory Safe Harbor

Alternatively, PNC again contends that RESPA's statutory safe harbor shields it from liability. Section 8(c) provides in relevant part that "[n]othing in [sections 8(a) or 8(b)] shall be construed as prohibiting...the payment to any person of a bona fide salary or compensation or other payment...for services actually performed." 12 U.S.C. §

---

[34] The Defendants argue that Judge Schiller's recent decision in <u>Riddle</u> that equitable tolling did not apply to analogous claims on summary judgment should persuade this court to find that equitable tolling does not apply at the motion to dismiss stage in this case. This argument is unpersuasive. Whether the Plaintiffs are entitled to equitable tolling is a fact intensive inquiry as to these Plaintiffs, not those in <u>Riddle</u>. While I previously agreed with <u>Riddle</u>'s analysis as to what the Plaintiffs' needed to pled to overcome a motion to dismiss, I am not bound to follow <u>Riddle</u>'s determination that equitable tolling did not apply to the facts <i>in that case</i>. <u>See</u> <u>Riddle v. Bank of Am. Corp.</u>, No. 12–1740, 2013 WL 6061363 (E.D.Pa. Nov. 18, 2013)("The Court refused to dismiss Plaintiffs claims as time-barred without any discovery on the statute of limitations issue. With that tailored discovery completed, the Court will set forth the facts uncovered.").

[35] <u>See also</u> <u>Barlee v. First Horizon</u>, No. 12-cv-3045, 2013 WL 706091, at *4 (E.D. Pa. Feb. 27, 2013)(finding that equitable tolling adequately pled should be decided after factual discovery); <u>Riddle v. Bank of Am. Corp.</u>, CIV.A. 12-1740, 2013 WL 1482668 (E.D. Pa. Apr. 11, 2013)(same); <u>Ba v. HSBC USA, Inc.</u>, No. 13-cv-72, 2013 WL 3238066, at *2 (E.D. Pa. June 27, 2013) ("[The court] will await summary judgment to determine whether [p]laintiffs' RESPA claims are untimely.")(citing <u>Cmty. Bank. II.</u>, 622 F.3d at 301–02); <u>Cunningham v. M & T Bank Corp.</u>, No. 12-cv-1238, 2013 WL 5876337, at *5-6 (M.D.Pa. Oct. 30, 2013)("This court is mindful of the Third Circuit's admonition that equitable tolling inquiries are generally fact-intensive…. For this reason, the court joins the <u>Barlee</u>, <u>Riddle</u>, and <u>Ba</u> opinions…and the court concludes that plaintiffs have stated a plausible case for equitable tolling of the RESPA statute of limitations."); <u>Menichino v. Citibank</u>, No. 2:12–cv–00058, 2014 WL 462622, at *4 (W.D.Pa. Feb. 5, 2014)(finding that statute of limitations defense more appropriate to be raised "on a more fully developed record at summary judgment").

2607(c)(2).  Insofar as Plaintiffs allege that NCMIC collected $236 million in insurance premiums and "paid" $14 million in claims PNC contends that NCMIC's receipt of premiums was in exchange "for services actually performed."  I disagree.

The Third Circuit foreclosed this line of reasoning in <u>Alston v. Countrywide Fin.</u> <u>Corp.</u>, 585 F.3d 753 (3d Cir. 2009), which involved a captive reinsurance arrangement similar to the one Plaintiffs allege here.  There, the court explained that section 8(c) "excepts charges for settlement services, otherwise violative of section 8(a) or section 8(b), that are *reasonably related to the value of goods or services provided*."  <u>Id.</u> at 757-58 (emphasis added); <u>see</u> <u>also</u> <u>id.</u> at 761 n.9 (noting that, under section 8(c), "*legitimate* business is exempted from the strictures of section 8") (emphasis added).  Accordingly, it was sufficient for the <u>Alston</u> plaintiffs to allege that the defendant bank's affiliate reinsurer "did not assume risk commensurate with the amount of premiums it received from plaintiffs' primary mortgage insurers."  <u>Id.</u> at 757. NCMIC's provision of *some* services does not necessarily render "bona fide" the payments it received for those services, particularly where "[t]he entire premise of plaintiffs' complaint is that the captive reinsurance arrangement is *not* a legitimate business arrangement."  <u>Id.</u> at 761 n.9.

PNC reliance on <u>Freeman v. Quicken Loans, Inc.</u>, 132 S. Ct. 2034 (2012), is also unavailing.  There, the Court held that "to establish a violation of § 2607(b), a plaintiff must demonstrate that a charge for settlement services was divided between two or more persons."  <u>Id.</u> at 2044.  The Court rejected the petitioners' argument that a single settlement-service provider could be liable under § 2607(b) by charging an unreasonably

high fee for the service provided and pocketing the excess, unearned portion. In doing so, the Court reiterated what the Third Circuit previously held in <u>Santiago v. GMAC Mortg. Group, Inc.</u>, 417 F.3d 384 (3d Cir. 2005), namely that RESPA does not "serve as a price control mechanism." <u>Id.</u> at 387 n.3.

From this, PNC claims that the reasonableness of the amounts paid to NCMIC is irrelevant under <u>Freeman</u>. Yet <u>Freeman</u>, in its own terms, "pertain[ed] to the scope of § 2607(b)." 132 S. Ct. at 2039. The case made no mention of section 8(c), which excepts only "*bona fide*...payment[s]...for services actually performed." <u>Minter v. Wells Fargo Bank, N.A.</u>, CIV.A. WMN-07-3442, 2013 WL 593963, at *8 (D. Md. Feb. 14, 2013) ("<u>Freeman</u> is simply silent as to Section 8(c) and no inference can be drawn from that silence."). Plaintiffs here specifically contend that premium payments to NCMIC were not "bona fide" insofar as its risk never exceeded the value of those payments. Beyond this, application of section 8(c) presents "a fundamental merits question," unresolvable at this early stage. <u>Alston</u>, 585 F.3d at 761 n.9.

At this stage, the exact arrangement made between the Defendants with regards to fees is unclear.[36] <u>See</u> <u>Cunningham v. M & T Bank Corp.</u>, No. 12-cv-1238, 2013 WL 5876337, at *7 (M.D.Pa. Oct. 30, 2013)("The determination of whether or not any real risk was assumed is a fact-based inquiry which, like the ultimate equitable tolling

---

[36] Like HUD investigators, I am not convinced that the payments of some reinsurance claims would necessarily negate the Plaintiffs allegation that the reinsurance scheme provided kickbacks or unearned fees. If these claim payouts were disproportionately low as compared to the amounts charged for the reinsurance coverage, the captive reinsurance scheme could still be one in which the Plaintiffs were paying much more for the services they actually might be entitled, if their mortgage defaulted under such an arrangement. <u>See</u> Jeff Horwitz, <u>Banks Took $6B in Reinsurance Kickbacks, Investigators Say</u>, AMERICAN BANKER (Doc. No. 148, Ex. 5)("[A]s HUD's inspector general reported to the DOJ in 2009… the fact that captive reinsurers paid claims does not mean the structures were unprofitable for the banks.").

determination, must await further litigation."). Viewing the facts in the light most

favorable to the Plaintiffs, the pleadings are sufficient to make out a claim under RESPA

§ 2607. Without further discovery, I cannot dismiss this claim and say the claim is legally

precluded based on the safe harbor provision.[37]

### c.    Unjust Enrichment (Count II)

#### 1.   Timeliness of Unjust Enrichment claim

PNC asserts that the Plaintiffs' unjust enrichment claim is also time barred. Under

Pennsylvania law, which governs the unjust enrichment claims brought by Nelson and

Lisa White, unjust enrichment has a four-year statute of limitations. See Cecil Twp. Mun.

Auth. v. N. Am. Specialty Sur. Co., 836 F. Supp. 2d 367, 380 (W.D. Pa. 2011). Under

California law, which applies to the unjust enrichment claims of Dan and Michelle

Johnston, Luz Garcia and Jill Crumpler, the statute of limitations for unjust enrichment is

three years. See McCarn, 2012 WL 5499433, at *9 (citing California authority). Under

Illinois law, which applies to the unjust enrichment claims of Charles and Colleen

Hightower, Kevin Zielinski and George Donald, Jr., the statute of limitations is five

years. See 35 Ill. Comp. Stat. 5/13-205 (2010); Frederickson v. Blumenthal, 648 N.E. 2d

1060, 1063 (Ill. Ct. App. 1995).

Like RESPA, the statute of limitations on unjust enrichment claims can also be

tolled.[38] For the reasons stated regarding the tolling of the Plaintiffs' RESPA claims, I

---

[37] See Freeman v. Quicken Loans, Inc., 132 S.Ct. 2034, 2038 (2012) (finding no RESPA violation under § 2607 after discovery had been taken and a summary judgment decision had been made).

[38] In addition to equitable tolling, the discovery rule is also applicable to Plaintiffs' unjust enrichment claims. See, e.g., Fine v. Checcio, 870 A.2d 850, 858 (Pa. 2005) (applicable to Plaintiffs Nelson and Lisa White); Belleville

will not determine at this time whether these claims are time-barred without further fact discovery.[39] In regards to the applicability of equitable tolling, the Plaintiffs' allegations are sufficient to overcome a motion to dismiss as to their unjust enrichment claim.

### 2. Plausibility of Unjust Enrichment Claim against PNC

PNC also moves to dismiss Plaintiffs' claim for unjust enrichment. To prevail on a claim of unjust enrichment, the Plaintiffs must allege facts showing that: 1) the Plaintiffs conferred a benefit on PNC; 2) that PNC accepted that benefit; and 3) PNC accepted and retained that benefit under circumstances that are inequitable and unjust. Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, 737 F. Supp. 2d 380, 424 (E.D. Pa. 2010).[40]

The Plaintiffs' pleadings make out a plausible unjust enrichment claim. The Plaintiffs paid premiums for private mortgage insurance to the Insuring Defendants. The Plaintiffs allege that the Insuring Defendants then paid a portion of those premiums to National City/PNC by way of NCMIC. They further allege that this portion of the premiums was gained by National City/PNC for reinsurance services that, in fact, did not

---

Toyota v. Toyota Motor Sales, U.S.A., 770 N.E. 2d 177, 192 (Ill. 2002)(applicable to Plaintiffs George Donald, Kevin Zielinski and Charles and Colleen Hightower); Jolly v. Eli Lilly & Co., 751 P.2d 923 (Cal. 1988) (applicable to Plaintiffs Dan and Michelle Johnston, Luz Garcia and Jill Crumpler). While this would be a separate inquiry, it adds further support for the argument that the statute of limitations would not bar these claims, since they allege they discovered their injuries only recently. See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385-87 (3d Cir. 1994)(explaining the difference between the discovery rule versus equitable tolling).

[39] See Barlee, 2013 WL 706091 at *6 (applying tolling reasons of RESPA claims to unjust enrichment claims under Pennsylvania law at motion to dismiss stage); McCarn, 2012 WL 5499433 at *9 (explaining that equitable tolling would apply to unjust enrichment claim under California law); Richards v. Burgett, Inc., No. 10 C 7580, 2011 WL 6156838, *5 (N.D.Ill. Dec. 12, 2011)(explaining how equitable tolling may be available under Illinois law for unjust enrichment claim).

[40] See also AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d 988, 991 (Pa. Super. Ct. 2001). "The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." Id. (citation omitted).

actually insure against the risk of default. PNC's portion of the premium was a benefit PNC received. The retention of this premium was unjust because the fee was obtained without any real service being rendered.[41]

PNC argues that this claim fails because the Plaintiffs have not alleged that a *direct* benefit was conferred. However, PNC does not offer support that a direct benefit is required for a claim of unjust enrichment for the state laws involved. The Plaintiffs have adequately pled an unjust enrichment claim, which will not be precluded based on this "direct benefit theory." See, e.g., Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, 737 F. Supp. 2d 380, 428–29 (E.D. Pa. 2010) (Stengel, J.)("As long as plaintiffs have adequately stated a claim under the applicable...consumer protection law, the absence of a direct relationship should not interfere with their remedial unjust enrichment claim."); Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392, 420 (E.D. Pa. 2006) ("The claim of unjust enrichment simply requires that plaintiff 'confer' benefits on a defendant; it does not require that plaintiff 'directly confer' those benefits.").

PNC also argues that the Plaintiffs unjust enrichment claim is legally precluded because the relationship between the Plaintiffs and PNC is governed by contract. PNC claims that Pennsylvania, California, and Illinois law—the three states in which the Plaintiffs reside—disallow an unjust enrichment claim when the parties have a written or

---

[41] See Cunningham, 2013 WL 5876337 at *8 (finding that similar allegations showed a plausible unjust enrichment claim).

express agreement.[42] While this point may be true, it appears unlikely that the illegal kickback arrangement alleged by the Plaintiffs is that to which they agreed in their agreements with the Defendants.[43] At this stage, I am unable to assess whether the terms of the agreement between the Plaintiffs and PNC cover the "same subject" as their unjust enrichment claim. Therefore, I will not dismiss the unjust enrichment claim on this legal basis. See Ba, 2013 WL 3238066 at *2 ("At this stage, I am unable to determine whether Plaintiffs' express contracts with Defendants are "on the same subject" as their claim for unjust enrichment."); Barlee I, 2013 WL 706091 at *6 ("[A]t this early stage of the litigation we are not able to determine whether this contract is on the same subject as their lawsuit."); Cunningham, 2013 WL 5876337 at *7 ("At this juncture, however, there are no facts from which the court could conclude that the unjust enrichment claim is "on the same subject" as the contract itself.").

## IV.   CONCLUSION

For the foregoing reasons, the motions to dismiss of PNC, Mortgage Guaranty, Genworth, Republic, and Radian are denied.

An appropriate order follows.

---

[42] See also Matter of Penn Center Transp. Co., 831 F.2d 1221, 1230 (3d Cir. 1987) (holding that plaintiff cannot maintain a claim of unjust enrichment when an express contract existed on the same subject).

[43] See Menichino, 2014 WL 462622 at *5 ("While Defendants argue that Plaintiffs cannot as a matter of law pursue an unjust enrichment claim because a contract-namely, the mortgage document and accompanying disclosures-is directly on point, the Plaintiffs contend that the kickback arrangement is not contemplated anywhere within the four corners of that agreement.").