# EXHIBIT A

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NELSON WHITE, JR., LISA WHITE, CHARLES HIGHTOWER, COLLEEN HIGHTOWER, DAN B. JOHNSTON, MICHELLE B. JOHNSTON, GEORGE G. DONALD, LUZ GARCIA, KEVIN ZIELINSKI, and JILL CRUMPLER, individually and on behalf of all others similarly situated, | Civil Action No.: 2:11-cv-07928-LS |
| Plaintiffs, | **THIRD AMENDED** <br> **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| THE PNC FINANCIAL SERVICES GROUP, INC. (as successor-in-interest to NATIONAL CITY CORPORATION, NATIONAL CITY BANK, N.A., NATIONAL CITY MORTGAGE A DIVISION OF NATIONAL CITY BANK, NATIONAL CITY MORTGAGE A DIVISION OF NATIONAL CITY BANK OF INDIANA, NATIONAL CITY MORTGAGE COMPANY, and NATIONAL CITY MORTGAGE INSURANCE COMPANY, INC.) and NATIONAL CITY CORPORATION, NATIONAL CITY BANK, N.A., NATIONAL CITY MORTGAGE A DIVISION OF NATIONAL CITY BANK, NATIONAL CITY MORTGAGE A DIVISION OF NATIONAL CITY BANK OF INDIANA, NATIONAL CITY MORTGAGE COMPANY, and NATIONAL CITY MORTGAGE INSURANCE COMPANY, INC. | |
| Defendants. | |

## <u>INTRODUCTION</u>

1.      Defendant The PNC Financial Services Group, Inc. ("PNC"), (as successor-in-interest to Defendants National City Corporation, National City Bank, N.A., National City Mortgage a division of National City Bank[1], National City Mortgage a Division of National City Bank of Indiana,   National City Mortgage Company ("National City Lenders"), and their affiliated reinsurer Defendant National City Mortgage Insurance Company, Inc. ("NCMIC")) (collectively, "National City" or "Defendants") have violated the strict prohibition against kickbacks, referral payments and unearned fee splits codified in the Real Estate Settlement Procedures Act of 1974 ("RESPA") and have engaged in a pattern of racketeering activity, using the mails and wires, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") by engaging in a deceptive captive reinsurance scheme, which defrauded Nelson White, Jr., Lisa White, Charles Hightower, Colleen Hightower, Dan B. Johnston, Michelle B. Johnston, George G. Donald, Jr., Luz Garcia, Jill Crumpler and Kevin Zielinski ("Plaintiffs") and the Classes (defined below) by compelling them to fund kickbacks and referral payments in the form of purported reinsurance premiums that were paid by Mortgage Guaranty Insurance Corporation ("MGIC"), Genworth Mortgage Insurance Corporation ("Genworth"), Republic

---

[1]      In its HUD-1 Statement Recitals, National City included a "LENDER NAME DISCLOSURE" which certifies that while National City Mortgage, a division of National City Bank is the identified lender, borrowers might see references which include "various abbreviations or versions of our legal name. Some of these variations are not an accurate depiction of our name and may be representative of other legal entities. However, these references and any other similar spelling can be assumed to refer to National City Mortgage, a division of National City Bank in the context of this mortgage loan transaction. These references can include the following but it is not an inclusive list: National City Mortgage, National City Mortgage Co., National City Mortgage Company, National City Mortgage, a division of NCBI, National City Mortgage, a division of NCB, National City Mortgage, Inc., National City Mortgage, a subsidiary of National City Bank, National City Mortgage, a subsidiary of National City Bank of Indiana, National City Mortgage, dba National City Bank, National City Bank, National City, NCM, NCMC, NCB, NCBI." *See* LENDER NAME DISCLOSURES for Plaintiffs Dan B. Johnston and Michelle B. Johnston, Luz Garcia, and Nelson White, Jr. and Lisa White, attached hereto as Exhibits 1-3.  As such, any reference herein to National City Mortgage is a reference to each of these entities as well.

Mortgage Insurance Company ("Republic"), Radian Guaranty Inc. ("Radian"), United Guaranty Residential Insurance Company ("UGI"), PMI Mortgage Insurance Company ("PMI Mortgage"), and Triad Guaranty Insurance Corporation ("Triad") (collectively, the "Private Mortgage Insurers") to NCMIC.

2.     This is a proposed nationwide class action brought by Plaintiffs on behalf of two classes of persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by the National City Lenders or any of its subsidiaries and/or affiliates and, in connection therewith, purchased private mortgage insurance and whose residential mortgage loans were included within Defendants' captive mortgage reinsurance arrangements.

3.     Captive reinsurance schemes, such as the scheme involving Defendants and the Private Mortgage Insurers described herein were designed and implemented by mortgage lenders and were intended to, and did in fact, mislead and deceive borrowers, allowing lenders to take a "[cut of] … what would ultimately amount to $6 billion of insurance premiums in exchange for assuming little or no risk."  *See* Jeff Horwitz, *Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction*, American Banker (Sept. 16, 2011, 7:45 PM), http://www.americanbanker.com/issues/176_181/mortgages-reinsurance-deals-kickbacks-HUD-1042277-1.html, attached as Exhibit 4 (hereinafter referred to as "Mortgage Kickback Scheme"); *see also* Jeff Horwitz, *Banks Took $6B in Reinsurance Kickbacks, Investigators Say*, American Banker (Sept. 6, 2011, 4:55 PM), http://www.americanbanker.com/issues/176_173/mortgage-reinsurance-respa-kickbacks-hud-investigation-doj-1041928-1.html, attached as Exhibit 5 (hereinafter referred to as "Reinsurance Kickbacks").

4.     As described below, this was accomplished through a secretive "pay-to-play

scheme"[2] that utilized carefully crafted excess-of-loss reinsurance contracts that identified "bands of losses" for which there was purported risk exposure or purported "quota-share" reinsurance with the intent that the reinsurer would not actually be exposed to any real reinsurance risk.  Further, even with regard to the purported band of exposure, certain lenders, including the National City Lenders and their mortgage lending subsidiaries and/or affiliates, insulated themselves from providing any real reinsurance by: (a) making their captive reinsurance arrangements "self-capitalizing," in that they were required to put only "nominal initial capital" into the trusts supporting the reinsurance contracts; and (b) providing no recourse for the failure to adequately fund the trusts.  *See* Mortgage Kickback Scheme.

5.     As *American Banker* described such arrangements:

> The banks were supposedly providing catastrophic reinsurance, but the policies appeared to render it impossible that they'd ever suffer significant losses.  In the event of catastrophic losses, a bank could simply walk away from its nominal initial investment and leave the insurer to bear the other costs . . . .

*See* Mortgage Kickback Scheme.

6.     In other words, these lenders—including the National City Lenders and their mortgage lending subsidiaries and/or affiliates—were "playing with the house's money" with no risk of meaningful losses.  As *American Banker* aptly explained:

> If defaults remained low, banks would pocket large premiums without paying any claims; if defaults were high, banks' losses would be capped at the amount of their small initial investments, plus the premiums paid by homeowners and passed along to them by their mortgage insurance partners.  In other words, it appeared to be a no-lose proposition for the banks.

*See* Mortgage Kickback Scheme.

7.     In this action, Plaintiffs challenge Defendants' fraudulent scheme, which resulted in borrowers, like Plaintiffs and the Classes funding illegal kickbacks.  Defendants effectuated

---

[2]        *Id.*

this scheme by forming an unlawful RICO enterprise, the members of which colluded in the creation of fraudulent captive reinsurance arrangements pursuant to which the Private Mortgage Insurers paid kickbacks, disguised as ceded reinsurance premiums to Defendants in exchange for a guaranteed portion of the National City Lenders' mortgage insurance business.

8.     Defendants conducted the affairs of the enterprise through the mails and wires thereby committing numerous predicate acts of mail fraud and/or wire fraud, including "honest services" fraud.  Both Defendants and each Private Mortgage Insurer participated in the scheme and was a party to the agreement/understanding that the illegal kickbacks would be given and accepted in exchange for the National City Lenders' mortgage insurance business and by agreeing to forego competition between each other.

9.     The National City Lenders were able to exploit their position as lender to execute this fraudulent scheme.

10.     Homeowners who buy a home with less than a 20% down payment are typically required to pay for private mortgage insurance ("PMI").  *See* http://usmi.org/mi-resources/.  PMI protects the lender in the event of a default by the borrower.  *Id.  See also* Exhibit 6 hereto at 1, Proposed EITF Issue titled "Risk Transfer in Mortgage Reinsurance Captive Arrangements," discussing the purpose of private mortgage insurance.

11.     National City selected the PMI provider for borrowers that it required to have private mortgage insurance, limiting its selection to the Private Mortgage Insurers, who agreed to participate in the fraudulent scheme.

12.     Pursuant to the agreement or understanding existing among Defendants and the Private Mortgage Insurers, and upon information and belief, the National City Lenders allocated their mortgage insurance business to the Private Mortgage Insurers on a modified rotating or

rotating basis and entered into captive reinsurance agreements with each of the Private Mortgage Insurers.   Borrowers typically had no opportunity to comparison-shop or select the provider of the PMI.  *See* Reinsurance Kickbacks ("Banks typically choose the insurance carrier . . .").

13.     Both during the settlement process of each borrower's mortgage loan and repeatedly thereafter, Defendants made false representations to borrowers regarding the captive reinsurance arrangement with the Private Mortgage Insurers.

14.     Borrowers paid their PMI premiums (either directly or indirectly, as further described below) to the Private Mortgage Insurers, and, in turn, each Private Mortgage Insurer paid a portion of the borrowers' PMI premiums to NCMIC, in the form of purported "reinsurance" premiums.

15.     Each of the Private Mortgage Insurers understood that the other Private Mortgage Insurers were also ceding premiums to NCMIC and they did so because agreeing to this apportionment of the National City Lenders' business benefitted them as a whole - assuring each a steady stream of business free from competition.   By accepting a guaranteed portion of the National City Lenders' mortgage insurance business, each of the Private Mortgage Insurers agreed to forego competition with the other Private Mortgage Insurers.

16.     National City assured itself a benefit from the steady flow of premiums ceded to its captive reinsurer, NCMIC, from the Private Mortgage Insurers. Both Defendants and the Private Mortgage Insurers knew that the premiums did not pay for legitimate reinsurance transfer of risk.

17.     Thus, as a result of the agreement/understanding among Defendants and the Private Mortgage Insurers, Plaintiffs and the Classes were forced to fund illegal kickbacks from the Private Mortgage Insurers to NCMIC. Defendants and the Private Mortgage Insurers all

benefitted, reaping extraordinary profits.  Plaintiffs and the Classes were injured in their business or property because they were forced to unwittingly fund illegal kickbacks.

18.     Illustrating the scope and brazenness of Defendants' conduct, from the beginning of 2004 through the end of 2013, according to Schedules F – Part 3 from the Annual Statements filed with the National Association of Insurance Commissioners ("NAIC") by each of the Private Mortgage Insurers for the years 2004 through 2013 (where available), NCMIC collected from the Private Mortgage Insurers **over $244 million** in ceded private mortgage insurance premiums (or "price paid" for reinsurance during the relevant time period) related to National City borrowers while paying **only approximately $23 million** toward purported reinsurance claims on the same pool of policies during this time period, far from commensurate with the risk it assumed.

19.     When broken down on an annual basis, the paid claims greatly increased from 2009 ($2.2 million) to 2010 ($8.8 million) and then decreased in 2011 ($2.4 million).  Given the unprecedented mortgage crisis and financial meltdown, which began in 2007/2008 and which dramatically increased the number of mortgage foreclosures and which therefore should have resulted in skyrocketing reinsurance claims, the reinsurance claims paid by NCMIC should have continued to increase in 2011, rather than decrease so precipitously.



20.     As set forth in detail below, Defendants' fraudulent, captive reinsurance kickback scheme and the false and misleading representations that Defendants made in order to carry out this scheme violated RICO, 18 U.S.C. § 1961, *et seq.*

21.     Defendants and their Private Mortgage Insurer associates used the mail and wires to further the objectives of the scheme.

22.     Defendants and the Private Mortgage Insurers misled Plaintiffs and Class members and made material misrepresentations in both mortgage documents and periodic account statements. They made intentional, false and misleading representations which hid the true nature of the captive reinsurance arrangement and the illegal kickbacks from Plaintiffs and Class members.

23.     As such, Defendants' actions constituted mail fraud and/or wire fraud, under RICO.   Defendants' scheme further constituted a pattern of racketeering activity, given their repeated fraudulent conduct with respect to Plaintiffs and Class members.

24.     As a result of Defendants' and the Private Mortgage Insurers misrepresentations, Plaintiffs and Class members were forced to fund illegal kickbacks thus injuring Plaintiffs and Class members in their business or property.  Defendants' fraudulent scheme also had the effect of reducing competition in the mortgage insurance market.

25.     Further, Section 2607(a) of RESPA prohibits any person from providing or accepting kickbacks or referral fees from any person providing a real estate settlement service, including private mortgage insurers.  Thus, a lender cannot legally accept a referral fee from the insurer issuing the private mortgage insurance policy on the borrower's home.   Similarly, Section 2607(a) prohibits private mortgage insurers from providing kickbacks or referral fees to

providers of real estate settlement services, including lenders and their affiliates. Accordingly, it is unlawful for private mortgage insurers to pay referral fees to lenders or their affiliates.

26.     Separately, Section 2607(b) of RESPA prohibits lenders from accepting any portion of a settlement service fee—including amounts paid by borrowers for private mortgage insurance—from any person providing a real estate settlement service, including private mortgage insurers, other than for services actually performed. Thus, a lender cannot legally accept an unearned fee split from the insurer issuing the private mortgage insurance policy on the borrower's home. Similarly, Section 2607(b) prohibits private mortgage insurers from providing any portion of a settlement service fee—including amounts paid by borrowers for private mortgage insurance—to providers of real estate settlement services, including lenders or their affiliates, other than for services actually performed. Accordingly, it is unlawful for private mortgage insurers to pay unearned fee splits to lenders or their affiliates.

27.     As alleged herein, in an effort to exploit the booming private mortgage insurance market for easy profits, Defendants violated RESPA's kickback and referral fee prohibitions through a scheme to provide sham reinsurance on PMI policies.

28.     While the Private Mortgage Insurers' payments to NCMIC are purportedly for "reinsurance" services, NCMIC accepted them while assuming very little or no actual "risk" on the underlying reinsurance contracts, in light of applicable rules, regulations and standards. These contracts, which were not furnished to Plaintiffs or Class members and were not publicly available, provide the Private Mortgage Insurers with no recourse if NCMIC abandons their purported reinsurance obligations at any time, or if NCMIC provides only nominal capital to the dedicated trusts that purportedly exist to fund private mortgage reinsurance claims (as discussed in detail below). As a result: (i) the purported reinsurance provided by NCMIC is illusory; (ii)

the purported reinsurance contracts between NCMIC and the Private Mortgage Insurers are shams; and (iii) the payments or premiums ceded to NCMIC thereunder constitute improper referral fees or kickbacks in violation of RESPA.

29.     Lastly, Defendants were unjustly enriched through their captive reinsurance arrangement, whereby they received the benefit of illegal kickbacks that were funded by borrowers, like Plaintiffs and the Classes, despite NCMIC having provided reinsurance services of little or no value.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.  This Court also has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

31.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in Plaintiffs' mortgage loan transactions is located in this district, and/or a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

**A.     Plaintiffs**

32.     Plaintiffs Nelson White, Jr. and Lisa White (the "Whites"), husband and wife, obtained a mortgage loan from Defendant National City Mortgage a division of National City Bank on or about December 29, 2006, for the purchase of their home located in Phoenixville, Pennsylvania.  *See* Exhibit 7 attached hereto (White Mortgage).  In connection with their loan, Plaintiffs Nelson White, Jr. and Lisa White were required to pay for PMI in the amount of $212.85 per month.  *See* Exhibit 8 attached hereto (White Initial Escrow Disclosure).  Their Private Mortgage Insurer was selected by their lender and was a provider with whom National

City had a captive reinsurance arrangement and, upon information and belief, their PMI was included in National City's captive reinsurance program based on, among other things, the date of closing and type of mortgage.

33.    Plaintiffs Charles Hightower and Colleen Hightower (the "Hightowers"), husband and wife, obtained a mortgage loan from Defendant National City Mortgage a division of National City Bank of Indiana on or about January 27, 2006, for the purchase of their home located in Crystal Lake, Illinois.  *See* Exhibit 9 attached hereto (Hightower Mortgage).  In connection with their loan, Plaintiffs Charles Hightower and Colleen Hightower were required to pay for PMI in the amount of $134.24 per month.  *See* Exhibit 10 attached hereto (Hightower Initial Escrow Disclosure).  Their Private Mortgage Insurer was selected by their lender and was a provider with whom National City had a captive reinsurance arrangement and, upon information and belief, their PMI was included in National City's captive reinsurance program based on, among other things, the date of closing and type of mortgage.

34.    Plaintiff George G. Donald, Jr. ("Donald") obtained a mortgage loan on or about January 11, 2006 from Defendant National City Mortgage a division of National City Bank of Indiana for the purchase of his home located in Lockport, Illinois. *See* Exhibit 11 attached hereto (Donald Mortgage).  In connection with his loan, Plaintiff Donald was required to pay for PMI in the amount of $96.54 per month.  *See* Exhibit 12 attached hereto (Donald, Initial Escrow Account Disclosure).  His private mortgage insurer, Republic, was selected by National City and was a provider with whom National City had a captive reinsurance arrangement and, upon information and belief, his PMI was included in National City's captive reinsurance program based on, among other things, the date of closing and type of mortgage.

10

35.     Plaintiffs Dan and Michelle Johnston (the "Johnstons") obtained a mortgage on or about December 24, 2008 from Defendant National City Mortgage a division of National City Bank for the purchase of their home located in Concord, California.  *See* Exhibit 13 attached hereto (Johnston Mortgage).  In connection with their loan, Dan and Michelle Johnston were required to pay for PMI in the amount of $101.80 per month.  *See* Exhibit 14 attached hereto (Johnston Initial Escrow Disclosure).  Their private mortgage insurer, Republic, was selected by National City and was a provider with whom National City had a captive reinsurance arrangement and was included in National City's captive reinsurance program.  *See* Exhibit 15 (Johnston Borrower Notice Regarding Reinsurance).

36.     Plaintiff Luz Garcia ("Garcia") obtained a mortgage on or about January 8, 2008 from Defendant National City Mortgage a division of National City Bank for the purchase of her home located in San Diego, California.  *See* Exhibit 16 attached hereto (Garcia Mortgage).  In connection with her loan, Plaintiff Garcia was required to pay for PMI in the amount of $333.60 per month.  *See* Exhibit 17 attached hereto (Garcia Annual Escrow Account Disclosure Statement for July 2010-July 2011).  Her private mortgage insurer, Republic, was selected by National City and was a provider with whom National City had a captive reinsurance arrangement and was included in National City's captive reinsurance program.

37.     Plaintiff Kevin Zielinski ("Zielinski") obtained a mortgage loan on or about January 20, 2006 from Defendant National City Mortgage a division of National City Bank of Indiana for the purchase of their home located in Lockport, Illinois.  *See* Exhibit 18 attached hereto (Zielinski Mortgage).  In connection with this loan, Plaintiff Zielinski was required to pay for PMI in the amount of $193.60 per month.  *See* Exhibit 19 attached hereto (Zielinski Initial Escrow Account Disclosure).  Their private mortgage insurer, MGIC, was selected by National

City and, upon information and belief, was included in National City's captive reinsurance program based on, among other things, the date of closing and type mortgage.

38.    Plaintiff Jill Crumpler ("Crumpler") obtained a mortgage loan on or about May 26, 2006 from Defendant National City Mortgage a Division of National City Bank of Indiana for the purchase of her home located in Sacramento, California.  *See* Exhibit 20 attached hereto (Crumpler Mortgage).  In connection with this loan, Plaintiff Crumpler was required to pay PMI in the amount of $117.94 per month.  *See* Exhibit 21 attached hereto   (Crumpler Initial Escrow Account Disclosure Statement).  Her private mortgage insurer, Genworth, was a provider with whom National City had a captive reinsurance and, upon information and belief, her PMI was included in National City's captive reinsurance program based on, among other things, the date of the mortgage and type of transaction.

**B.    Defendants**

39.    Defendant The PNC Financial Services Group, Inc. ("PNC"),[3] a Pennsylvania corporation with headquarters in Pittsburgh, Pennsylvania, is one of the nation's largest diversified financial services organizations in the United States with approximately $320.3 billion in assets as of December 31, 2013.  *See* Exhibit 22 hereto at 1 (excerpt from PNC's  Form 10-K for the year ending December 31, 2013).  On December 31, 2008, PNC acquired Defendant National City Corporation for approximately $6.1 billion and PNC continued as the surviving entity.  *See* Exhibit 23 hereto at 2, 13 (excerpts from PNC's 2008 Form 10-K for the year ending December 31, 2008, dated March 2, 2009).  Upon completing the acquisition, PNC became

---

[3] PNC is named as a defendant and referenced here and throughout the complaint solely in its capacity as the successor-in-interest to Defendants National City Corporation, National City Bank, N.A., National City Mortgage a division of National City Bank, National City Mortgage a Division of National City Bank of Indiana, National City Mortgage Company, and National City Mortgage Insurance Company, Inc.

"responsible for future litigation arising out of the conduct of the business of National City and its subsidiaries before the acquisition." *Id.* at 141.

40.     Defendant National City Corporation was a Delaware corporation headquartered in Cleveland, Ohio.  National City Corporation was a financial holding company which operated a banking network and conducted business throughout the United States.  *See* Exhibit 24 at 2 (excerpts from National City Corporation's 2007 Annual Report, dated February 13, 2008). National City Corporation's primary business activities included commercial and retail banking, mortgage and asset management.  *Id.* at "About Us."

41.     Defendant National City Bank, N.A., formerly a national banking association that conducted business throughout the United States, was the principal subsidiary bank of Defendant National City Corporation through which "substantially all [of its] operations" were conducted. *See* Exhibit 24 hereto at 7.  National City Bank, N.A. branches were located within National City Corporation's "nine-state footprint" which included Ohio, Florida, Illinois, Indiana, Kentucky, Michigan, Missouri, Pennsylvania and Wisconsin.   National City Bank, N.A. also served customers in selected markets nationally.  *Id.* at "About Us" and 29.

42.     Defendant National City Mortgage a division of National City Bank originated mortgage loans directly to consumers and conducted business throughout the United States. Both National City Mortgage and National City Bank were subsidiaries of National City Corp. *See* Exhibit 25 at Ex. 21.1 (excerpts from National City Corp.'s Form 10-K for the year ending December 31, 2007, dated February 13, 2008).

43.     Defendant National City Mortgage, a division of National City Bank of Indiana originated mortgage loans directly to consumers and conducted business throughout the United States.   Both National City Mortgage and National City Bank, Indiana were subsidiaries of

National City Corp.  *See id.  See also* Comptroller of the Currency, Adm'r of National Banks, Community Reinvestment Act, Performance Evaluation, National City Bank (June 30, 2005), at Appendix A-1 (listing National City Mortgage Corporation as a subsidiary of National City Bank of Indiana; listing its business products as "home purchase, home improvement, and home refinanced loans"), attached hereto as Exhibit 26.

44.     Defendant National City Mortgage Company, an Ohio corporation, was a subsidiary of Defendants National City Corporation and National City Bank, N.A. and serviced loans originated by Defendant National City Mortgage a division of National City Bank.  *See* Exhibit 25 at Ex. 21.1 hereto, (listing National City Mortgage Company, an Ohio corporation, as a subsidiary of National City Corporation); Exhibit 27 hereto (RESPA Servicing Disclosure provided to Plaintiff Nelson White, Jr. by National City Mortgage a division of National City Bank, noting that "[i]n most instances, servicing will be transferred to National City Mortgage Co., a subsidiary of National City Bank.").[4]

45.     Defendant National City Mortgage Insurance Co., Inc. was a reinsurance company incorporated in the State of Hawaii and a subsidiary of National City Corporation. Exhibit 25 hereto (listing NCMIC, a Hawaii corporation, as a subsidiary of National City Corporation).[5]

---

[4]     Plaintiffs name National City Mortgage, a division of National City Bank, National City Mortgage a division of National City Bank of Indiana and National City Mortgage Company as defendants in this action because, based upon information provided to them with their closing documents, Plaintiffs have reason to believe that the entities are different.  *See* Exhibits 1-3 hereto (Lender Name Disclosures).  In addition, the "RESPA SERVICING DISCLOSURE" form provided to Plaintiffs identifies their lender as National City Mortgage a division of National City Bank, but notes that "[i]n most instances, servicing will be transferred to National City Mortgage Co., a subsidiary of National City Bank."  *See, e.g.,* Exhibits 27-33 (RESPA Serving Disclosures provided to Plaintiffs White, Hightower, Donald, Johnston, Garcia, Zielinski, and Crumpler, respectively).

[5]     Upon information and belief, National City Mortgage Insurance Co., Inc. merged with and into National City Mortgage Insurance Solutions, Inc. ("NCMIS"), effective November 7, 2009. *See* Exhibit

C.      **The Private Mortgage Insurers**

46.      Radian is a Pennsylvania corporation headquartered in Philadelphia, PA, and, during the relevant time period, conducted business throughout the United States. According to the Annual Statements filed by Radian with the NAIC, Radian ceded premiums to NCMIC, each and every year from and including 2004 up to and through at least 2013.

47.      MGIC is a Wisconsin corporation headquartered in Milwaukee, WI, and, during the relevant time period, conducted business throughout the United States. According to the Annual Statements filed by MGIC with the NAIC, MGIC ceded premiums to NCMIC, each and every year from and including 2004 up to and through 2011.

48.      Genworth is a North Carolina corporation headquartered in Raleigh, NC, and, during the relevant time period, conducted business throughout the United States.  According to the Annual Statements filed by Genworth with the NAIC, Genworth ceded premiums to NCMIC each and every year from and including 2004 up to and through at least 2013.

49.      PMI Mortgage is an Arizona corporation headquartered in Walnut Creek, CA, and, during the relevant time period, conducted business throughout the United States. According to the Annual Statements filed by PMI Mortgage with the NAIC, PMI Mortgage ceded premiums to NCMIC each and every year from and including 2004 up to and through at least 2013.

50.      Republic is a North Carolina corporation headquartered in Winston-Salem, NC, and, during the relevant time period, conducted business throughout the United States.

---

34 (State of Hawaii Business information for National City Mortgage Insurance Company, Inc.; Exhibit 35 (State of Hawaii Business information for National City Mortgage Insurance Solutions, Inc. and filings list; Exhibit 36 (State of Hawaii Business filings listing notice of redomestication; Exhibit 37 (Vermont Corporate Information). The following day, NCMIS was renamed PNC Re, Inc. and changed its domicile from Hawaii to Vermont.

According to the Annual Statements filed by Republic with the NAIC, Republic ceded premiums to NCMIC each and every year from and including 2008 up to and through at least 2013.

51.     Triad is an Illinois corporation headquartered in Winston-Salem, NC, and, during the relevant time period, conducted business throughout the United States.  According to the Annual Statements filed by Triad with the NAIC, Triad ceded premiums to NCMIC each and every year from and including 2008 up to and through 2011.

52.     UGI is a North Carolina corporation headquartered in Greensboro, NC, and, during the relevant time period, conducted business throughout the United States.  According to the Annual Statements filed by UGI with the NAIC, UGI ceded premiums to NCMIC from and including 2004 up to and through 2011.

## FACTUAL ALLEGATIONS

### National City's Mortgage Operations

53.     National City Corporation was one of the nation's largest financial holding companies and one of the largest banking institutions in the United States, with approximately $150 billion in assets as of December 31, 2007.  *See* Exhibit 24 at 2.

54.     National City Corporation's principal bank subsidiary was National City Bank, N.A., a national bank with retail branches located throughout nine states in the United States. *See* Exhibit 24 at 2, 7.

55.     According to its last Annual Report filed prior to its acquisition by PNC in 2008, National City Corporation's "Mortgage Banking" line of business originated residential mortgages, home equity lines and loans both within National City's nine-state "banking footprint" and on a nationwide basis. Mortgage loans generally represented loans collateralized by one-to-four-family residential real estate and were made to borrowers in good credit standing. The loans were typically sold to primary mortgage market aggregators (Fannie Mae, Freddie

Mac, Ginnie Mae, or the Federal Home Loan Banks) and other third-party investors.  Mortgage Banking's business activities also included servicing mortgage loans, home equity loans, and home equity lines of credit for third-party investors.  Significant revenue streams included net interest income earned on portfolio loans and loans held for sale, as well as loan sale and servicing revenue.  *See* Exhibit 24 at 2.

**Private Mortgage Insurance Industry**

56.     Each of the Private Mortgage Insurers provides or provided PMI for the protection of residential mortgage lenders such as the National City Lenders and their mortgage lending subsidiaries and/or affiliates and entered into a captive reinsurance agreement with NCMIC.

57.     In order to lessen the risk of default, lenders typically prefer to finance no more than eighty percent (80%) of the value of a home, with the remaining twenty percent (20%) being paid as a down payment by the borrower.  In the event of a default, the lender is then more likely to completely recover its investment.

58.     Many potential homebuyers cannot afford to pay 20% of the purchase price as a down payment on a home.  Private mortgage insurance allows the lender to make loans in excess of 80% of the home's value by providing a guarantee from a dependable third party—the provider of private mortgage insurance—to protect the lender in the event of a default by the borrower.  *See* http://usmi.org/mi-resources/.  *See also* Exhibit 6 at 1-2, discussing the purpose of mortgage insurance.

59.     Providers of private mortgage insurance are typically unaffiliated third-party companies who agree to cover the first twenty percent (20%) to thirty percent (30%) of the amount of the potential claim for private mortgage insurance coverage, including unpaid principal, interest and certain expenses.  *See* Exhibit 6 at 1-2.

17

60.     The amount of private mortgage insurance coverage required varies according to the perceived risk of default.  The lower the percentage of the borrower's down payment, the greater the amount of mortgage insurance required.  For example, more private mortgage insurance is required with a five percent (5%) down payment than with a fifteen percent (15%) down payment.

61.     While the lender is the beneficiary of the private mortgage insurance, the borrower pays for the insurance, either: (a) directly through the addition of monthly premiums to the borrower's monthly mortgage payment, or (b) indirectly through a higher interest rate on the loan (the lender pays the initial private mortgage insurance premium as a lump sum and then passes this cost on the borrower in the form of a higher interest rate for the life of the loan).

62.     Borrowers generally have no opportunity to comparison-shop for private mortgage insurance, as the private mortgage insurance is arranged by the lender.  The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the lender and the provider of private mortgage insurance, rather than negotiated between the borrower and the provider of private mortgage insurance.  *See, e.g.*, Reinsurance Kickbacks ("Banks typically choose the insurance carrier . . . .").

**Mortgage Reinsurance**

63.     Beginning in the mid to late 1990s, mortgage companies began looking for ways to capitalize on the booming profitability of the private mortgage insurance market.  *See* Exhibit 38 hereto (Timothy J. Cremin, *Using a Bank Captive Subsidiary to Reinsure Mortgage Insurance*, (Mar. 23, 1998), www.captiveguru.com/mfcms/files/article3_mortgage.pdf).

64.     In order to "share in these profits," lenders typically created reinsurance subsidiaries.   These reinsurers entered into contracts with providers of private mortgage

insurance, whereby the reinsurer typically agrees to assume a portion of the private mortgage insurer's risk with respect to a given pool of loans.  *Id.*  In return, the mortgage insurer pays to the reinsurer a portion of the premiums it receives from borrowers with respect to the loans involved.

65.     Mortgage reinsurance arrangements can generally take one of two forms: (a) "quota share," or (b) "excess-of-loss."

66.     In a typical quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the private mortgage insurer's insured losses.  Thus, if the private mortgage insurer experiences losses, the reinsurer is expected to experience losses in the percentage agreed upon in the reinsurance contract.

67.     In an excess-of-loss arrangement, the reinsurer is liable only for a specified corridor or "band" of loss, with the losses below and above the band being covered by the private mortgage insurer.  In other words, the reinsurer is liable only for claims, or a percentage thereof, above a particular point, commonly known as an attachment or entry point, and subject to a ceiling, commonly known as a detachment or exit point.  Under this structure, then, the reinsurer's liability begins, if ever, only when the private mortgage insurer's incurred losses reach the attachment point and ends when such losses reach the detachment point.

68.     A reinsurance arrangement, quota share or excess-of-loss, between a reinsurer and a private mortgage insurer, that does not expose the reinsurer to any real possibility that it may be required to contribute its own money when called upon by the primary private mortgage insurer to pay for its share of losses, is a sham.

69.     Quota share arrangements do not constitute real or commensurately priced reinsurance if provisions in the reinsurance contract limit the reinsurer's liability to pay claims to

the assets held in the trust accounts established for each mortgage insurer into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums that it collects from borrowers, and the Private Mortgage Insurers have no recourse against the reinsurer.

70.     An excess-of-loss arrangement does not necessarily result in any actual "losses" being shifted to the reinsurer, even if the reinsurer begins paying claims.  Paid claims, as discussed herein, do not establish that the reinsurance agreements provide for true, and commensurately priced, risk transfer.  Risk/liability/recourse limiting features such as those described herein make any claim of "loss" illusory and purposefully inaccurate.

71.     Under accepted accounting principles, and actuarial principles, for a contract to be treated as "real" risk-transferring reinsurance, the reinsurer must assume significant insurance risk and it must be "reasonably possible that the reinsurer may realize a significant loss."  *See* CAS Research Working Party on Risk Transfer Testing, Risk Transfer Testing of Reinsurance Contracts: Analysis and Recommendations, Casualty Actuarial Society *Forum*, Winter 2006, at 282-283, attached hereto as Exhibit 39; *see generally* Statement of Financial Accounting Standards No. 113, "Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts," (December 1992) at 7, attached hereto as Exhibit 40.

72.     The likelihood of the reinsurer experiencing any real losses (meaning losses from the reinsurer's coffers as opposed to merely paying "claims" from reinsurance premiums/illegal referral payments) under the arrangement depends not only on the amount of losses paid by the private mortgage insurer (*i.e.*, whether the amount of claims paid by the insurer ever reaches the band where the reinsurer's responsibility to pay claims attaches) but also on whether the reinsurance agreement between the reinsurer and the private mortgage insurer exposes the

reinsurer to any real possibility that it may be **required** to contribute its **own** money when called upon by the primary private mortgage insurer to pay for its share of losses.

73.     The absence of any likelihood that the reinsurer will experience real losses, in turn, reveals a lack of "real" risk transfer, and, thus, that the reinsurance agreement between the reinsurer and primary private mortgage insurer is a sham.

**Captive Mortgage Reinsurance Arrangements**

74.     Lenders produce customers for private mortgage insurers.  In the early years of the private mortgage insurance industry, there were no financial ties between lenders and the private mortgage insurers.  *See* Reinsurance Kickbacks.

75.     However, mortgage lenders such as the National City Lenders and their mortgage lending subsidiaries and/or affiliates, seeking to capitalize on the hundreds of millions of dollars their borrowers pay to private mortgage insurers in premiums each year, entered into a scheme with the Private Mortgage Insurers to establish its own affiliated or "captive" reinsurer and, "[i]n exchange for steering home buyers to the [Private Mortgage] [I]nsurers, [] demand[ed] unjustifiably lucrative [captive] reinsurance deals" with such Private Mortgage Insurers (whose business was dependent upon referrals from the lenders and who initially used reinsurance deals as marketing tools).  *See* Mortgage Kickback Scheme; *see also* Michael C. Schmitz, *Investigating Captive Mortgage Reinsurance,* Mortgage Banking, February 1, 1998, attached hereto as Exhibit 41.

76.     These arrangements require the private mortgage insurer to cede a percentage of the borrowers' premiums to the lender's captive reinsurer for the "reinsurance" purportedly provided.  *See* Comptroller of the Currency, Adm'r of National Banks, Activities Permissible for

a National Bank, Cumulative, 2011 Annual Edition (April 2012), at 50, attached hereto as Exhibit 42.

77.    Thus, as opposed to receiving direct payments for referring its customers to a certain private mortgage insurer, lenders have utilized carefully crafted reinsurance contracts, as described herein, to funnel unlawful kickbacks from private mortgage insurers to the lenders' captive reinsurance subsidiaries.

78.    Lender captive reinsurers provide reinsurance primarily or exclusively for loans the lender originates, funds and/or originates through correspondent lending and which include private mortgage insurance.  *See* Exhibit 43, at 63 attached hereto (excerpt from "Investment in Subsidiaries and Equities, Comptroller's Licensing Manual"), Washington, D.C., July 2008 ("National banks may reinsure mortgage insurance on loans originated, purchased, or serviced by the bank, its subsidiaries, or its affiliates.").  Under captive reinsurance arrangements, the lender refers its borrowers to a private mortgage insurer who agrees to reinsure with the lender's captive reinsurer.  These arrangements require the private mortgage insurer to agree to cede a percentage of the borrowers' premiums to the lender's captive reinsurer for the "reinsurance" purportedly provided.

79.    Notably, after investigating mortgage lenders' captive reinsurance arrangements with private mortgage insurers, the Office of the Inspector General of HUD concluded that "banks and insurance companies had created elaborate financial structures that had the appearance of reinsurance but failed to transfer significant amounts of risk to their bank underwriters."  *See* Reinsurance Kickbacks.

80.    This is because some lenders, including the National City Lenders and its mortgage lending subsidiaries and/or affiliates, collaborated with private mortgage insurers to

create lucrative excess-of-loss and/or quota share reinsurance deals and purposefully designed their reinsurance contracts in such a manner as to receive hundreds of millions of dollars in purported reinsurance premiums, while assuming little or no actual risk.  As American *Banker* reported, "[w]hile designed to look like reinsurance, the deals weren't built to perform like it. The problem was how they split up the risks and rewards of insuring homeowners' mortgages." *See* Reinsurance Kickbacks.

81.    Typically, pursuant to the terms of the reinsurance contracts, the premiums ceded by the private mortgage insurers are deposited directly into trust accounts supporting the reinsurance contracts—that is, accounts which hold the funds that are to be used under the reinsurance contracts to pay claims.  *See, e.g.*, Exhibit 6, at 4, discussing the use of a trust fund.

82.    Premiums are ceded into the supporting trusts on a "book year" basis, as described by an American Institute of CPAs ("AICPA") Task Force addressing issues regarding risk transfer in mortgage reinsurance captive arrangements.

> A contract functions at the book year level and is typically for a 10 year term. For example, 1999 is a book year and all mortgage insurance policies written during 1999 would be considered "book year 1" and reinsurance premium and reinsurance losses related to that book year would be ceded to the captive reinsurer for 10 years . . . . Trust funds for all book years for the particular MI cross-collateralize the entire reinsured obligation to the MI.

*See* Exhibit 6 at 3.

83.    Thus, all claims under a reinsurance contract with a particular private mortgage insurer can be satisfied from all the funds in the trust created to support that reinsurance contract, rather than only from premiums ceded for a given book year.  *See* Exhibit 6 at 3.  Moreover, upon information and belief, when certain trust reserve requirements are met, the funds in the trust typically can also be released as dividends to the captive reinsurer.  Thus, the ceded premiums which are deposited into the trusts remain there until they are paid out to cover claims,

paid out to cover administrative expenses incurred by the captive reinsurer, or released as a dividend to the captive reinsurer.

84.     Normally, by design, lenders' captive reinsurance contracts with private mortgage insurers, such as NCMIC's contracts with the Private Mortgage Insurers, limit the lenders' liability/payment responsibilities under the contracts through provisions that permit the captive reinsurer to effectively opt out of the contracts at will by simply failing to adequately capitalize the trust supporting the reinsurance contract.  *See* Reinsurance Kickbacks.

85.     While the captive reinsurer is facially required to maintain the trust fund's net assets at a level required by state law (typically, upon information and belief, 10% of the current cumulative loss exposure for all book years or 100% of loss reserves, including a contingency reserve) through, *inter alia*, capital infusions, this requirement is a chimera as the private mortgage insurers have no monetary recourse against the captive reinsurer or the lender to ensure that the trusts are sufficiently funded on an ongoing basis in order to cover actual or expected losses under the reinsurance contract.  *See* Reinsurance Kickbacks.

86.     Thus, the captive reinsurer's potential exposure for payment of reinsurance claims is commonly limited to the amount held in the trust account established for the mortgage insurer—no matter what state law or regulation, or even other portions of the reinsurance contracts, require.   This is accomplished either through concurrent contractual provisions expressly providing that the captive reinsurer and its affiliates have no exposure for the failure to adequately fund the trusts or through an unwritten understanding of the parties.  *See, e.g*., Exhibit 44, at 10 (excerpts from MGIC Investment Corporation's 2007 Form 10-K at 10, noting that "[t]he captive's ultimate liability is limited to assets in the trust account."); Exhibit 45,  at 23 (excerpts from Genworth Financial Inc.'s 2011 Form 10-K, noting that "[o]nce the captive

24

reinsurance or trust assets are exhausted, we are responsible for any additional losses incurred."); Exhibit 46, at 31 (excerpts from Genworth Financial Inc.'s 2006 Form 10-K, noting "[h]owever, we cannot ensure that each captive with which we do business can or will meet all its obligations to us.").

87.     As *American Banker* succinctly described such arrangements:

> And the deals were "self-capitalizing," meaning that a bank could fund its stake with incoming premiums.  If the deal went bad, the bank could walk away and leave the insurer to cover its losses.  Conceptually, such arrangements are analogous to letting a gambler with $10 in casino chips place a $100 bet at a blackjack table on the assumption that he'll win.

*See* Reinsurance Kickbacks.

88.     In other words, should the captive reinsurer choose not to maintain the required funds in the trust (as, upon information and belief, NCMIC decided here), once the trust is depleted, the captive reinsurer bears no further risk and the mortgage insurer assumes any remaining obligations—no matter if the funds available in the trusts were not enough to cover the amount of risk or "losses" the captive reinsurer contracted and paid to cover.  The absence of such recourse distinguishes the challenged captive reinsurance contracts from true mortgage reinsurance contracts.

89.     Generally, lenders' captive reinsurance arrangements provide yet another layer of protection from true reinsurance losses, in that:

> Each of a bank's reinsurance vehicles was legally separate not only from the bank's main reinsurance subsidiary but also from all the other funds.  If a reinsurance deal didn't have enough money to pay its obligations, the bank could abandon it and leave the mortgage insurer with the unpaid bill.
>
> To carry on the casino analogy above, it would be as if the gambler with $10 in chips were allowed to make that same $100 bet at ten different blackjack tables, collecting on the winning bets and renouncing the losers.

*See* Reinsurance Kickbacks.

90.     Lenders in the late 1990s and 2000s aggressively pursued such arrangements with private mortgage insurers.

91.     Captive mortgage reinsurance arrangements, such as Defendants' arrangements with the Private Mortgage Insurers resulted in a practice of illegal kickbacks.  Private mortgage insurers are dependent on the lender to obtain business, while the lender is collaborating with the insurer to obtain a share of the premium revenue generated by referral of its borrowers to the private mortgage insurers.  The private mortgage insurer stimulates/guarantees its business by providing a lucrative stream of revenue for the lender via the lender's captive reinsurer.  The Private Mortgage Insurers also tacitly and complicity agreed to cease competing with each other for the lender's business.

92.     The Private Mortgage Insurers understood that in order to receive referrals of primary mortgage insurance business, and thus a steady stream of business from mortgage lenders—like the National City Lenders and their mortgage lending subsidiaries and/or affiliates—that they would have to agree to higher premium cessions and/or kickbacks through reinsurance premiums ceded.  Thus, one of the Private Mortgage Insurers, Genworth, noted in its 2004 Form 10-K filing:

> Starting in late 2003, we generally sought to exit or restructure a portion of our excess-of-loss risk sharing arrangements with premium cessions in excess of 25% to improve profitability.  This resulted in a significant reduction in business from several of these lenders and a reduction in the percentage of primary new risk written that is subject to captive reinsurance arrangements.  ***We then re-evaluated these relationships*** on a case-by-case basis, assessing various factors, including ceding terms, attachment points and quality of portfolios.  As a result, we reinstated or restructured some of these arrangements.

*See* Exhibit 47, at 34-35 (excerpts from Genworth Financial Inc.'s 2004 Form 10-K) (emphasis added).

93.    The Private Mortgage Insurers knew that they had to participate and perpetuate the scheme in order to get more business from lenders, like the National City Lenders, and, as evidenced herein, they did.  *See, e.g.*, Exhibit 48, at 139 (excerpts from Genworth Financial Inc.'s 2005 Form 10-K, indicating "a decreased demand for mortgage insurance . . . as a reduction in business from some mortgage lenders following our actions to restructure our captive reinsurance arrangements with premium risk cessions in excess of 25%.).  *See also* Exhibit 49, at 66 (excerpts from Radian Group Inc.'s 2005 Form 10-K, noting with respect to its ability to participate in and profit from the mortgage insurance business, its competitors include "mortgage lenders that demand increasing participation in revenue-sharing arrangements such as captive reinsurance arrangements.").

94.    Milliman, Inc. ("Milliman"), or another similarly placed actuarial firm, upon information and belief, which provided actuarial services to each of the top lenders and their captive reinsurers with regards to these captive arrangements, provided a diagram as part of a handout during a 2008 seminar for actuaries, the relevant portions of which are summarized below.  The following chart represents the basic and identical nature of the captive arrangements between and among the lenders, their reinsurance subsidiaries, and the private mortgage insurers:



*See* Private Mortgage Insurance: Beyond Carriers and Actuarial Opinions at 13, Prepared for 2008 Casualty Loss Reserve Seminar ("CLRS") by Milliman, available at: http://www.casact.org/ education/clrs/2008/handouts/mrotek.pdf. *See also* http://www.casact.org/ education/clrs/2008/ index.cfm?fa=consess (regarding the 2008 CLRS).

95.   In fact, Milliman, or another similarly placed actuarial firm, actively promoted the establishment of lender captive mortgage reinsurance entities as a money-making enterprise for mortgage lenders. *See generally* Exhibit 38.

96.   As Milliman acknowledged, if everything went as planned, the scheme would operate as a perfect kickback: "[i]f actual losses develop to the expected level, the above arrangement, from the lender's perspective, is financially equivalent to receiving a commission or profit sharing equal to a percentage of premium." Exhibit 38.

97.   Upon information and belief, under the terms of the virtually identical reinsurance contracts entered into between private mortgage insurance providers and each of the top lender captive reinsurers in the country, including National City, the lenders were protected from any

liability beyond their initial capital infusion and bore no real risk.  Most significantly, each of these reinsurance contracts contained "termination clauses" and "trust caps" which, without a counter-balancing "recourse" provision *vis à vis* the parent lender to ensure that the private mortgage insurance reinsured through termination would indeed continue to be reinsured— effectively allowed the reinsurer to opt out of the scheme at its choosing and without suffering adverse consequences.

98.     When asked to opine on contracts like those cited above with non-recourse and liability-limiting provisions in *Moore v. GMAC Mortgage, LLC*, No. 07-cv-04296 (E.D. Pa.), an action that also concerned the reinsurance of private mortgage insurance, Andrew Barile, a noted reinsurance industry expert, stated that he had never, "in all [his] years of experience," seen reinsurance agreements with similar non-recourse/trust cap terms to those in the reinsurance agreements between the lender captive reinsurer and the Private Mortgage Insurers.  *See* Defendants' Reply In Support of Motion to Compel Plaintiffs' Experts to Produce Documents at 7, *Moore v. GMAC Mortgage, LLC*, No. 07-cv-04296, ECF No. 144 (E.D. Pa. Oct. 12, 2010).

99.     The lenders, their captive reinsurers, and the private mortgage insurers continued these agreements/understandings through 2008 in the midst of the unprecedented mortgage crisis.   The "brakes" were only applied to this ongoing scheme after Freddie Mac's announcement that effective June 1, 2008, it would limit the percentage of premiums a PMI provider could cede to a captive reinsurer by 25%.  *See* Exhibit 50 attached hereto (Freddie Mac Private Mortgage Insurer Eligibility Requirements, dated January 2008).   *See also* http://www.freddiemac.com/news/archives/corporate/2008/20080214_capture.html.        This limitation clearly contributed to the decline in profits for lenders and their captives, who, upon

information and belief, were receiving a much higher percentage of ceded premiums until that point in time.

100.    As a result of the participation of the lenders, their captives, the private mortgage insurance providers and third-parties such as Milliman, or another similarly placed actuarial firm, in this singular scheme, mortgage insurance premiums increased as the entire market was severely impacted.   Consumers thus paid mortgage insurance premiums that included the kickbacks to lenders.

**HUD Notes the Potential for RESPA Violations Under Captive Reinsurance Arrangements**

101.    In 1997, HUD was the federal entity primarily responsible for interpreting and enforcing RESPA.  Concerned that lenders' captive reinsurance arrangements with private mortgage insurers would be designed to disguise a funneling of referral fees back to the lender that had arranged for the private mortgage insurer to obtain business, HUD issued a letter dated August 6, 1997 ("HUD letter") addressing the potential problem posed by lenders' captive reinsurers and RESPA's anti-kickback and improper fees provisions.  *See* Exhibit 51, HUD Letter.

102.    The HUD letter concluded that captive reinsurance arrangements were permissible under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance services 'actually furnished or for services performed,' and (2) are bona fide compensation that does not exceed the value of such services."  *Id.* at 3.

103.    The HUD letter evaluates potential violations of RESPA Section 8(a) & (b) based upon whether the arrangement between the lender's captive reinsurer and the private mortgage insurer represents "a real transfer of risk."  In determining whether there is a real transfer of risk, HUD warned that "[t]he reinsurance transaction cannot be a sham under which premium

payments . . . are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims." *Id.* at 6.

104.    The HUD letter also states that "[t]his requirement for a real transfer of risk would clearly be satisfied by a quota share arrangement" provided that "the reinsurer is bound to participate pro rata in every claim." *Id.*[6]

105.    The HUD letter states that excess-of-loss private mortgage reinsurance contracts can escape characterization as an unlawful referral fee or fee-split *only if*:

> [T]he band of the reinsurer's potential exposure is such that a reasonable business justification would motivate a decision to reinsure that band. Unless there is a real transfer of risk, no real reinsurance services are actually being provided. In either case, the premiums paid . . . must be commensurate with the risk.

*Id.* at 3.  In other words, even if there is some transfer of risk, the reinsurance arrangement will still violate RESPA if the amount paid (*e.g.,* the premiums ceded) is not commensurate with the risk transferred.

**Regulatory, Accounting and Actuarial Standards Require Real Risk Transfer and a Reasonable Possibility of Significant Loss in Private Mortgage Reinsurance**

106.    Accepted accounting and actuarial principles determine whether a reinsurance arrangement, like those at issue here, represent a "real transfer of risk," including for purposes of RESPA. These principles provide that, for a contract to be treated as real reinsurance, the reinsurer must assume significant insurance risk and it must be "reasonably possible that the reinsurer may realize a significant loss."  *See* CAS Research Working Party on Risk Transfer

---

[6]     As noted below, even quota share arrangements to reinsure private mortgage insurance do not constitute real or commensurately priced reinsurance if provisions in the reinsurance contract limit the reinsurer's liability to pay claims to the assets held in the trust accounts established for each mortgage insurer into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums that it collects from borrowers, and the private mortgage insurers have no recourse against the reinsurer.

Testing, Risk Transfer Testing of Reinsurance Contracts: Analysis and Recommendations, Casualty Actuarial Society Forum, Winter 2006, at 282-283, attached hereto as Exhibit 39; *see generally* Statement of Financial Accounting Standards No. 113, "Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts," at 7 (December 1992), attached hereto as Exhibit 40.  The reinsurance arrangements at issue in this action violated RESPA because they foreclosed the reasonable possibility that NCMIC "may realize a significant loss."

107.   Insurers and reinsurers are subject to two sets of accounting standards in the United States: "(1) statutory accounting principles (SAP) and (2) generally accepted accounting principles (GAAP)."  *See* Exhibit 52 hereto (Robert W. Klein & Shaun Wang, *Catastrophe Risk Financing in the US and the EU:A Comparative Analysis of Alternative Regulatory Approaches,* The Journal of Risk and Insurance, 2009, Vol. 76, No. 3, 609).  SAP rules are determined by state insurance regulators through the NAIC, and insurers are required to file detailed financial statements and other reports in accordance with SAP.  *Id.*  GAAP rules are "determined by the Financial Accounting Standards Board (FASB), and insurers are required to follow GAAP in their non-regulatory financial statements and Securities and Exchange Commission (SEC) reports."  *Id.*

108.   FASB 113 or "FAS 113" was "implemented in 1993 to prevent, among other things, abuses in GAAP accounting for contracts (such as the ones at issue in this litigation) that have the formal appearance of reinsurance but do not transfer significant insurance risk and thus should not be eligible for reinsurance accounting.  SSAP 62 [or SAP 62, now SAP 62R], which largely incorporates the same language as FAS 113, was implemented shortly thereafter to address the same issues with respect to statutory accounting."  *See* Exhibit 39 at 282-83.

109.     Under FAS 113, "in order for a contract to qualify for reinsurance accounting treatment [as real, risk-transferring reinsurance] . . . it must transfer insurance risk from an insurer to a reinsurer.  To meet the risk transfer requirement, a reinsurance contract must satisfy one of two conditions:

> 1.     It must be evident that "the reinsurer has assumed substantially all of the insurance risk relating to the reinsured portion of the underlying insurance contracts" (paragraph 11), or
>
> 2.     The reinsurer must "assume significant insurance risk under the reinsured portions of the underlying insurance contracts" (paragraph 9a) and it must be "reasonably possible that the reinsurer may realize a significant loss from the transaction" (paragraph 9b).

*Id.* at 283; *see generally* Exhibit 40 at 7.

110.     The test can be more fully and formally stated as mandating that real transfer of insurance risk is passed to a reinsurer only if: (i) the reinsurer assumes ***significant*** insurance risk under the reinsured portions of the underlying reinsurance contracts; and (ii) it is reasonably possible that the reinsurer may realize a significant loss from the transaction.  *Id.* at 7.

111.     Further, FAS 113 provides the blueprint for how to structure a "real risk transfer" analysis:

> The ceding enterprises' evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction shall be based on the present value of all cash flows between the ceding and assuming enterprises under reasonably possible outcomes, without regard to how the individual cash flows are characterized.  The same interest rate shall be used to compute the present value of cash flows for each reasonably possible outcome tested.
>
> Significance of loss shall be evaluated by comparing the present value of all cash flows . . . with the present value of the amounts paid . . . to the reinsurer.

*Id.* at 7.

112.    SSAP 62R's test for whether a reinsurance contract effectuates a real risk transfer is substantively identical:[7]

a.    The reinsurer assumes significant insurance risk under the reinsured portions of the underlying insurance agreements; and

b.    It is reasonably possible that the reinsurer may realize a significant loss from the transaction.

*See* Exhibit 53 hereto at paragraph 13, SAP 62R-6 (NAIC Accounting Practices & Procedures Manual, March 2010, Statement of Statutory Accounting Principles No. 62R, Property and Casualty Reinsurance).

113.    Reinsurance "[c]ontracts that do not result in the reasonable possibility that the reinsurer may realize a significant loss from the insurance risk assumed generally do not meet the conditions for reinsurance accounting and are to be accounted for as deposits." *See* Exhibit 40 at 4; *see generally* Exhibit 54 hereto (Section AICPA Technical Practice Aids, Section 10,760, Statement of Position 98-7 Deposit Accounting: Accounting for Insurance and Reinsurance Contracts that Do Not Transfer Insurance Risk, October 19, 1998).

114.    In a deposit accounting/no-risk transfer arrangement, payment from a reinsurance trust to a primary insurer is a "loss" to the primary insurer, *but not the reinsurer*— it is akin to a withdrawal from a traditional bank savings account.   Payment of "claims" under a deposit accounting "reinsurance" arrangement is specifically anticipated, and accounting for such payments (versus payments made under "real," risk-transferring reinsurance contracts) is subject to a different set of rules than those that apply to true reinsurance.   *See* Exhibit 53 at paragraph 35, SAP 62R-11 at (b) (referencing "disbursements"), (e) (referencing "settlement of losses"),

---

[7]    "The above provisions of SSAP 62 are essentially the same as those in FAS 113." *See* American Academy of Actuaries, Committee on Property and Liability Financial Reporting, Risk Transfer in P&C Reinsurance: Report to the Casualty Actuarial Task Force of the National Association of Insurance Commissioners, August 2005 at 6, available at http://www.actuary .org/pdf/casualty/risk_transfer.pdf.

and (f) (referencing loss and loss adjustment expense in these types of "non" risk transfer contracts); *see also* Exhibit 55 (superseding SSAP No. 75, amending SSAP No. 62R, paragraph 3, at 75-3 (paragraph (b), referencing "disbursements," paragraph (d), referencing "settlement of losses," and paragraph (e), referencing loss and loss adjustment expense)).

115.   In addition, at least one state regulator has explicitly concluded that no real transfer of risk exists where reinsurance agreements include liability-limiting provisions or lack sufficient recourse provisions to ensure that the reinsurer lives up to its commitments.  The State of Arizona Department of Insurance has made clear its view that mortgage reinsurance arrangements with any or all of the following characteristics *result in "insufficient risk transfer" and should be accounted for under "deposit accounting guidelines"*:

- where there are unusual termination provisions, such as provisions for automatic termination and recapture by the ceding mortgage insurer with no further liability to the reinsurer, in the event the reinsurer fails to adequately fund the reinsurance treaty trust account;

- where the reinsurer shall have no liability to the ceding insurer in the event the assets in the trust account are insufficient to pay any amounts then due and payable by the reinsurer; and

- where the ceding company shall have no recourse against the reinsurer or its assets other than the trust funds.

*See* Exhibit 56 hereto (Department of Insurance, State of Arizona, Supplemental Schedule F-5 for Mortgage Guaranty Insurers that Cede to Captive and/or Unauthorized Reinsurers) (emphasis added).

116.   In sum, under the foregoing principles, a purported reinsurance arrangement—quota share or excess-of-loss—does not constitute real reinsurance if: (i) the reinsurance contract limits the reinsurer's liability to pay claims to the amount of assets held in the trust accounts established for each mortgage insurer and into which the mortgage insurer deposits the ceded

portion of the premium collected from borrowers; (ii) the reinsurer puts no or merely nominal capital into the trust accounts; or (iii) the private mortgage insurer has no recourse against the reinsurer.  Indeed, as noted by the American Academy of Actuaries:

> [S]traight quota share contracts are typically exempted from risk transfer requirements under the paragraph 11 exception of FAS 113. However, the ***introduction of risk limiting features to a quota share contract, such as a loss ratio cap . . .*** a loss retention corridor, or a sliding scale commission, often prevents the contract from qualifying for the exception.

*See* Exhibit 57 hereto, January 2007 Reinsurance Attestation Supplement 20-1, at 14 (emphasis added).   Similarly, for a private mortgage insurance reinsurer subject to an excess-of-loss contract to be exposed to any real losses (as opposed to merely paying claims from ceded premiums), two circumstances must exist: (i) the amount of losses paid by the private mortgage insurer must reach the band where the reinsurer's responsibility to pay claims attaches; and (ii) the reinsurance agreement between the reinsurer and the private mortgage insurer must contain provisions ***requiring*** the reinsurer to contribute its ***own*** money to pay its share of losses when called upon by the primary private mortgage insurer.

117.    In contrast, a reinsurance arrangement between a reinsurer and a private mortgage insurer that does not expose the reinsurer to any real possibility that it may be required to contribute its own money—and thereby experience real insurance "losses"—when called upon to pay claims by the private mortgage insurer, does not constitute actual risk-transferring reinsurance, but is a sham which contravenes RESPA.  As set forth below NCMIC's agreements with the Private Mortgage Insurers did not involve a real transfer of risk and the ceded premiums paid pursuant thereto were kickbacks and referral payments that violated RESPA.

**<u>Defendants' Captive Reinsurance Arrangements with the Private Mortgage Insurers</u>**

118.    During the relevant time period, in connection with the untold millions of dollars in home loans originated, funded and/or originated through correspondent lending by the National City Lenders and their mortgage lending subsidiaries and/or affiliates, many of their borrowers paid for private mortgage insurance.

119.    NCMIC was a party to the captive reinsurance arrangements joined by each of the Private Mortgage Insurers.  Pursuant to these virtually identical arrangements, the National City Lenders and their mortgage lending subsidiaries and/or affiliates referred their borrowers to, and, upon information and belief, allocated referrals on a rotating or other systematic basis having nothing to do with quality of service, price, reputation, performance, or other appropriate metric among, the Private Mortgage Insurers.

120.    The Private Mortgage Insurers each entered into a carefully crafted "reinsurance" contracts with NCMIC that provided for no true transfer of risk of reinsurance losses to NCMIC, or the National City Lenders.  The Private Mortgage Insurers understood that the captive "reinsurance" arrangement did not transfer risk and that National City structured the captive reinsurance arrangement with them to shield Defendants from any liability.  Both knew that the arrangements were a sham.

121.    For example, one reinsurance contract between MGIC and NCMIC provided for termination of the contract if NCMIC failed to make a required deposit into the trust account but limited NCMIC's liability to the assets in the trust account.  *See* ECF No. 131-2 at §§ 2.1, 5.2-5.3 and 13.3 (filed under seal).  Provisions such as these resulted in the Private Mortgage Insurers having no monetary recourse against NCMIC to ensure that the trusts were sufficiently funded to cover actual losses under the contract, and the reinsurance contract between MGIC and NCMIC

thus exemplifies the lack of true transfer of risk in Defendants' captive reinsurance arrangements.

122.   The National City Lenders and their mortgage lending subsidiaries and/or affiliates along with the Private Mortgage Insurers effectuated this scheme by defrauding borrowers like Plaintiffs and Class members.

123.   Defendants with the cooperation and knowledge of the Private Mortgage Insurers made false and misleading representations regarding this captive reinsurance arrangement in the mortgage documents provided to borrowers, like Plaintiffs and the Classes.  The scheme also included the provision of separate, misleading representations to borrowers, like Plaintiffs and Class members, in periodic account statements that were transmitted to borrowers by Defendants and their agents through the mail and wires.

124.   Defendants allocated their business among the Private Mortgage Insurers.  The Private Mortgage Insurers remitted a portion of the borrowers' premiums to NCMIC for the purported reinsurance, with Plaintiffs and Class members having no knowledge of the unlawful kickback scheme.

125.   Defendants represented to Plaintiffs and Class members that it entered into the captive reinsurance arrangement to share risk.  This was a blatant misrepresentation.

126.   Defendants' captive reinsurance arrangement with the Private Mortgage Insurers was a scheme or artifice designed to defraud borrowers, like Plaintiffs and the Classes, into funding illegal kickbacks.  Further, Defendants' and the Private Mortgage Insurers' coordinated actions resulted in a reduction of competition in the mortgage insurance market.

**Defendants did not Provide the Private Mortgage Insurers with Real Reinsurance**

127.   From the beginning of 2004 through the end of 2013, NCMIC collected from the Private Mortgage Insurers **over $244 million** as its "share" of borrower's private mortgage

insurance premiums.  In contrast, its "share" of paid claims from the trust accounts supporting its captive reinsurance arrangements during this time period was *only approximately $23 million*, as depicted in the chart below.[8]



128.    As *American Banker* observed with respect to lenders' captive reinsurance arrangements, "[s]ome of the deals were designed to return a 400% profit on a bank's investment during good years and remain profitable even in the event of a real estate collapse."  *See* Reinsurance Kickbacks.

129.    Beginning in 2007, the United States experienced one of the worst mortgage meltdowns in recent history.  *See, e.g.*, Katalina M. Bianco, *The Subprime Lending Crisis: Causes and Effects of the Mortgage Meltdown*, CCH Mortgage Compliance Guide and Bank Digest (2008), attached as Exhibit 58.  Thus, it is not at all surprising that some claims were paid from the trusts during 2009 and 2010.

130.    Indeed, the mere fact that NCMIC paid claims from the trust accounts does not establish that the underlying reinsurance contracts constitute real, risk-transferring and

---

[8] These figures were obtained from a review of the Schedule F – Part 3 of the Annual Statements for the Private Mortgage Insurers filed with the NAIC for the years 2004 through 2013.

commensurately priced reinsurance as required by RESPA.  Instead, upon information and belief, even after paying some claims, due to the structure of the reinsurance agreements, NCMIC continued to carry no true risk of loss, as defined in the applicable standards and regulations addressed above, and the premiums received by NCMIC were not commensurate to any risk that NCMIC purportedly assumed.

131.    In fact, payments from the reinsurance trusts maintained by NCMIC to the Private Mortgage Insurers do not constitute "losses" to NCMIC because, upon information and belief, under the terms of the underlying agreements, NCMIC will either: (i) receive more in premiums from the Private Mortgage Insurers than the trusts will ever transfer to the Private Mortgage Insurers in purported reinsurance claims; or (ii) have the option to walk away from their purported reinsurance obligations if they are called upon to pay more in claims than is available in the trust accounts.  The premiums ceded from the Private Mortgage Insurers and deposited into the trust accounts effectively constitute the only funds available to cover reinsurance claims payments.

132.    The over $244 million dollars in "reinsurance" premiums paid by the Private Mortgage Insurers and collected by National City, through its captive reinsurer through the end of 2013 have clearly not been commensurate to NCMIC's actual risk exposure.

133.    When broken down on an annual basis, the paid claims greatly increased from 2009 ($2.2 million) to 2010 ($8.8 million) and then decreased in 2011 ($2.4 million).  Given the unprecedented mortgage crisis and meltdown, which began in 2007/2008 and which dramatically increased the number of foreclosures and which therefore should have resulted in skyrocketing reinsurance claims, the reinsurance claims paid by NCMIC should have continued to increase in 2011, rather than decrease so precipitously.

134.    The only logical explanations for the pattern of claim payments is: (1) Defendants refused to inject any addition of its own capital into the reinsurance trusts, pursuant to liability limiting contractual provisions; or relatedly (2) when faced with the prospect of actually losing or spending its own funds to cover reinsurance claims, Defendants forced the commutation, runoff, and/or cutoff of these arrangements with each and every affected Private Mortgage Insurer.

135.    The money which National City collected from the Private Mortgage Insurers through NCMIC far exceeded the value of the services, if any, NCMIC performed.  There was no real transfer of risk or, at least, not a commensurate transfer of risk given the vast disproportion between the amount of premium ceded to NCMIC and the contractual limitations on NCMIC's actual obligations.  Instead, the amounts paid to NCMIC were simply disguised kickbacks and unearned fees to National City for the referral of borrowers to the Private Mortgage Insurers.

136.    Thus, Defendants' captive reinsurance arrangements were sham transactions, which, in essence, forced Plaintiffs and Class members to fund the illegal kickbacks and unearned fees.

137.    Amounts paid to lenders as unlawful kickbacks have become a part of the cost of doing business for private mortgage insurers.  As a result, private mortgage insurance premiums incorporate the payment of such kickbacks—to the detriment of consumers.

138.    Every kickback or premium ceded to NCMIC by the Private Mortgage Insurers constitutes a separate illegal kickback and/or referral fee split "incident to or part of a real estate settlement service involving a federally related mortgage loan" in violation of RESPA, 12 U.S.C. § 2607(a).

139.    Congress has already determined that the *aggregate* effect of an unlawful kickback/referral arrangement, such as a sham captive mortgage reinsurance arrangement, is to unnecessarily inflate and artificially maintain the costs consumers pay for real estate settlement services.  *See* 12 U.S.C. § 2601(b) ("It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services.").  Thus, kickbacks and unearned fees have the effect of unnecessarily and artificially inflating the price of settlement service charges, including private mortgage insurance premiums.

**Defendants' and the Private Mortgage Insurers Used the Interstate Mails and/or Wires to Perpetrate the Deceptive Scheme**

140.    Defendants' scheme perpetrated the RICO predicate acts of mail fraud and/or wire fraud, including "honest services" fraud, in violation of 18 U.S.C. §§ 1341 and 1343.

141.    The mail fraud statute reads, in relevant part:

> Whoever, having devised … any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises … [uses the mails in furtherance of the scheme shall be punished by imprisonment or fine or both].

18 U.S.C. § 1341.

142.    The wire fraud statute is in relevant respects identical.  *See* 18 U.S.C. § 1343.

143.    The conduct of Defendants and the Private Mortgage Insurers constituted the execution of a scheme and artifice to defraud Plaintiffs and Class members for the purpose of obtaining money from them to fund illegal kickbacks in violation of 18 U.S.C. § 1341 and § 1343.

144.    Defendants, with the Private Mortgage Insurers' knowledge and consent, fraudulently misrepresented the reinsurance arrangement claiming that it was entered into for the

purpose of allocating risk when the parties to captive reinsurance arrangements never intended to transfer or share any risk.

145.    The misrepresentations appeared in Plaintiffs' and Class members' mortgage documents and periodic account statements.

146.    In particular, Plaintiffs and Class members received from Defendants a form mortgage document (the "Mortgage Document") and/or a "Private Mortgage Guaranty Insurance Disclosure" ("MI Document") (the Mortgage Document and MI Document are referred to herein as the "Form Documents"), each of which contained numerous similar affirmative misrepresentations intended to conceal Defendants' unlawful conduct.

147.    The Mortgage Document stated, in relevant part:

> *Borrower is not a party to the mortgage insurance.*
>
> Mortgage insurers evaluate their total risk on all such insurance in force from time to time and *may enter* into agreements with other parties that share or modify their risk, or reduce losses….
>
> As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity or any affiliate of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of the Borrower's payments for Mortgage Insurance, *in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."*  Further:
>
> **Any such arrangements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance…. Any such agreements will not affect the rights Borrower has—if any—with respect to the mortgage insurance**…." (Bold emphasis in original).

*See, e.g.,* Exhibits 7, 9, 11, 13, 16, 18, 20 hereto (the Mortgage Documents provided to Plaintiffs White, Hightower, Donald, Johnston, Garcia, Zielinski, and Crumpler, respectively).   Upon information and belief, all borrowers who were required to purchase private mortgage insurance

received the Mortgage Document regardless of whether their private mortgage insurance was ever reinsured.

148.    In addition, the "MI Document" stated:

Mortgage Insurers *may enter* into a reinsurance arrangement with other insurance companies. *In return for assuming a portion of the risk covered by the Mortgage Insurance policy*, the other insurance company (usually called the "Reinsurance Company") receives a portion of the mortgage insurance premiums. *This reinsurance arrangement does not increase your Mortgage Insurance premiums and does not affect the coverage of the condition for cancellation of the Mortgage Insurance.*

The Mortgage Insurer that is providing Mortgage Insurance on your loan *has entered, or may enter,* a reinsurance agreement with a Reinsurance Company known as "National City Mortgage Insurance Company [NCMIC]." Under this reinsurance relationship, *National City Mortgage Insurance Company [NCMIC] will assume a portion of the risk associated with the Mortgage Insurance on your loan* and will receive a portion of the Mortgage Insurance premiums you pay.

*See, e.g.*, Exhibits 59-65 hereto (the MI Documents provided to Plaintiffs White, Hightower, Donald, Johnston, Garcia, Zielinski and Crumpler respectively).

149.    The MI Document concludes with a "Certification of Borrower(s)," in which borrowers "certify," *"I/we also understand that this reinsurance relationship does not increase my/our Mortgage Insurance premiums and does not affect the coverage or the conditions for cancellation of the Mortgage Insurance."* *Id.* (emphasis in original).

150.    Defendants' statements, as set forth above, were false and misleading for a number of reasons. First, the actual reinsurance services provided by NCMIC were a sham, with little or no risk being assumed by the reinsurer. Second, the disclosures do not alert the borrower to the fact that the PMI provider was selected by Defendants because of its willingness to pay kickbacks and to participate in the captive reinsurance scheme. Third, the captive reinsurance/kickback arrangement negatively impacted Plaintiffs' and the Classes' rights.

151.    Defendants and the Private Mortgage Insurers' use of the mails and/or wires formed a central feature of the scheme to defraud.

152.    Defendants transmitted borrowers' Form Documents and periodic account statements *via* mail, electronic mail, wire transfer and/or facsimile and also received mortgage payments from Plaintiffs and Class members, which included the premium payment for the private mortgage insurance they required.

153.    Defendants also used the mail and wires to communicate with each other and to execute the fraudulent captive reinsurance scheme, including draft contracts and amendments, comments, discussions, memos, the captive reinsurance contracts, amendments thereto and related communications.

154.    The Private Mortgage Insurers transmitted cession statements to Defendants on a regular, periodic basis.  They also transmitted the sham premiums to NCMIC using the mail and/or wires.

155.    Defendants' and the Private Mortgage Insurers also knew that it would be necessary to use the mail and wires to carry out the core purpose of the scheme – payment of kickbacks to Defendants by means of a seemingly legitimate captive reinsurance arrangement that intentionally disguised the nature of the ceded premium payments.

156.    Defendants and the Private Mortgage Insurers also used the mail and wires to create and maintain the structures that allowed them to execute the fraudulent scheme.

157.    In addition to the above disclosures, borrowers received periodic account statements from the National City Lenders and/or their agents.  These account statements, which masked and concealed the illegal kickbacks, constituted new and independent predicate acts.

The account statements thus caused Plaintiffs and Class members to fund additional kickbacks and suffer further injury.

158.    Plaintiffs and Class members were injured each time they were forced to fund illegal kickbacks – specifically each time the Private Mortgage Insurers ceded a portion of borrowers' PMI premiums to NCMIC.

159.    The National City Lenders transmitted hundreds, and likely thousands, of mortgage documents and periodic account statements to borrowers across state lines.

160.    Plaintiffs were injured each time they were forced to fund illegal kickbacks – specifically each time the Private Mortgage Insurers ceded a portion of the PMI premiums to NCMIC.

161.    The conduct described above constituted multiple violations of the mail fraud and/or wire fraud statutes, 18 U.S.C. § 1341 and § 1343, which are predicate offenses for purposes of RICO, 18 U.S.C. § 1962(c).

162.    The scheme alleged herein also constituted "honest services" fraud, in violation of 18 U.S.C. § 1346.

163.    The mail fraud and wire fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services."  Specifically, Congress broadened the scope of the mail fraud and wire fraud statutes by enacting 18 U.S.C. § 1346, which provides:

> For the purposes of this chapter [including § 1341 and § 1343], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right to honest services.

At all relevant times, the National City Lenders owed a fiduciary duty to Plaintiffs and Class members to render lending services, and those duties included selecting for borrowers an insurer to provide private mortgage insurance.

164. Defendants, however, misused their position and thereby breached their obligation to render "honest services" to borrowers. Indeed, Defendants devised a scheme or artifice to defraud Plaintiffs and Class members of the intangible right to "honest services" by selecting an insurer to provide private mortgage insurance for borrowers based on that insurer's payment of unlawful kickbacks.

165. Defendants further were unjustly enriched and increased their profits by executing a scheme which deprived Plaintiffs and the Classes of the funds that were funneled from the Private Mortgage Insurers to NCMIC in the form of illegal kickbacks. Defendants benefitted from the illegal kickbacks, despite providing reinsurance services of little or no value.

### CLASS ACTION ALLEGATIONS

166. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and/or (b)(3) on behalf of themselves and a class of all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by the National City Lenders or any of their subsidiaries and/or affiliates between January 1, 2004 and the present and, in connection therewith, purchased private mortgage insurance and whose residential mortgage loans were included within National City's captive mortgage reinsurance arrangements (the "RICO Class").

167. Plaintiffs also bring this action on behalf of themselves and a class of all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by the National City Lenders, or any of its subsidiaries and/or affiliates, and, in connection therewith, purchased PMI and whose residential mortgage loans were included within National City's captive mortgage reinsurance arrangements, and who paid PMI premiums after December 31, 2010 (the "RESPA Class") (the RICO Class and the RESPA Class are referred to herein as the "Classes").

168.     The Classes exclude Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

169.     The Classes are so numerous that joinder of all members is impracticable.

170.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

171.     Plaintiffs' claims are typical of the claims of the Classes.  As alleged herein, Plaintiffs and members of the Classes were injured in their business or property as a result of Defendants' common course of unlawful conduct.

172.     There are questions of law and fact common to the Classes, the answers to which will advance the resolution of the claims of all class members, including but not limited to:

    a.  Whether Defendants and the Private Mortgage Insurers constituted an association-in-fact RICO enterprise;

    b.  Whether Defendants have engaged in a common scheme, plan and course of conduct to compel borrowers to fund illegal kickbacks;

    c.  Whether Defendants committed mail fraud, wire fraud and/or "honest services" fraud;

    d.  Whether Defendants have engaged in a pattern of racketeering activity;

    e.  Whether Defendants' captive reinsurance arrangements involved sufficient transfer of risk;

    f.  Whether payments to NCMIC exceeded the value of any services actually performed;

    g.  Whether Defendants' captive reinsurance arrangements constituted unlawful kickbacks from the Private Mortgage Insurers;

h.   Whether a portion of borrowers' private mortgage insurance premiums were ceded to NCMIC;

i.   Whether Defendants accepted referral fees from the Private Mortgage Insurers or a portion, split or percentage of borrowers' private mortgage insurance premiums from the Private Mortgage Insurers other than for services actually performed;

j.   Whether the Private Mortgage Insurers paid or gave referral fees to Defendants or a portion, split or percentage of borrowers' private mortgage insurance premiums to Defendants other than for services actually performed;

k.   Whether the Private Mortgage Insurers entered an agreement to funnel kickbacks to Defendants in exchange for the referral of business;

l.   Whether Plaintiffs and the Classes were forced to fund the kickbacks to Defendants through their private mortgage insurance premiums;

m.   Whether Plaintiffs and the Classes suffered an injury to their business or property as a result of Defendants' conduct; and

n.   The appropriate measure of the injury suffered by Plaintiffs and the Class.

173.   These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual Class members.  The basic terms and contours of the challenged captive reinsurance arrangements are not tied to any specific, individual consumer loan.  Rather, the captive reinsurance arrangements apply to groups or pools of loans.  Further, each and every Class member that Plaintiffs seek to represent was required, as part and parcel of obtaining their mortgage from the National City Lenders and their mortgage lending subsidiaries and/or affiliates, to pay for PMI.  The Private Mortgage Insurers ceded a portion of every Class member's mortgage insurance premiums to NCMIC pursuant to purported

captive reinsurance contracts, the essential and basic terms of each of those "reinsurance" contracts between NCMIC and the Private Mortgage Insurers were, for all intents and purposes, materially the same – and each of the Class members, no matter the Private Mortgage Insurer to whom they were referred, suffered the same harm.

174.    The same common issues predominate with respect to all members of the Classes, regardless of whether their loans were originated or funded by the National City Lenders and their mortgage lending subsidiaries and/or affiliates or originated through correspondent lending.

175.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes.  Plaintiffs have no claims antagonistic to those of the Classes.  Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation.  Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Classes.

176.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants.

177.    Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Classes would create a risk of adjudications with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

178.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only

individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## STATUTE OF LIMITATIONS

179.    RICO claims are subject to a four year limitations period, however the limitations period does not begin to run until a plaintiff knew or should have known about his or her injury.

180.    Prior to and throughout the relevant time period, Defendants participated in, and were parties to, an agreement or understanding that was, by its very nature, a "pay-to-play" scheme.  Through this agreement or understanding, Defendants violated RICO through captive reinsurance arrangements pursuant to which Defendants' "preferred" mortgage insurers – the Private Mortgage Insurers – funneled kickbacks to NCMIC.  The kickback payments that the Private Mortgage Insurers provided were made in exchange for National City's referral of its borrowers' mortgage insurance business, rather than actual reinsurance services (as defined by applicable regulatory, actuarial, and accounting guidelines) that NCMIC were to perform or actually performed.

181.    The statute of limitations applicable to the RICO claims asserted herein should be tolled based upon the principles of the injury discovery rule.  As set forth below, Plaintiffs and other members of the RICO Class were not (nor should they have been) on notice of their claims against Defendants until at least 2011, and they each exercised objectively reasonable due diligence under the circumstances.  This is particularly true here based upon Defendants' affirmative acts of concealment.

182.    Under the injury discovery rule, the statute of limitations is not triggered until Plaintiffs knew or should have known of their injury.  There must be "storm warnings," alerting Plaintiffs of the possibility of their injuries, prompting a duty to investigate potential

wrongdoing.  The injury discovery rule prolongs the accrual of Plaintiffs' claims until such time they are aware of their injuries.

183.    Any delay in the commencement of this litigation is excusable and, accordingly, it would be inequitable for the Court to apply the four-year limitation period for RICO claims to preclude the claims of Plaintiffs.

184.    As this Court has already noted, applying the rigid statute of limitation would imply that borrowers should:

> basically distrust anyone involved in the home buying process. To advocate that this be the standard behavior by home buyers would gum-up an already complicated process. To ask them to second-guess the information that has been provided them by those with more expertise in these sorts of dealings—to essentially undertake their own investigation into the legality of every part of their loan transaction simply because there may be some possibility that the transaction may be illegal—is ***unreasonable and unrealistic***.

*White v. PNC Fin. Services Group, Inc.*, No. 11-cv-7928, 2014 WL 4063344, at *5 (E.D. Pa. Aug. 14, 2014) (emphasis added).

185.    Plaintiffs and the RICO Class's claims are further timely for any and all injuries that occurred within the four years prior to December 31, 2011.

186.    Likewise, Plaintiffs and the RESPA Class's claims are timely for any and all injuries that occurred within one year prior to December 31, 2011.

**Plaintiffs were Reasonably Unaware of their Claims Due to the Lack of "Storm Warnings"**

187.    Due to the complex, undisclosed and self-concealing nature of Defendants' scheme which provided for the payment of illegal kickbacks from the Private Mortgage Insurers to Defendants, Plaintiffs and Class members did not and could not have known of information sufficient to enable them to discover the true nature of Defendants' scheme.

188.    Moreover, Plaintiffs and the Class did not and could not have known of Defendants' scheme and the injuries suffered by Plaintiffs and the RICO Class despite their

exercise of due diligence, because Defendants knowingly and actively concealed their wrongdoing by engaging in a scheme that was, by its very nature and purposeful design, self-concealing.   Plaintiffs and the RICO Class did not have sufficient information regarding Defendants' wrongdoing to be on notice of such wrongdoing.

189.   A home purchase is a significant life event, full of anxiety and stress.   Home buyers spend considerable time ensuring that they have undertaken the requisite inspections, filled out the appropriate paperwork, and read the voluminous documents presented to them. They understandably and justifiably rely upon the uniform written representations made to them to facilitate this important transaction.

190.   Plaintiffs fully participated in their mortgage closings.   At each Plaintiff's respective closing, each Plaintiff was presented with the Form Documents (discussed above), which each Plaintiff read and signed.   Based upon the generic and unsuspicious language within the Form Documents concerning the captive reinsurance arrangements, as well as Plaintiffs' reliance upon Defendants' affirmatively false and misleading representations therein, Plaintiffs lacked any basis to investigate further the term "captive reinsurance."

191.   Indeed, Plaintiffs believed that Defendants correctly presented everything within the Form Documents concerning the captive reinsurance arrangements, including the putative legitimacy of any financial benefit to either the mortgage insurers or reinsurer, and thus there was no cause for concern.   Only after Plaintiffs received the assistance of counsel did they become aware of the possibility that the Form Documents had misled them. As *American Banker* reported, "making matters worse, banks allegedly forced unknowing consumers to buy more insurance than they needed *and failed to properly disclose the reinsurance contracts*."   *See* Reinsurance Kickbacks (emphasis added).   In fact, HUD investigators reported to the DOJ that

"[m]ost of the time, lenders did not tell borrowers in advance that their captives were reinsuring the deals . . . [i]n some cases, banks allegedly told customers that the charge for the reinsurance was 'none.'" *Id*.

192.    Plaintiffs were able to discover their injuries and the underlying basis for the claims alleged herein only with the assistance of counsel.  Otherwise, Plaintiffs and Class members had no basis upon which to investigate the validity of the undisclosed payments from the Private Mortgage Insurers to Defendants for purported reinsurance.  Because Plaintiffs and Class members did not, and could not, have discovered Defendants' scheme until receiving assistance from counsel, the limitations period did not begin to run until then – in 2011.  Thus, Plaintiffs and the RICO Class's claims are within the four year limitations period.

193.    Plaintiffs and Class members reasonably did not, and could not, possess sufficient information to put them on notice of the true nature of Defendants' captive reinsurance arrangements.  The average homebuyer is neither an insurance expert nor a reinsurance expert. *See, e.g.*, Reinsurance Kickbacks (noting that even HUD's investigation "may have stagnated because demonstrating that the captive reinsurance amounted to kickbacks would require accounting expertise that the Department does not possess").

194.    Defendants' statements in the Form Documents clearly misled borrowers. Specifically, the statements misled and failed to reveal, among other things, that the actual reinsurance services provided by NCMIC were a sham, that a private mortgage insurer was selected by Defendants because of its willingness to pay unlawful kickbacks.  Likewise, a statement that the reinsurer will assume some portion of the risk associated with a borrower's loan is insufficient to put the average homebuyer on notice that anything improper or actionable may have occurred with respect to that reinsurance.  *See* Exhibits 1-3, 7-21, 27-33, and 59-65.

195.    Further supporting that the scheme could not be discovered by Plaintiffs and the

RICO Class, upon information and belief, Defendants actively concealed their conduct by

providing incomplete and/or inaccurate information to state regulators.   As *American Banker*

reported:

> All the same, banks persuaded state insurance regulators to sign *off* on the
> structures.  To judge whether the reinsurance agreements were fair, state officials
> relied in part on actuarial analyses submitted by the banks and insurers.
>
> "Review of these opinions has found them to frequently contain significant
> defects and omissions which render them inapplicable to the actual reinsurance
> agreements executed," HUD investigators later concluded.

*See* Reinsurance Kickbacks.

196.    The misleading Form Documents constitute affirmative misrepresentations that

bear directly upon Plaintiffs' ability to learn of both their injuries and the facts underlying their

claims.   These misrepresentations precluded Plaintiffs from detecting Defendants' fraudulent

conduct and commencing litigation within the limitations period.   Upon information and belief,

Defendants used the misleading Form Documents for the purpose of concealing their scheme and

preventing Plaintiffs from discovering their injuries and the underlying bases for their claims,

despite exercising reasonable due diligence both within and outside the limitations period.

197.    The false assurances within the Form Documents quelled any concern that an

objectively reasonable borrower, including Plaintiffs, may have regarding the potential

reinsurance of their PMI that they were required to purchase for the benefit of Defendants.

**Following their Loan Transactions, Plaintiffs were Neither on Notice of their Claims Nor
Could They Have Reasonably Discovered the Facts Underlying Those Claims**

198.    As alleged above, the Whites' loan transaction took place on or around December

29, 2006.  The Whites were only put on notice of the *possibility* of their claims and injuries when

55

they received a notice of investigation ("Notice") from Kessler Topaz Meltzer and Check LLP ("KTMC") on or around September 16, 2011.

199.    The Whites first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims and injuries on or around September 22, 2011.

200.    Mr. White signed a written agreement regarding KTMC's legal representation on or around September 26, 2011.

201.    Mrs. White signed a written agreement regarding KTMC's legal representation on or around November 2, 2011.

202.    Prior to communicating with counsel, nothing that the Whites received from Defendants following their closing, by mail or otherwise, including, but not limited to:  (i) any Borrower Notice Regarding Reinsurance; (ii) monthly billing statements pertaining to the payment of their respective mortgage and/or private mortgage insurance; or (iii) correspondence from their lender and/or Private Mortgage Insurer, provided them with notice of even the *possibility* of their claims or injuries.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement could have, would have, or was having, ***any practical impact*** on their costs or loan terms, or on their mortgage insurance or settlement rights or obligations.

203.    Once the Whites discovered the underlying basis for the claims and injuries alleged herein with the assistance of counsel, they contacted National City in an effort to discover the identity of their private mortgage insurance providers and also contacted the Private Mortgage Insurers to obtain further information about the reinsurance of their private mortgage

insurance.  None of the employees with whom Mr. White spoke were familiar with or were able to answer questions regarding National City's captive reinsurance program.

204.    When Mr. White first contacted PNC on November 2, 2011 to inquire about the identity of his private mortgage insurance provider, he was told by a customer service representative that the information could only be provided in writing and that it would be sent to him via regular mail within ten days.  After nearly two weeks, Mr. White called PNC on November 11, 2011 to inquire about the letter and was told that his request had been received and the information should be in the mail.  Nearly two months later, Mr. White still had not received any information in the mail from PNC.  He again called PNC on December 27, 2011 and was told by a customer service representative that while his original request to learn the identity of his private mortgage insurance provider had been received, the request had been "closed" approximately one week later with no further notes.  The individual was unaware of Defendants' captive reinsurance program and was unable to help Mr. White beyond identifying Bank of America as his private mortgage insurance provider.  When Mr. White called back later that day to confirm whether Bank of America is indeed his private mortgage insurance provider, another customer service representative named "Damian" told Mr. White that he had been misinformed.  Damian also told Mr. White that he could not connect him to anyone in the private mortgage insurance department because customer service handles all of that department's calls.

205.    As alleged above, the Hightowers' loan transaction took place on or around December January 27, 2006.  The Hightowers were only put on notice of the *possibility* of their claims and injuries when they received a Notice from KTMC on or around September 16, 2011.

206.    The Hightowers first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims and injuries on or around October 5, 2011.

207.    The Hightowers each signed a written agreement regarding KTMC's legal representation on or around October 20, 2011.

208.    Prior to communicating with counsel, nothing that the Hightowers received from Defendants following their closing, by mail or otherwise, including, but not limited to:  (i) any Borrower Notice Regarding Reinsurance; (ii) monthly billing statements pertaining to the payment of their respective mortgage and/or private mortgage insurance; or (iii) correspondence from their lender and/or Private Mortgage Insurer, provided them with notice of even the *possibility* of their claims and injuries.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement would have, or was having, ***any practical impact*** on their costs or loan terms, or on their mortgage insurance or settlement rights or obligations.

209.    Once the Hightowers discovered the underlying basis for the claims and injuries alleged herein with the assistance of counsel, they contacted National City in an effort to discover the identity of their private mortgage insurance providers and also contacted the Private Mortgage Insurers to obtain further information about the reinsurance of their private mortgage insurance.  None of the employees with whom Mr. Hightower spoke were familiar with or were able to answer questions regarding National City's captive reinsurance program.

210.    Mr. Hightower was similarly met with resistance, obfuscation and/or ignorance when he contacted PNC.  Despite repeated calls to PNC, Mr. Hightower was unable to learn the identity of his private mortgage insurance provider or the method by which he could remove his loan from Defendants' captive reinsurance program. When Mr. Hightower first called PNC on

November 28, 2011, the customer service representative with whom he spoke named "Derek" was unable to answer his questions regarding reinsurance and sought assistance from his supervisor. Rather than providing Mr. Hightower with information concerning the reinsurance of his private mortgage insurance, Derek informed Mr. Hightower that his supervisor had told him that Mr. Hightower was not able to remove the private mortgage insurance from his loan (which was obviously not what he was inquiring about). Derek did, however, tell Mr. Hightower that it is possible that he had signed a "paper" stating that he "wanted PNC to take on National City's private mortgage insurance risk." Derek told Mr. Hightower that he would request from PNC all paperwork regarding Mr. Hightower's private mortgage insurance and reinsurance, but that it could take up to 15 business days for Mr. Hightower to receive the information. After approximately three weeks with no response from PNC, Mr. Hightower again called PNC on December 20, 2011 and spoke with a different customer service representative named "Alicia Jones." Ms. Jones informed Mr. Hightower that while Derek had notified the private mortgage insurance department of Mr. Hightower's request, the private mortgage insurance department had "closed the task." Ms. Jones told Mr. Hightower that he was entitled to know the identity of his private mortgage insurance provider and that she would follow up with the private mortgage insurance department. She told Mr. Hightower that he should receive something in the mail in approximately one week. In addition, with respect to the reinsurance, Ms. Jones told Mr. Hightower that "PNC takes full responsibility for reinsurance." On December 23, 2011, Mr. Hightower again called PNC and spoke with a third customer service representative named "Steven Koscielny" who informed him that a letter from the private mortgage insurance department was sent to him that week with the information that he had requested. Mr. Koscielny had no further knowledge about Defendants' captive reinsurance program. Mr. Hightower

subsequently received a letter from "Insurance Administration,"[9] which referred to a "Reinsurance letter" that Mr. Hightower had allegedly received and informed him that under PNC's reinsurance arrangement, PNC Mortgage Company will assume a portion of the risk associated with the private mortgage insurance on his loan and will receive a portion of the private mortgage insurance premiums paid in return.  He was informed that if he did not want his loan to be reinsured with PNC Mortgage Company, Inc. that he was to "sign and return the notice."   *See* Exhibit 66 hereto, November 28, 2011 letter from PNC Mortgage to Mr. Hightower.  Because he did not know what "notice" was referenced in the letter, Mr. Hightower again called PNC on December 28, 2011 and was told by an individual in customer service named "Chris" (I.D.  #6264) that he could not speak with anyone in the insurance administration department because all of that department's calls are handled by customer service.  Chris noted that he would submit a request to the insurance administration department to identify Mr. Hightower's private mortgage insurance provider and to remove Mr. Hightower's loan from Defendants' captive reinsurance arrangement.  Mr. Hightower made one last attempt to find out if his loan was reinsured.  On December 30, 2011, he called PNC and spoke to a customer service representative named Carol.  When he asked for her last name or identification number she refused to provide it.  She too did not know anything about reinsurance but was able to tell him that his mortgage insurance provider was recently changed, though she could not identify the new provider.  To date, Mr. Hightower has received no further response from PNC.

211.   As alleged above, Plaintiff Donald's loan transaction took place on or around January 11, 2006.  Plaintiff Donald was only put on notice of the *possibility* of his claims and injuries when he received a Notice from KTMC on or around September 16, 2011.

---

[9]      Although the letter is dated November 28, 2011, it was postmarked December 22, 2011.

212.    Plaintiff Donald first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims and injuries on or around September 30, 2011.

213.    Plaintiff Donald signed a written agreement regarding KTMC's legal representation on March 26, 2012.

214.    Prior to communicating with counsel, nothing that Plaintiff Donald received from Defendants following his closing, by mail or otherwise, including, but not limited to:  (i) any Borrower Notice Regarding Reinsurance; (ii) monthly billing statements pertaining to the payment of his mortgage and/or private mortgage insurance; or (iii) correspondence from his lender and/or Private Mortgage Insurer, provided him with notice of even the *possibility* of his claims and injuries arising out of his loan transaction.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement would have, or was having, ***any practical impact*** on his costs or loan terms, or on the his private mortgage insurance or settlement rights or obligations.

215.    Once Plaintiff Donald discovered the underlying basis for the claims and injuries alleged herein with the assistance of counsel, he contacted National City in an effort to discover the identity of his private mortgage insurance providers and also contacted the Private Mortgage Insurers to obtain further information about the reinsurance of his private mortgage insurance.  None of the employees with whom he spoke were familiar with or were able to answer questions regarding National City's captive reinsurance program.

216.    Mr. Donald spoke with a representative of PNC named Sheila to find out whether his loan was part of National City's reinsurance program.  Mr. Donald asked if his loan was reinsured.  Sheila did not know if his loan was reinsured and told him that "she did not see one."

217.    As alleged above, Plaintiff Garcia's loan transaction took place on or around January 8, 2008.  Plaintiff Garcia was only put on notice of the *possibility* of her claims and injuries when she received a Notice from KTMC on or around September 16, 2011.

218.    Plaintiff Garcia first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims and injuries on or around September 26, 2011.

219.    Plaintiff Garcia signed a written agreement regarding KTMC's legal representation on or around April 24, 2012.

220.    Prior to communicating with counsel, nothing that Plaintiff Garcia received from Defendants following her closing, by mail or otherwise, including, but not limited to:  (i) any Borrower Notice Regarding Reinsurance; (ii) monthly billing statements pertaining to the payment of their respective mortgage and/or private mortgage insurance; or (iii) correspondence from their lender and/or Private Mortgage Insurer, provided her with notice of even the *possibility* of her claims and injuries arising out of her loan transaction.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement would have, or was having, ***any practical impact*** on her costs or loan terms, or on the her private mortgage insurance or settlement rights or obligations.

221.    Once Plaintiff Garcia discovered the underlying basis for the claims and injuries alleged herein with the assistance of counsel, she contacted National City in an effort to discover the identity of her private mortgage insurance providers and also contacted the Private Mortgage Insurers to obtain further information about the reinsurance of her private mortgage insurance. None of the employees with whom she spoke were familiar with or were able to answer questions regarding National City's captive reinsurance program.

222.    Plaintiff Garcia met with the same lack knowledge when she called Green Tree (who services her loan on behalf of PNC) to find out whether the mortgage insurance on her loan was reinsured.   On May 31, 2012, she spoke with a customer service representative named Nicoryia who, while able to inform her that Republic was the mortgage insurance provider, she "never heard of reinsurance."   Nicoryia then "Googled" Ms. Garcia's question and told her that "my friend Google tells me" that the loan could not be reinsured as it "closed 11 months before the qualification which was December 2008."   Nicoryia was wrong.   Plaintiff was unable to obtain correct information about her mortgage insurance from her bank.

223.    As alleged above, the Johnstons' loan transactions took place on or around December 24, 2008.  The Johnstons were only put on notice of the *possibility* of their claims and injuries when they received a Notice from KTMC on or around September 16, 2011.

224.    The Johnstons first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims and injuries on or around September 22, 2011.

225.    The Johnstons each signed a written agreement regarding KTMC's legal representation on or around February 21, 2012.

226.    Prior to communicating with counsel, nothing that the Johnstons received from Defendants following their closing, by mail or otherwise, including, but not limited to:  (i) any Borrower Notice Regarding Reinsurance; (ii) monthly billing statements pertaining to the payment of their respective mortgage and/or private mortgage insurance; or (iii) correspondence from their lender and/or Private Mortgage Insurer, provided them with notice of even the *possibility* of their claims and injuries arising out of their loan transaction.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement would have, or was

having, **any practical impact** on their costs or loan terms, or on their private mortgage insurance or settlement rights or obligations.

227.    Once the Johnstons discovered the underlying basis for the claims and injuries alleged herein with the assistance of counsel, they contacted National City in an effort to discover the identity of their private mortgage insurance providers and also contacted the Private Mortgage Insurers to obtain further information about the reinsurance of their private mortgage insurance.  None of the employees with whom Ms. Johnston spoke were familiar with or were able to answer questions regarding National City's captive reinsurance program.

228.    The Johnstons were unable to learn the identity of their mortgage insurance provider without the assistance of counsel despite their best efforts, once they discovered the underlying basis for their claims asserted herein.  When Mrs. Johnston called PNC on February 24, 2012 and asked for the mortgage insurance provider on their loan, a customer service representative named Shirley told her she was "not allowed to give out that information."

229.    As alleged above, Plaintiff Crumpler's loan transaction took place on or around May 26, 2006.  Plaintiff Crumpler was only put on notice of the *possibility* of her claims and injuries when she received a Notice from KTMC on or around September 16, 2011.

230.    Plaintiff Crumpler first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims and injuries on or around September 28, 2011.

231.    Plaintiff Crumpler signed a written agreement regarding KTMC's legal representation on or around March 15, 2012.

232.    Prior to communicating with counsel, nothing that the Plaintiff Crumpler received from Defendants following her closing, by mail or otherwise, including, but not limited to:  (i)

any Borrower Notice Regarding Reinsurance; (ii) monthly billing statements pertaining to the payment of her respective mortgage and/or private mortgage insurance; or (iii) correspondence from her lender and/or Private Mortgage Insurer, provided her with notice of even the *possibility* of her claims and injuries arising out of her loan transaction.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement would have, or was having, ***any practical impact*** on her costs or loan terms, or on the her private mortgage insurance or settlement rights or obligations.

233.   Once Plaintiff Crumpler discovered the underlying basis for the claims and injuries alleged herein with the assistance of counsel, she contacted National City in an effort to discover the identity of her private mortgage insurance providers and also contacted the Private Mortgage Insurers to obtain further information about the reinsurance of her private mortgage insurance.  None of the employees with whom she spoke were familiar with or were able to answer questions regarding National City's captive reinsurance program.

234.   Plaintiff Crumpler could not confirm whether or not her loan was part of National City's reinsurance program despite her efforts to obtain that information from the bank.  On August 12, 2012, Ms. Crumpler called PNC and spoke to a customer service representative named Sherry and asked her whether her loan was part of National City's reinsurance arrangement.  Sherry asked if that was something to do with PMI and when Jill confirmed it was, Sherry stated that she "was not familiar with that."  Plaintiff Crumpler also contacted Genworth, her mortgage insurance provider.  She spoke with a Genworth customer service representative, also on August 21, 2012, who told her that she "could not tell one way or the other" if the loan was part of a reinsurance arrangement with National City.

235.    As alleged above, Plaintiff Zielinski's loan transaction took place on or around January 20, 2006.  Plaintiff Zielinski was only put on notice of the *possibility* of his claims and injuries when he received a Notice from KTMC on or around September 16, 2011.

236.    Plaintiff Zielinski first communicated with counsel concerning the subject matter of the Notice and to discuss the basis of any *possible* claims and injuries on or around October 6, 2011.

237.    Plaintiff Zielinski signed a written agreement regarding KTMC's legal representation on or around February 17, 2012.

238.    Prior to communicating with counsel, nothing that the Plaintiff Zielinski received from Defendants following his closing, by mail or otherwise, including, but not limited to:  (i) any Borrower Notice Regarding Reinsurance; (ii) monthly billing statements pertaining to the payment of his mortgage and/or private mortgage insurance payments; and (iii) correspondence from his lender and/or Private Mortgage Insurer, provided him with notice of even the *possibility* of his claims and injuries arising out of his loan transaction.  For instance, nothing indicated that the purportedly legitimate captive reinsurance arrangement would have, or was having, ***any practical impact*** on his costs or loan terms, or on the his private mortgage insurance or settlement rights or obligations.

239.    Once Plaintiff Zielinski discovered the underlying basis for the claims and injuries alleged herein with the assistance of counsel, he contacted National City in an effort to discover the identity of his private mortgage insurance providers and also contacted the Private Mortgage Insurers to obtain further information about the reinsurance of his private mortgage insurance.  None of the employees with whom he spoke were familiar with or were able to answer questions regarding National City's captive reinsurance program.

240.   Plaintiff Zielinski was also unable to ascertain whether or not his mortgage insurance was part of National City's captive reinsurance program.  On March 9, 2012, Plaintiff Zielinski's wife telephoned Green Tree Servicing to find out if the mortgage insurance on her loan was part of National City's captive reinsurance program.  She spoke with a customer service representative named Julio as asked if her loan was part of the National City's captive reinsurance program.  Julio responded that he did not know what Mrs. Zielinski was talking about and had never heard of a "captive reinsurance program."  Julio thought someone in the escrow department might know, but would not transfer Mrs. Zielinski to the escrow department.  Mrs. Zielinski called Green Tree Servicing again on March 15, 2012 and spoke to a customer service representative named Melissa.  Mrs. Zielinski again asked if her loan was part of the captive reinsurance program.  Melissa informed Mrs. Zielinski that she did not know anything about captive reinsurance.

241.   Prior to communicating with counsel, and despite actively participating in their loan transactions by, *inter alia*, reading and reviewing each of the documents presented at closing, nothing Plaintiffs were aware of or received at or following closing providing notice of facts bearing upon their claims.  Specifically, none of the Class members received any document or communication indicating that the purportedly legitimate captive reinsurance arrangements could have, would have, or were having, ***any practical impact*** on Plaintiffs' rights or obligations.  These documents and communications include, but are not limited to (i) the Form Documents; (ii) periodic account statements pertaining to Plaintiffs' respective mortgages and/or private mortgage insurance; and (iii) correspondence from Defendants or from any of the Private Mortgage Insurers.  Defendants were in exclusive possession of all essential facts relating to Defendants' unlawful captive reinsurance arrangements.

242.    Moreover, it is unrealistic to expect Class members to be as diligent as state regulatory agencies such as the Minnesota Department of Commerce whose investigation of certain captive mortgage reinsurance transactions involving several of the Private Mortgage Insurers did not begin until around 2007, years after the transactions came into existence.  *See* Reinsurance Kickbacks (noting that the Minnesota Department of Commerce began to review the insurance on home loans around 2007 and presented its findings to the Department of Justice in the summer of 2009).

243.    Despite years of investigation, it took the Federal Government until 2012 to publicly announce its investigation into captive reinsurance arrangements.  Indeed, the Director of the Consumer Financial Protection Bureau, Richard Cordray, when subsequently announcing enforcement actions against some of the Private Mortgage Insurers, stated that, "[h]omeownership is difficult and expensive enough for most people without extra costs imposed by financial kickbacks that are kept hidden from them." *See* Exhibit 67 (April 4, 2013 Prepared Remarks of Richard Cordray).

244.    Further, upon information and belief, NCMIC and other captive reinsurance companies incorporated in "captive-friendly" states are not required to file with the NAIC the type of detailed annual reports usually required of commercial insurance companies.  *See* Janis Mara, *Wells Fargo, Citibank Under Investigation in Alleged Kickback Schemes*, Inman News (Mar. 7, 2005), attached as Exhibit 68 ("The annual reports and actuarial reports of Vermont captives are protected by the state's confidentiality laws and cannot be accessed without a court order by anyone other than a regulator."); *see also* Ex. 4 (Mortgage Kickback Scheme) (noting that Vermont ranks among the world's top three domiciles along with Bermuda and the Cayman Islands).  Even the most sophisticated borrower could not, for example, simply contact the NAIC

to obtain information on National City's captive reinsurer.  One would need a subpoena to obtain such information; and to obtain a subpoena, one would have to file a lawsuit.

245.    For instance, HUD investigators have alleged that "Vermont insurance regulators went a step further in enabling the mortgage reinsurance business to flourish," finding that:

> Vermont regulators signed off on actuarial opinions from banks and insurers that failed to accurately describe the terms of the reinsurance deals in question, overpaid banks for the risk they were taking and allowed banks to claim insurance trust accounts were capitalized with money that had been explicitly deemed off-limits for claims-paying purposes.

*See id.* (also noting that, when "[f]aced with the prospect of either tacitly admitting that it was not taking on actual risk or filing financial statements that did not conform to accounting guidelines, [Countrywide Financial Corporation's captive reinsurer] Balboa was rescued by Vermont insurance officials.").

246.    In sum, Defendants provided misleading and false information to Plaintiffs and Class members, thus affirmatively acting to conceal their unlawful kickback scheme.  By funneling kickbacks through NCMIC and representing that such payments were for services actually performed, rather than referral fees, Defendants acted to conceal and prevent Plaintiffs from discovering the underlying basis for their claims.  Any delay by the absent putative Class members is excusable and, accordingly, Plaintiffs and the Class contend that it would be inequitable for the Court to apply the four-year limitation period set forth in RICO in a way that would preclude Plaintiffs' claims.

## CLAIMS FOR RELIEF

**COUNT ONE**
**(VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968)**
**(brought by Plaintiffs individually and on behalf of the RICO Class)**

247.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

248.    Plaintiffs, each member of the RICO Class, and each Defendant are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

**The RICO Enterprise**

249.    For the purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of the Private Mortgage Insurers and Defendants, including their respective officers, directors, employees, agents, and indirect subsidiaries (the "Enterprise").   The Enterprise was separate and distinct from the persons that constituted the Enterprise.

250.    Defendants and the Private Mortgage Insurers associated together for the purpose of defrauding Plaintiffs and the RICO Class by tricking them into paying for kickbacks disguised as ceded reinsurance premiums flowing from the Private Mortgage Insurers to Defendants.

251.    Each of the Defendants and each of the Private Mortgage Insurers agreed to, and did, participate in the conduct of the Enterprise and carried out their roles using broad and independent discretion.

252.    The National City Lenders established NCMIC to serve as a repository and conduit for kickbacks paid by the Private Mortgage Insurers to Defendants and to provide a structure that allowed the Enterprise associates to conduct their fraudulent enterprise.

253.    The National City Lenders were largely responsible for the management of the Enterprise. The National City Lenders organized the fraudulent scheme and procured the involvement of the Private Mortgage Insurers.

254.    The National City Lenders required each and every Class member to obtain private mortgage insurance from one of the Private Mortgage Insurers—each of whom had reinsurance contracts with NCMIC, structured, as challenged here, to purchase "reinsurance" on that private mortgage insurance.

255.    The National City Lenders allocated its mortgage insurance business to the Private Mortgage Insurers, who had agreed to cede a portion of Plaintiffs' and the RICO Class's mortgage insurance business on a rotating or modified rotating basis as payment for the business.

256.    The associated members of the Enterprise agreed to cooperate with each other and deceive Plaintiffs and the RICO Class into believing that the captive reinsurance arrangement was legitimate, knowing that it was not.

257.    The Private Mortgage Insurers participated in the Enterprise because their participation ensured each a guaranteed portion of National City's mortgage insurance business.

258.    By participating in and conducting the affairs of the Enterprise, the Private Mortgage Insurers agreed to forego competition with each other for the National City Lenders' mortgage insurance business.  They understood that they were agreeing to a coordinated and complimentary course of conduct with the other Private Mortgage Insurers.

259.    Upon information and belief, the Enterprise has operated since at least 2004.

**Pattern of Racketeering Activity**

260.    At all times relevant, in violation of 18 U.S.C. § 1962(c), Defendants  and the Private Mortgage Insurers conducted the affairs of the Enterprise through a pattern of racketeering activity, as defined in RICO, 18 U.S.C. § 1961(5), by virtue of the conduct described herein.

261.    The pattern of racketeering activity consisted of mail fraud and/or wire fraud, including "honest services" fraud, in violation of 18 U.S.C. § 1341 and § 1343.  Specifically, Defendants engaged in an intentional scheme or artifice to defraud borrowers into funding kickbacks flowing from the Private Mortgage Insurers to Defendants.

262.    Defendants committed mail and/or wire fraud by using the mails and wires to conduct the affairs of the Enterprise including use of the mails and/or wires for the purpose of

communicating with each other, transmitting and sharing information and transferring and receiving funds, including but not limited to Plaintiffs' and the RICO Class's mortgage documents, mortgage insurance premiums and premiums ceded by the Private Mortgage Insurers to NCMIC for sham reinsurance.

263.    Defendants further committed new and independent acts of mail and/or wire fraud through its misleading accounts statements and other communications, which were repeatedly and periodically provided to borrowers.

264.    Defendants' conduct included a fraudulent scheme to deprive borrowers of their intangible rights to the Private Mortgage Insurers' "honest services," in violation of 18 U.S.C. § 1346.  Defendants' initial selection of the Private Mortgage Insurers due to their participation in the captive reinsurance scheme violated borrowers' rights to "honest services," and each of the Defendants intentionally and willfully conspired and participated in the "honest services" violations.

265.    It was reasonably foreseeable to Defendants that the mails and/or wires would be used in furtherance of the fraudulent scheme, and the mails and/or wires were in fact used to further and execute the scheme.

266.    The nature and pervasiveness of both the Enterprise necessarily entailed frequent mail and/or wire transmissions.  The precise dates of all such transmissions cannot be alleged without access to the books and records of Defendants and their agents, however Plaintiffs generally allege that such transmissions were repeated and regular, occurring in the initial mortgage documents transmitted to borrowers at the time of closing, repeated in periodic statements which were transmitted to borrowers thereafter, communications between and among

Defendants and their associated Enterprise members and for the purpose of collecting premiums and the transmission of kickbacks from the Private Mortgage Insurers to Defendants.

267.    For the purpose of furthering and executing their scheme, Defendants regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private commercial interstate carrier.

268.    For the purpose of furthering and executing their scheme, Defendants also regularly transmitted and caused to be transmitted writings and electronic data in interstate commerce by means of wire communication.

269.    Defendants utilized the mails and/or wires for the purpose of furthering and executing their scheme.

270.    The Form Documents and account statements, examples of which are attached as Exhibits 1-3, 7-21, 27-33, and 59-65, are only a few instances of the pattern of racketeering activity, consisting of mail fraud and/or wire fraud violations, engaged in by Defendants.

271.    Each postal and electronic transmission was incident to an essential part of the scheme, namely to mask the true nature of the captive reinsurance scheme and the funneling of kickbacks from the Private Mortgage Insurers to Defendants.  As detailed above, Defendants engaged in similar activities with respect to each member of the RICO Class.

272.    Additionally, each postal and/or electronic transmission constituted a predicate act of mail fraud and/or wire fraud in that each transmission furthered and executed the scheme to defraud borrowers.

273.    Defendants each participated in the scheme to defraud knowingly, willfully and with a specific intent to defraud borrowers into funding kickbacks.

274.   The predicate acts of mail fraud and/or wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).  The predicate acts were not isolated events, but were related acts aimed at the common purpose and goal of defrauding borrowers to fund illegal kickbacks.

275.   Defendants, along with the Private Mortgage Insurers, were common participants in the predicate acts.  Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers like Plaintiffs and the RICO Class.

**Injury to Plaintiffs and the Class**

276.   As a direct and proximate result of the violations of 18 U.S.C. § 1962(c) by Defendants, Plaintiffs and the RICO Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).

277.   In particular, Plaintiffs and the RICO Class were injured by being forced to fund illegal kickbacks.  The amount of the kickbacks that Plaintiffs and the RICO Class were compelled to fund is quantifiable.  Borrowers, such as Plaintiffs and the RICO Class, received nothing of value in exchange for paying the kickbacks.

278.   Plaintiffs and the RICO Class were injured each time that they funded illegal kickbacks, *i.e.* each time their private mortgage insurance premiums were ceded by the Private Mortgage Insurers to NCMIC.

279.   Under Defendants' scheme, the mortgage insurance premiums paid by Plaintiffs and the RICO Class necessarily and wrongly included payments unlawfully kicked back to NCMIC that far exceeded the value of any services performed (indeed, there were no services performed in return for this payment).

280.    The specific harms identified above have been recognized as widespread in the mortgage lending marketplace.    *See generally* Mortgage Kickback Scheme; Reinsurance Kickbacks.

281.    Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs and the RICO Class for three times the damages sustained, plus costs of bringing this suit, including reasonable attorneys' fees.

### COUNT TWO
### (CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d))
### (brought by Plaintiffs individually and on behalf of the RICO Class)

282.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

283.    RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

284.    Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. §1962(c).

285.    As set above, at all relevant times, Plaintiffs and Class members are "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

286.    As also set forth above, at all relevant times, Defendants are "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

287.    Defendants formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of defrauding borrowers into funding illegal kickbacks from the Private Mortgage Insurers to Defendants.

288.    The Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

289.    As set forth above, Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).

290.    Defendants were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. §1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

291.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to accomplish the objects thereof, including but not limited to the acts set forth herein.

292.    As a direct and proximate result of the overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the RICO Class have been injured in their business and property.  In particular, Plaintiffs and the RICO Class were injured by being compelled to fund illegal kickbacks.

293.    Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs and the RICO Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**COUNT THREE**
**(VIOLATION OF RESPA, 12 U.S.C. § 2607)**
**(brought by Plaintiffs individually and on behalf of the RESPA Class)**

294.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

295.    Throughout the relevant time period, Defendants provided "settlement services" and/or engaged in business incident to real estate settlement services in respect of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

296.    Plaintiffs and other members of the RESPA Class obtained federally-related residential mortgage loans through the National City Lenders and collectively have made hundreds of millions of dollars in PMI premium payments in connection with their real estate closings.

297.    The amounts paid by the Private Mortgage Insurers and accepted by National City through its captive reinsurance arrangements constitute "things of value" within the meaning of RESPA § 2602(2).

298.    Defendants arranged for an unlawfully excessive split of borrowers' premiums to be ceded to NCMIC under carefully crafted excess-of-loss and purported quota share reinsurance contracts.

299.    These ceded premiums: (i) were not for services actually furnished or performed; and/or (ii) exceeded the value of any such services provided.

300.    The millions of dollars paid by the Private Mortgage Insurers and accepted by National City through their captive reinsurance arrangements constituted fees, kickbacks or things of value pursuant to agreements between the National City Lenders and the Private Mortgage Insurers that business incident to real estate settlement services involving federally-related mortgage loans would be referred to such insurers.  Such practice violated RESPA, 12 U.S.C. § 2607(a).

301.    In connection with transactions involving federally-related mortgage loans, the Private Mortgage Insurers gave, and National City accepted, a portion, split or percentage of charges received by the Private Mortgage Insurers for the rendering of real estate settlement services and/or business incident to real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. § 2607(b).   The money paid by the Private

Mortgage Insurers and accepted by National City through their captive reinsurers was a portion, split or percentage of the private mortgage insurance premiums paid by National City's customers NCMIC participated in the scheme and served as the direct party to which the split was paid.   NCMIC agreed to provide purported "reinsurance" services involving private mortgage insurance paid by Plaintiffs and other members of the RESPA Class.

302.    Plaintiffs and other members of the RESPA Class were subjected to settlement services and/or business incident to real estate settlement services tainted by kickbacks or referrals of business inherently biased by the unlawful kickback scheme, which involved each and every major provider of private mortgage insurance in the country.   Defendants' reinsurance arrangements with the Private Mortgage Insurers over time affected the price, quality or other characteristics of the "referred" private mortgage insurance through, among other things, inherent limits on settlement service choice and competition.

303.    First, Plaintiffs and other members of the RESPA Class were harmed in that, as a matter of law, they were entitled to purchase settlement services from providers that did not participate in unlawful kickback and/or fee-splitting schemes.   Congress bestowed upon Plaintiffs and other members of the RESPA Class a right to a real estate settlement free from unlawful kickbacks and unearned fees, and has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties without proof of an overcharge.   *See* 12 U.S.C. §§ 2601, 2607(d)(2).   Private Mortgage Insurers have given, and National City has accepted, unlawful kickback payments and/or an unearned portion of settlement service charges and/or charges for business incident to real estate settlement services—private mortgage insurance premiums—in violation of RESPA.

304.    Defendants' scheme also resulted in a limitation on both settlement service choice

and competition.  The National City Lenders eliminated competition among providers PMI by requiring their borrowers to purchase private mortgage insurance from one of the Private Mortgage Insurers with whom they had an arrangement.  Upon information and belief, referred borrowers were allocated to one of the Private Mortgage Insurers on a rotating or other systematic basis, which unlawfully guaranteed business for each Private Mortgage Insurer in return for a referral fee.  The referral fee included no evaluation of price, quality, service provided, reputation, performance or any other aspect of the product provided by any of the Private Mortgage Insurers receiving the referrals.

305.    Further, as set forth above, Defendants did not disclose the true nature of the reinsurance arrangements to Plaintiffs.  Congress has already determined that an unlawful kickback/referral arrangement, such as the sham captive mortgage reinsurance arrangement at issue here, may reduce competition among settlement service providers.  *See Carter v. Welles-Bowen Realty, Inc.*, 553 F.3d 979, 987 (6th Cir. 2009) (explaining that the 1983 amendment to the RESPA statute was necessary to address "practices [that] could result in harm to consumers beyond an increase in the cost of settlement services," including the reduction of healthy competition) (citing H.R. Rep. No. 97-532, at 52 (1982)).

306.    Moreover, though not necessary to prevail on their claims, Plaintiffs and other members of the Class were harmed because their PMI premiums were artificially inflated as a result of Defendants' conduct.[10]  Congress has already determined that the *aggregate* effect of an unlawful  kickback/referral  arrangement,  such  as  a  sham  captive  mortgage  reinsurance

---

[10]      The Third Circuit, in a directly analogous action, held that, although the plaintiffs contended that they were overcharged for mortgage insurance, "[t]he plain language of RESPA section 8 does not require plaintiffs to allege an overcharge." *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 759 (3d Cir. 2009).

arrangement, is to unnecessarily inflate the costs consumers pay for real estate settlement services.  *See* 12 U.S.C. § 2601(b) ("It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services.").  Thus, kickbacks and unearned fees unnecessarily and artificially inflate the price of settlement service charges, including private mortgage insurance premiums.

307.    Under Defendants' scheme, the mortgage insurance premiums paid by Plaintiffs and the members of the RESPA Class necessarily and wrongly included payments for both: (i) actual mortgage insurance services; and (ii) payments unlawfully kicked back to NCMIC that far exceeded the value of any services performed (indeed, there were no services performed in return for this payment) and, were also, in fact, illegal referral fees.

308.    The specific harms identified above have been recognized as widespread in the mortgage lending marketplace.  *See generally* Mortgage Kickbacks Scheme; Reinsurance Kickbacks.

309.    For the reasons set forth above, Defendants have violated RESPA, 12 U.S.C. §§ 2607(a) and (b).  Pursuant to RESPA, 12 U.S.C. § 2607(d), Defendants are jointly and severally liable to Plaintiffs and the members of the RESPA Class in an amount equal to three times the amounts they have paid or will have paid for private mortgage insurance as of the date of judgment.

310.    Defendants violated RESPA each time that the Private Mortgage Insurers ceded premiums to NCMIC.

311.    In accordance with RESPA, 12 U.S.C. § 2607(d), Plaintiff also seeks attorneys' fees and costs of suit.

## COUNT FOUR
## (UNJUST ENRICHMENT)

312.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

313.    Defendants, by their actions, benefitted from, and increased their profits by effecting a scheme which deprived Plaintiffs and Class members of the funds that were funneled from the Private Mortgage Insurers to Defendants in the form of illegal kickbacks.  Defendants benefitted from the illegal kickbacks, despite providing reinsurance services of little or no value.

314.    Defendants accepted and received the benefits of the illegal kickbacks, which were funded by Plaintiffs and Class members.  It is inequitable and unjust for Defendants to retain these monies, which were procured by false and misleading pretenses and representations.

315.    Plaintiffs and Class members are entitled to relief for this unjust enrichment in an amount equal to the benefits unjustly retained by Defendants, plus interest on these amounts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Classes and award the following relief:

A.    Certifying this action as a class action pursuant to Rule 23 of the Federal rules of Civil Procedure, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B.    Declaring, adjudging, and decreeing the conduct alleged herein as unlawful;

C.    Awarding Plaintiffs and the RICO Class statutory damages pursuant to RICO, 18 U.S.C. § 1964(c);

D.    Awarding Plaintiffs and the RESPA Class statutory damages pursuant to RESPA Section 8(d)(2), 12 U.S.C. § 2607(d)(2);

E.     Granting Plaintiffs and the Classes costs of suit, including reasonable attorneys' fees and expenses;

F.     Granting Plaintiffs and the Classes restitution of all improperly collected reinsurance premiums and/or disgorgement of Defendants' ill-gotten gains, and imposing an equitable constructive trust over all such amounts for the benefit of the Class; and

G.     Granting Plaintiffs and the Classes such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury as to all claims in this action so triable.

Dated:  September 7, 2016                    Respectfully submitted,

                                             **KESSLER, TOPAZ**
                                             **MELTZER & CHECK, LLP**

                                             <u>/s/ Edward W. Ciolko</u>
                                             Joseph H. Meltzer, Esq.
                                             Edward W. Ciolko, Esq.
                                             Terence S. Ziegler, Esq.
                                             Amanda R. Trask, Esq.
                                             280 King of Prussia Road
                                             Radnor, PA  19087
                                             Telephone: (610) 667-7706
                                             Facsimile: (610) 667-7056

                                             **BERKE, BERKE & BERKE**
                                             Ronald J. Berke, Esq.
                                             420 Frazier Avenue
                                             Chattanooga, TN  37402
                                             Telephone: (423) 266-5171
                                             Facsimile: (423) 265-5307

**BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER LLP**
Alan R. Plutzik, Esq.
2125 Oak Grove Blvd., Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0770
Facsimile: (925) 945-8792

*Attorneys for Plaintiffs and the Proposed Classes*