**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NELSON WHITE, JR., et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 11-7928** |
| | : | |
| **THE PNC FINANCIAL SERVICES** | : | |
| **GROUP, INC., et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                              **January 9, 2017**

## I.     INTRODUCTION

This is a putative class action brought by homeowners claiming violations of the

Real Estate Settlement Procedures Act, 12 U.S.C. § 2607 (RESPA). The plaintiffs claim

the defendants carried on a "captive reinsurance scheme" in which the defendants

enjoyed kickbacks, referrals, and fees that are prohibited by RESPA.

After I denied defendants' motion to dismiss in 2014, this case was stayed pending

the U.S. Court of Appeals for the Third Circuit's decision in Cunningham v. M & T Bank

Corp., 814 F.3d 156 (3d Cir. 2016). Both parties sought a stay pending the Cunningham

decision because the issue in that case was identical to an issue in this case: whether

equitable tolling applies to RESPA's one-year statute of limitations. Now that

Cunningham has been decided, plaintiffs move to lift the stay. Plaintiffs also move for

leave to amend their complaint to modify their RESPA claim and add several entirely

1

new claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (RICO).[1] For the reasons that follow, I will grant in part and deny in part plaintiffs' motion for leave to amend.

## II.   BACKGROUND

For purposes of this motion, it is important to understand both the substantive nature of plaintiffs' claims as well as the procedural posture of this case.

### A.   *The Nature of Plaintiffs' RESPA Claims*

Understandably, when many people purchase a home, they cannot afford to make a 20% down payment. To protect lenders in the event of default, homeowners who are unable to make a 20% down payment are required to purchase private mortgage insurance. Once a homeowner enters into a mortgage insurance contract with an insurance company (an "insurer"), often times, the insurer then enters into a separate "reinsurance" arrangement with another company (a "reinsurer"). In theory, and under RESPA, the reinsurer is required to assume part of the risk that the insurer took on when it entered into a contract with the homeowner.

In this case, plaintiffs allege that the defendant insurers, lenders, and reinsurers have colluded to create a scheme that violates RESPA. Plaintiffs maintain that the lenders, as a general practice, form subsidiary companies that become the reinsurers. These lenders then systematically refer homeowners to the insurers to buy mortgage insurance. In exchange for a constant stream of profit-producing homeowner-borrowers,

---

[1] Both parties agree that the stay should be lifted. Thus, the only real issue at hand is whether the plaintiffs should be permitted to amend their complaint.

the insurers then pay a kickback to the reinsurer who, as a subsidiary, is really just an extension of the lender.[2] Plaintiffs claim this "pay-to-play" scheme harms homeowners because, by colluding, the insurers, reinsurers, and lenders, were able to reduce competition in the mortgage insurance market, thereby increasing the premium payments the homeowner-plaintiffs are required to pay to maintain their mortgage insurance.

To be sure, there is nothing inherently wrong with—or unlawful about—reinsurance contracts. However, RESPA prohibits certain captive reinsurance schemes that result in "sham" service. See Alston v. Countrywide Fin. Corp., 585 F.3d 753, 755–57 (3d. Cir 2009) (explaining how certain captive reinsurance schemes, like the one alleged here, may violate RESPA). Specifically, Section 8(a) of RESPA prohibits fees and kickbacks paid in exchange for business referrals involving federally related mortgage loans. 12 U.S.C. § 1607(a). Section 8(b) prohibits unearned fees: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service . . . other than for services actually performed." Id. § 1607(b). Plaintiffs allege defendants violated these provisions of RESPA because: (1) they systematically gave and received kickbacks; (2) the reinsurers did not assume any real risk; and (3) the reinsurers never "actually performed" any real services.

---

[2] In theory the lender is using homeowners as forms of currency, so to speak; the more homeowners that the lender refers to the insurer, the more money, in the form of kickbacks, the reinsurer (and necessarily the lender) gets back.

### B.     Procedural Background

The plaintiffs filed their initial complaint on December 31, 2011. In it, they brought two claims for: (1) a violation of § 2607 of RESPA; and (2) common law unjust enrichment. (Doc. No. 1). Several months later, the parties filed a joint motion to stay all proceedings pending the U.S. Supreme Court's review of <u>Edwards v. First American Financial Corp.</u>, 610 F.3d 514 (9th Cir. 2010).[3] After the U.S. Supreme Court dismissed the writ of certiorari in <u>Edwards,</u> the parties filed a joint motion to lift the stay. (Doc. No. 75). The stay was lifted and plaintiffs then filed an amended class action complaint. (Doc. No. 83). In their amended complaint, plaintiffs reasserted the identical two claims they had asserted in their original complaint. (<u>Id.</u>)

Defendants then moved to dismiss the plaintiffs' RESPA claims as untimely. Plaintiffs argued in response that their claims were timely based on principles of equitable tolling. On June 20, 2013, I dismissed plaintiffs' RESPA claims without prejudice, finding that equitable tolling did not apply. (Doc. No. 145). A few weeks later, plaintiffs filed a second amended complaint. (Doc. No. 148). In their second amended complaint, plaintiffs reasserted the identical two claims they had asserted in their original complaint and in their amended complaint: (1) a RESPA violation; and (2) unjust enrichment. (<u>Id.</u>) Defendants then filed a second motion to dismiss, again arguing the RESPA claims were time-barred. Plaintiffs renewed their equitable tolling argument, this

---

[3] The issue in <u>Edwards</u> was whether a RESPA plaintiff has standing to sue under Article III, § 2 of the U.S. Constitution. The U.S. Supreme Court dismissed the writ of certiorari as improvidently granted and never decided the issue. <u>First American Fin. Corp. v. Edwards</u>, 132 S. Ct. 2536 (2012).

time stressing that they were reasonably diligent in discovering the RESPA claims.[4] I denied defendants' second motion to dismiss finding that, based on then-current precedent, whether equitable tolling applied could only be decided at the summary judgment stage after fact discovery had concluded. (Doc. No. 185 at 19).

A few weeks after I denied this motion to dismiss, the parties filed another joint motion to stay all proceedings pending the Third Circuit's decision in Riddle v. Bank of America Corp., 588 F. App'x 127 (3d Cir. 2014). Riddle addressed the issue of equitable tolling with respect to RESPA's statute of limitations. After the Third Circuit decided Riddle, the stay was lifted. (Doc. No. 195). The defendants then filed motions for reconsideration of my Order denying their motion to dismiss. Before those motions were decided, the parties filed yet another joint motion to stay all proceedings pending the Third Circuit's decision in Cunningham. (Doc. No. 219). In their third joint motion to stay, the parties agreed that "the ultimate resolution of the central issue in the Cunningham Action, i.e. the applicability and application of the doctrine of equitable tolling, has a very reasonable likelihood of informing this Court on the resolution of such matters in this case, and advancing the ultimate disposition of this action." (Id. at 2). Months later, during this Cunningham stay, the Consumer Financial Protection Bureau ("CFPB") issued a decision in a landmark RESPA case, holding that RESPA's statute of limitations did not bar claims for kickbacks that occurred after the closing of home loans.

---

[4] Plaintiffs seeking to enjoy the benefit of equitable tolling due to fraudulent concealment—which the plaintiffs argued in this case—must establish the following three elements: (1) the defendants actively misled the plaintiff; (2) which prevented plaintiff from recognizing the validity of her claim within the limitations period; and (3) the plaintiff's ignorance is not attributable to her lack of reasonable due diligence in attempting to uncover the relevant facts. Cunningham v. M & T Bank Corp., 814 F.3d 156, 161 (3d Cir. 2016).

Several months after this CFPB decision, the Third Circuit decided Cunningham. The plaintiffs in Cunningham were homeowners who brought the same exact type of RESPA claim—based on reinsurance kickbacks—that is brought here. 814 F.3d at 158. They did not file their complaint until years after RESPA's one-year statute of limitations had expired. Id. The Cunningham plaintiffs relied on equitable tolling to argue that their claims were timely. Id. In fact, they made the same exact argument that has previously been made in this litigation: the first time they became aware of their RESPA claims was when they received letters informing them of the potential viability of the claims. Id. at 162. The Third Circuit expressly rejected this equitable tolling argument. Id. at 160–62. It found that the plaintiffs became aware of their RESPA claims much earlier: on the date of closing when they read certain disclosures that explained reinsurance. Id. at 161–64. Therefore, the Court held that the plaintiffs were not reasonably diligent in bringing their claims, which is required of them to enjoy the doctrine of equitable tolling based on fraudulent concealment.

The plaintiffs now move for leave to amend their complaint to modify their RESPA claim and to add new claims under RICO.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 15 governs amendment of pleadings generally. Fed. R. Civ. P. 15. The U.S. Court of Appeals for the Third Circuit has explained that a district court's inquiry is distinctly different under Rule 15(a) than it is under Rule 15(c). Arthur v. Maersk, Inc., 434 F.3d 196, 202–03 (3d Cir. 2006).

Rule 15(a) applies to motions for leave to amend. "The Federal Rules of Civil Procedure express a preference for liberally granting leave to amend." Oran v. Stafford, 226 F.3d 275, 291 (3d Cir. 2000). A motion for leave to amend a complaint should be granted "whenever justice so requires." Fed. R. Civ. P. 15(a); Arthur, 434 F.3d at 202–03. In determining whether "justice so requires," courts consider a number of factors including undue delay, bad faith, prejudice to the opposing party, and futility. Foman v. Davis, 371 U.S. 178, 182 (1962). Delay alone is not sufficient to warrant denial of leave to amend. Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir. 1984). However, when delay becomes "undue," it forms an adequate basis, on its own, for denial of a motion to amend. Bjorgung v. Whitetail Resort, LP, 550 F.3d 263, 266 (3d Cir. 2008). "Delay becomes 'undue,' and thereby creates grounds for the district court to refuse leave, when it places an unwarranted burden on the court or when the plaintiff has had previous opportunities to amend." Id. Thus, an undue delay analysis requires courts to focus on "the movant's reasons for not amending sooner." Id. (quoting Cureton v. Nat'l Collegiate Athl. Ass'n, 252 F.3d 267, 273 (3d Cir. 2001)). A proposed amendment is futile "if the amendment will not cure the deficiency in the original complaint or if the amended complaint cannot withstand a renewed motion to dismiss." Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 292 (3d Cir. 1988).

Rule 15(c) addresses the issue of whether a proposed amended complaint "relates back" to the filing of the original complaint. Under Rule 15(c)(1)(B), an amendment to a pleading relates back to the date of the original pleading where "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or

attempted to be set out—in the original pleading." "Where an amendment relates back, Rule 15(c) allows a plaintiff to sidestep an otherwise-applicable statute of limitations, thereby permitting resolution of a claim on the merits, as opposed to a technicality." Glover v. FDIC, 698 F.3d 139, 145 (3d Cir. 2012). The Third Circuit has made clear that "only where the opposing party is given fair notice of the general fact situation and the legal theory upon which the amending party proceeds will relation back be allowed." Id. at 146. On the contrary, "amendments that significantly alter the nature of a proceeding by injecting new and unanticipated claims are treated far more cautiously." Id. When a plaintiff's original complaint does not provide a defendant "'fair notice of what the plaintiff's [amended] claim is and the grounds upon which it rests,' the purpose of the statute of limitations has not been satisfied and it is 'not an original pleading that [can] be rehabilitated by invoking Rule 15(c).'" Id. (quoting Baldwin Cty. Welcome Ctr. v. Brown, 466 U.S. 147, 149 n.3 (1984)).

## IV. DISCUSSION

Plaintiffs move for leave to amend their complaint to modify their RESPA claim and to add two new RICO claims. Defendants oppose plaintiffs' motion. Defendants argue that the motion is unduly delayed, they would be prejudiced by amendment, and the proposed amendment is futile. I will deny plaintiffs' motion to amend the complaint to add RICO claims because I agree the plaintiffs' actions—and lack thereof—constitute undue delay with respect to these claims. I also find that the RICO claims do not relate back to the original complaint under Rule 15(c). Because I find the continuing violations

doctrine applicable to the plaintiffs' RESPA claims, I will grant them leave to amend their RESPA claims.[5]

### A.    *Plaintiffs' Proposed Modified RESPA Claim*

Plaintiffs concede that they are no longer relying on principles of equitable tolling to support survival of their RESPA claims. Instead, plaintiffs argue that the continuing violations doctrine applies to their RESPA claims.[6]

### 1.    <u>RESPA's Statute of Limitations</u>

An action under Section 2607 of RESPA must be brought within "1 year . . . from the date of the occurrence of the violation." 12 U.S.C. § 2614. In <u>Cunningham</u>, the Third Circuit noted that this statute of limitations begins running "from the date of the occurrence of the violation . . . which begins at the closing of the loan." 814 F.3d at 160 (citation omitted); <u>In re Cmty. Bank of N. Va.</u>, 622 F.3d 275, 281 (3d Cir. 2010) ("RESPA's one-year statute of limitations . . . begins to run from the date of the occurrence of the violation, . . . i. e., the date the loan closed") (citation omitted).The plaintiffs argue that the closing is not the only time that a RESPA violation can occur. They maintain defendants violated RESPA each time they paid an illegal kickback or fee,

---

[5] Although I am granting amendment to modify the RESPA claims, I do not find amendment necessary since the plaintiffs are merely asserting a new legal argument—not new facts or a new legal claim. The plaintiffs' second amended complaint, on its face, contains sufficient allegations to support a continuing violations argument. <u>See</u> Second Am. Compl. ¶ 75 ("Each and every premium already ceded to NCMIC by the Private Mortgage Insurers, as well as each and every premium that they will continue to cede to NCMIC in the future, constitutes a separate illegal kickback"); <u>id.</u> ¶ 14 (alleging "the arrangements were part of a unitary scheme that was effectuated over time"). Thus, what I am really deciding today is that the continuing violations doctrine applies to plaintiffs' RESPA claims as they have been pled all along.

[6] The Third Circuit has not yet addressed this doctrine in the context of RESPA.

or made an illegal referral. According to plaintiffs, each violation triggered a new statute of limitations period.

### 2.     The Continuing Violations Doctrine

"In most federal causes of action, when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." Brenner v. Local 514 United Bros. of Carpenters of Am, 927 F.2d 1283, 1295 (3d Cir. 1991); 287 Corp. Ctr. Assocs. V. Township of Bridgewater, 101 F.3d 320, 324 (3d Cir. 1996) (noting the same). As the U.S. Court of Appeals for the Third Circuit has explained, "[t]he continuing violations doctrine has been most frequently applied in employment discrimination claims." Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2011). "However, this has not precluded the application of the doctrine to other contexts." Id.

The U.S. Supreme Court and Third Circuit have applied the continuing violations doctrine in a wide variety of contexts. See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971) (applying the doctrine to an antitrust claim under the Sherman Act); Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.15 (1968) (same); Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc., 530 F.3d 204, 217–18 (3d Cir. 2008) (recognizing the continuing violations doctrine's applicability in antitrust cases); Brenner, 927 F.2d at 1283 (applying the doctrine to a claim brought under the National Labor Relations Act); Centifanti v. Nix, 865 F.2d 1422, 1432–33 (3d Cir. 1999) (applying the doctrine to a constitutional due process claim brought under 42 U.S.C. § 1983); Cowell, 263 F.3d at 292–93 (finding the doctrine generally applicable to

§ 1983 cases but not in the particular case at bar); <u>Crawford v. Washington Cty. Children</u>
<u>& Youth Servs.</u>, 353 F. App'x 726, 729 (3d Cir. 2009) (same); <u>In re Niaspan Antitrust</u>
<u>Litig.</u>, 42 F. Supp. 3d 735, 745–47 (E.D. Pa. 2014) (finding the doctrine applicable to
Sherman Act pay-for-delay and price-fixing claims based on a "continuing illegal
contract" under which the defendants continued to sell drugs "at an above-market price").
The Third Circuit has also emphasized that "application of the continuing violations
doctrine is not dependent on which statute gives rise to the plaintiff's claim." <u>Cardenas v.</u>
<u>Massey</u>, 269 F.3d 251, 258 (3d Cir. 2001).

### 3. RESPA and the Continuing Violations Doctrine

Against this backdrop, defendants argue that amendment would be futile because
the continuing violations doctrine does not apply to plaintiffs' RESPA claims. In support,
they note that RESPA's statute of limitations begins to run on the date that plaintiffs
closed on their loans. <u>Cunningham</u>, 814 F.3d at 160. For a number of reasons discussed
in more detail below, this argument misses the mark. First, RESPA's limitations period
only runs from the date of the closing if I assume the continuing violations doctrine does
not apply to plaintiffs' claims. Second, RESPA's statutory text clearly prohibits certain
post-closing kickbacks, fees, and referrals, and plaintiffs have offered persuasive
authority confirming the same. Third, applications of the continuing violations doctrine in
other analogous contexts support application of the doctrine to plaintiffs' RESPA claims.
Fourth, the idea that there can be only one violation of RESPA (at the closing) contradicts
U.S. Supreme Court precedent. Finally, application of the continuing violations doctrine
does not affect <u>Cunningham</u>'s holding.

      **a.**      ***The Continuing Violation Doctrine's Potential Effect on
When RESPA's Statute of Limitations Expires***

For starters, I agree that ordinarily RESPA's statute of limitations begins running
on the date that a homeowner closes on his or her home loan. Id. However, the question
of when a statute of limitations begins to run (by default) is entirely separate from the
question of whether or not subsequent kickbacks, fees, and referrals are violations of
RESPA that can trigger new limitations periods. This is because, "under the continuing
violation theory, the statute of limitations runs from the date of the last alleged violation
rather than the first." Burnette v. City of Phila., No. Civ. A. 02–cv–21293682, 2003 WL
21293682, at *2 (E.D. Pa. Jan. 14, 2003) (citing Cowell, 293 F.3d at 292). Under this
doctrine, RESPA's statute of limitations will only begin to run upon the most recent
alleged RESPA violation committed by defendants. In other words, even though
RESPA's statute of limitations begins to run at the moment the plaintiffs close on their
loan, this does not affect the possibility that a subsequent pattern of kickbacks and fees
(prohibited by RESPA) amounts to a "continuing violation," thereby re-setting the statute
of limitations upon each new violation.

      **b.**      ***The CFPB Decision On RESPA's Statute of Limitations***

Plaintiffs have offered persuasive authority suggesting that the continuing
violations doctrine applies to their RESPA claims. In 2015, the CFPB brought an
enforcement action against a national mortgage lender for violations of RESPA based on
a captive reinsurance scheme. In the Matter of PHH Corp., No. 2014-CFPB-0002 (CFPB,
June 4, 2015) [Doc. No. 224-7]. This enforcement action resulted in a $109 million fine

to the lender. Id. at 26–27. In arriving at its decision, the CFPB concluded that the defendant "violated RESPA every time it accepted a reinsurance payment." Id. at 22. It rejected the argument that there can be only one violation of RESPA. Id. at 23 ("[T]he use of the singular 'violation' in the statute of limitations indicates only that there is one limitations period for one violation, not that a transaction involving multiple kickback payments would result in only a single violation"). It pointed out that "a single course of conduct can result in multiple violations of a statute, regardless of whether the relevant statute of limitations refers to a single cause of action." Id. (citing Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp., 522 U.S. 192, 201–02 (1997)).[7] Consequently, the CFPB held the defendant "liable for each payment it accepted on or after [a certain date] even if the loan with which that payment was associated had closed prior to that date." Id. at 22.

The CFPB went out if its way to distinguish between situations where borrowers pay insurance policies at one time "in full" as compared to captive reinsurance schemes where borrowers pay for insurance as a part of each and every mortgage payment. Id. at 22. In the former situation, it makes sense to apply RESPA's statute of limitations to that one event: the payment of the policy in full. In the latter situation, however, it defies the plain language of § 2607 to not consider each prohibited kickback or referral a separate violation capable of resetting the limitations period. Since certain kickbacks, fees, and referrals are unlawful under RESPA, the very nature of a reinsurance arrangement would

---

[7] In Bay Area Laundry, the U.S. Supreme Court held that in an ERISA case, "each missed payment creates a separate cause of action with its own . . . limitations period." 522 U.S. at 195. The Court rejected the argument that the plaintiffs' failure to sue within the limitations period following the "first" missed payment time-barred the plaintiffs' claims for all subsequent missed payments. Id. at 195–96.

mean that the defendants "committed multiple violations over time in connection with a single loan." In the Matter of PHH Corp., at 25.

I agree with the CFPB's distinction here. Some of RESPA's statutory provisions certainly relate to the closing of a home loan. This is because borrowers usually purchase settlement services at closing. Id. Simply because the closing may be the first time that a RESPA violation occurs, however, does not mean that other RESPA violations may not subsequently occur. Section 8 clearly speaks in terms of each fee, kickback, or referral as being its own violation of RESPA. 12 U.S.C. § 2607 (prohibiting the act of either "accept[ing]" or "giv[ing]" a "fee, kickback, or thing of value"). If this were not the case, then lenders, insurers, and reinsurers would be free to violate RESPA by accepting kickback after kickback for years on end. When a borrower would sue under RESPA for this conduct, the lenders, insurers, and reinsurers could avoid liability if the borrower did not file suit within one year of the very first (of many) illegal acts.[8] Such a reading of the statute would eviscerate the clear purpose behind RESPA, which aims to eliminate "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b)(2). Accordingly, I find that defendants violated RESPA each and every time they delivered or accepted an unlawful fee or kickback.

---

[8] To offer an illustration, a lender could accept dozens of illegal kickbacks, starting on January 1, 2017 (the date of the closing) and continuing through January 1, 2019. Under the defendants' reading of RESPA, any borrower who sued on January 3, 2018—for example—would be too late. This would be the case even if the most recent illegal kickback had occurred a day before the borrower filed his or her complaint. It goes against basic principles of fairness and logic to expect consumers to somehow understand the ongoing nature of a captive reinsurance scheme on the day of their closing, before this scheme even takes effect. This is especially true because—unlike at closing where consumers are present with the bank on the other side of the table—the plaintiffs here had no way of knowing when the defendants were paying kickbacks as they are not privy to the inner workings of defendants' daily financial transactions.

Each alleged violation, in turn, reset RESPA's one-year statute of limitations. Therefore, plaintiffs' claims would be untimely only if there had been no alleged kickback, fee, or referral within the one year leading up to the day they filed their complaint.[9]

### c.      The D.C. Circuit's Remand of the CFPB Decision

Defendants argue that plaintiffs' reliance on the CFPB's decision is misplaced because the U.S. Court of Appeals for the D.C. Circuit vacated in part and remanded that decision. PHH Corp. v. CFPB, 839 F.3d 1 (D.C. Cir. 2016). Plaintiffs counter that defendants have mischaracterized the import of the D.C. Circuit's decision. I agree with plaintiffs. The D.C. Circuit did vacate part of the CFPB's decision, but it did so purely on unrelated constitutional grounds. Specifically, it held that the CFPB's structure violated Article II of the U.S. Constitution because the CFPB is an independent agency that is headed by one director rather than a multi-person commission. Id. at 12. In arriving at this decision, however, it did not vacate part of the CFPB's underlying decision on the merits. In particular, the D.C. Circuit expressly reserved the very issue in this case to be decided by the CFPB on remand:

---

[9] RESPA explicitly prohibits certain kickbacks, fees, and referrals. 12 U.S.C. § 2607. Because these acts are specifically prohibited by statute, they are not the "continual ill effects" of a prior violation but rather violations in their own right. Cf. MacNamara v. Hess, 67 F. App'x 139, 143 (3d Cir. 2003) (explaining that the continuing violations doctrine does not apply to situations where there are mere "ill effects stemming from an original violation"). In MacNamara, the Third Circuit held, in the context of § 1983, that the government's failure to return plaintiff's seized records was not a continuing violation but rather a mere "ill effect" of the original unconstitutional search and seizure. 67 F. App'x at 144; see also Mumma v. High-Spec, Inc., 400 F. App'x 629, 632 (3d Cir. 2010) (differentiating between "a new violation" to which the continuing violations doctrine applies and a "perpetuation of the original violation" to which it does not apply); Tearpock-Martini v. Borough of Shickshinny, 756 F.3d 232, 236–37 (3d Cir. 2014) (holding that, with respect to a street sign that violated the First Amendment, the continued presence of the sign was not a continuing violation because the only affirmative act was the initial installation of the sign). Here, the RESPA kickbacks and fees in this case are explicitly prohibited by statute. This makes them new independent violations rather than perpetuations of a violation (such as the continuing presence of a street sign or failure of the government to return one's records after a constitutional violation). These ongoing violations are not isolated or sporadic events. Rather, as alleged, they are all a part of one reinsurance scheme, the very nature of which requires defendants to make continuous and periodic illegal kickbacks.

> We do not decide here whether each alleged above-reasonable market value payment from the mortgage insurer to the reinsurer triggers a new three-year statute of limitations for that payment. We leave that question for the CFPB on remand and any future court proceedings.

Id. at 55 n.30.[10] Having read the CFPB's decision, it only follows that the D.C. Circuit at the very least acquiesced in the CFPB's holding that each RESPA violation triggers a new limitations period. By "leav[ing] that question" for the CFPB to decide on remand, the D.C. Circuit necessarily acknowledged that the CFPB has the authority to decide this issue. The fact that the D.C. Circuit—having exhaustively reviewed the CFPB decision for error—knows exactly how the CFPB already ruled on this issue is telling. The defendants seem to acknowledge this, but then emphasize that the D.C. Circuit found the CFPB to be "wrong" "on every substantive RESPA issue the Circuit decided." (Doc. No. 227 at 22). This is a peculiar argument to make given that the D.C. Circuit explicitly decided to not rule on the RESPA statute of limitations issue that is now before me. Since the D.C. Circuit ruled on some of the CFPB's substantive RESPA findings, then certainly it could—and would—have reversed the CFPB on this issue had it disagreed with the CFPB's ruling on it.[11]

### d.   *Analogous Applications of the Continuing Violations Doctrine*

My finding today is bolstered by U.S. Supreme Court and Third Circuit case law involving analogous ongoing unlawful schemes that result in civil liability. In Bay Area

---

[10] In actions brought by the CPFB as opposed to a private person, a three-year—not one-year— statute of limitations applies. 12 U.S.C. § 2614.

[11] Even if the defendants were correct that the CFPB's decision lacks any precedential value, that still would not preclude me from finding, based on RESPA's statutory language alone, that each violation of RESPA triggers a new one-year limitations period.

Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp., the U.S. Supreme Court
addressed a factually similar scenario in the context of ERISA. 522 U.S. at 195. Under a
certain ERISA statutory provision, an employer is required to make a series of periodic
payments into a trust fund. Bay Area Laundry, 522 U.S. at 196. The question was
whether the failure of an employer to make one of these required payments is an unlawful
event that triggers a new limitations period every time it happens. Id. at 195. The U.S.
Supreme Court, adopting the Third Circuit's approach to the issue, answered this
question in the affirmative: "each missed payment creates a separate cause of action with
its own six-year limitations period." Id. at 206 (citing Bd. Trs. Dist. No. 15 Machinists'
Pension Fund v. Kahle Engineering Corp., 43 F.3d 852, 857–61 (3d Cir. 1994)). In doing
so, the Court emphasized that the statute required employers to make each payment when
it became due. Id. at 208. Based on its finding, the Court allowed plaintiffs to pursue
recovery for missed payments that fell within the limitations period leading up to when
they filed suit. Id. at 206. It only barred recovery for the first missed payment, which
occurred outside the statute of limitations period. The same rationale applies here. Just as
each missed payment violates ERISA, each unlawful kickback, fee, or referral violates
RESPA. Accordingly, each unlawful fee, kickback, or referral carries its own statute of
limitations period that commences once the violation is committed. The nature of the
conduct in Bay Area Laundry is also similar to the alleged conduct here. Both situations
involve an ongoing series of statutory violations.

        Similarly, in In re Niaspan Antitrust Litigation, our district court was confronted
with an antitrust claim based on drug manufacturers' overpriced sales of pharmaceutical

drugs. 42 F. Supp. 3d at 746. The court agreed with every single other court to consider the issue and held "that a new cause of action accrues to purchasers upon each overpriced sale of the drug." In re Niaspan Antitrust Litig., 42 F. Supp. 3d at 747. Therefore, "the Court conclude[d] that plaintiffs' claims are timely under the continuing-violation doctrine." Id. Just like the reinsurance arrangement between defendants here, the factual basis for the plaintiffs' claims in the above case rested upon their entering into, and furtherance, of a continuing illegal scheme. Id. at 745. Just because that illegal scheme was one between drug companies and here the alleged illegal scheme is between mortgage companies does not eliminate the common thread between the two: both are an ongoing and anticompetitive arrangement between companies that results in periodic statutory violations.[12]

### e.    Other Courts' Interpretations

There has only been one other district court, within this Circuit, to consider the issue before me today. In that case, the court held that the continuing violations doctrine did not apply to the same type of RESPA claims brought here. Menichino v. Citibank, N.A., Civ. Action No. 12–0058, 2013 WL 3802451, at *11 (W.D. Pa. July 19, 2013). In doing so, that court did not rely on Third Circuit precedent (and it could not have because the Third Circuit has never spoken on this point). Rather, it relied on Fifth Circuit case law in concluding that RESPA only speaks of a "single violation" and, thus, the only possible limitation-triggering event contemplated by RESPA is the closing. Id. I

---

[12] In In re Niaspan Antitrust Litigation, the periodic violations were each sale of the illegally overpriced drugs. Here, the periodic violations were each illegal kickback, fee, or referral.

respectfully disagree with this reasoning and see no reason to believe that the Third Circuit would take such a narrow view of RESPA's statutory language.[13]

The district court above took its reasoning from the Fifth Circuit's decision in Snow v. First American Title Insurance Co., 332 F.3d 356 (5th Cir. 2003). In Snow, a group of homeowners sued title insurance companies under RESPA. 332 F.3d at 357. The plaintiffs had "paid for the insurance at their real estate closings." Id. Because the plaintiffs sued longer than one year after their closings, defendants argued the claims were time-barred. Id. at 358. Plaintiffs argued that "the closing is not the only event that triggers the one-year period." Id.

The Fifth Circuit concluded that the claims were time-barred specifically because, in that particular case, the defendants "earned the allegedly prohibited 'thing of value'" at the closing when the homeowners bought their title insurance. Id. at 359. However, the court was careful to limit its holding to the particular circumstances of the case before it:

> We use "closing" interchangeably with the date of plaintiffs' payment for the title insurance, because they are identical in this case, as they are in most real estate transactions. We recognize, however, the possibility that purchasers could pay for a settlement service subject to § 2607(a)-(b) at a time other than the closing, in which case "the date of the occurrence of the violation" presumably would be the date of payment, not the unrelated closing.

---

[13] I have previously held that RESPA's statute of limitations barred a claim. Morilus v. Countrywide Home Loans, Inc., 651 F. Supp. 2d 292, 306 (E.D. Pa. 2008). In Morilus, the plaintiffs claimed their mortgage company violated RESPA when it did not disclose a property appraisal charge in their mortgage documents. 651 F. Supp. 2d at 306. There, I held that the date of the violation was the closing. Id. In doing so, however, I was careful to point out that the "violation" of RESPA is not always at closing—it depends on the case. Id. ("Here, the date of the violation was the date of the closing") (emphasis added). Unlike Morilus, the plaintiffs' claims here are based—not on the events that occurred the day they closed on their mortgages—but on the various kickbacks and referrals made and received by defendants after the closing.

Id. at 359 n.3; see also id. at 360 (noting that a violation occurs "typically"—not always—at the closing); Nelson v. Fidelity Nat'l Fin. Inc., No. 1:13–cv–1452, 2014 WL 641978, at *6–7 (E.D. Pa. Feb. 18, 2014) (same). Despite this limiting language, many courts have assumed Snow stands for the wide-sweeping proposition that any RESPA violation can only occur one time: at the closing.

The Third Circuit has never taken such a position, though it once cited Snow in dicta. In re Cmty. Bank N. Va., 622 F.3d 275, 281 (3d Cir. 2010). The case involved a settlement-only RESPA class action and the decision was not based at all on RESPA's statute of limitations, the continuing violations doctrine, or the statutory phrase "violation" found in § 2607. The Third Circuit noted in passing that RESPA's statute of limitations begins running on "the date of the occurrence of the violation, *i.e.* the date the loan closed," but it did not decide that there can be only one single violation of RESPA at the closing. Id. at 281 (quoting Snow, 332 F.3d at 359–61). Nor did it decide whether RESPA violations that occur subsequent to the closing prevent the statute of limitations from expiring. Nowhere did it address the continuing violations doctrine's applicability to RESPA.[14] Six years after the Third Circuit decided that case, however, it chose not to cite Snow while directly addressing RESPA's statute of limitations. See generally Cunningham, 814 F.3d at 158–64. It also chose not to treat the "violation" as being interchangeable with the closing. Instead, it merely stated that the statute of limitations begins running at the closing: "[The statute of limitations] runs from the date of the occurrence of the violation, . . . which *begins* at the closing of the loan." Id. at 160

---

[14] This is no surprise since none of those issues were before the court in that case.

(emphasis added) (citation omitted). Hence, under the Third Circuit's most recent precedent on the issue, a RESPA violation "begins" at the closing of the loan. This, however, does not in any way mean that a subsequent violation—after the closing—is not an independent actionable event carrying with it its own limitations period. More importantly, even if the Third Circuit had followed Snow, this would not disrupt my finding here since Snow explicitly "recognize[d] the possibility that purchasers could pay for a settlement service subject to § 2607(a)–(b) at a time other than the closing, in which case 'the date of the occurrence of the violation' presumably would be the date of payment, not the unrelated closing." Snow, 332 F.3d at 359 n.3. [15]

### f. The "One Violation" Reading of RESPA Contradicts U.S. Supreme Court Precedent

Defendants' arguments and some courts' reasoning—that any RESPA "violation" can only occur at a closing—also defies U.S. Supreme Court precedent. The U.S. Supreme Court has only addressed RESPA in one case. In that case, the Court made perfectly clear that a "violation" of RESPA can occur in many different ways at many

---

[15] With that said, the instant case differs from Snow in three important ways. First, Snow did not involve a captive reinsurance scheme whereby an insurance company pays a kickback to a reinsurer/lender. Rather, it involved only the insurance company's general practice of paying annual bonuses to its own employees—bonuses which did not necessarily have any connection to the plaintiffs themselves. Snow, at 357 (noting that the insurance agents would get bonuses based on their overall "high volumes of title insurance sales"). Second, unlike the borrowers in Snow who paid for their insurance all at once at closing, here, the plaintiffs paid for it piecemeal, over time, in the form of premium payments. This distinction is particularly relevant because, allegedly, defendants would then use these premium payments to contribute to their illegal kickbacks. Lastly, here, the defendants' alleged "violation" of RESPA is not merely their acceptance of each premium payment from the plaintiffs. Plaintiffs also allege a violation each time the insurer pays the reinsurer an illegal kickback. (Doc. No. 224-2 ¶ 310). The plaintiffs' payment of premiums, over a period of years, indisputably occurred "at a time other than the closing" and thus "the date of the occurrence of the violation presumably would be the date of payment, not the unrelated closing." Snow, 332 F.3d at 359 n.3. Likewise, the illegal kickback payments paid by the insurers to the reinsurers occurred "at a time other than the closing" and are "unrelated [to the] closing." Id. Clearly these alleged kickbacks are prohibited by RESPA and thus amount to "violations" of RESPA. 12 U.S.C. § 2607(a) ("No person shall give and no person shall accept any fee, kickback, or thing of value . . . ."). If Congress enacted RESPA to eliminate illegal kickbacks and fees, § 2601(b)(2), it is difficult to imagine why it would not make actionable the very type of conduct that the statute aims to eliminate.

different times. <u>Freeman v. Quicken Loans, Inc.</u>, 132 S. Ct. 2034 (2012). Reading the plain language of the statute, the Court explained that borrowers may sue any time someone "violate[s] the prohibitions" of § 2607. <u>Id.</u> at 2038. Some of the "prohibitions" of § 2607 include the very violations alleged in this case: kickbacks, fees, and referrals. 12 U.S.C. § 2607(a), (b). The Court also offered hypothetical "violations" of the statute that have nothing to do with a real estate closing. <u>Freeman</u>, 132 S. Ct. at 2043 ("[A] settlement-service provider who agrees to exchange valuable tickets to a sporting event in return for a referral of business would violate § 2607(a)"); <u>id.</u> ("[A] settlement-service provider who gives a portion of a charge to another person who has not rendered any services in return would violate § 2607(b)"). Accordingly, I cannot agree that a RESPA violation only occurs at the closing because to do so would be to go directly against the U.S. Supreme Court's interpretation of RESPA.

### g. *<u>Cunningham</u> and the Continuing Violations Doctrine*

Finally, my finding here does nothing to disrupt <u>Cunningham</u> or the state of the law regarding RESPA's relationship to the doctrine of equitable tolling. The equitable tolling doctrine and the continuing violations theory are two separate and distinct legal principles subject to entirely different analyses. <u>E.g.</u>, <u>Bennett v. Susquehanna Cty. Children & Youth Servs.</u>, 592 F. App'x 81, 83–86 (3d Cir. 2014) (analyzing the equitable tolling doctrine completely separate from the continuing violations doctrine); <u>McAleese v. Brennan</u>, 483 F.3d 206, 217–20 (3d Cir. 2007) (same); <u>Henchy v. City of Absecon</u>, 148 F. Supp. 2d 435, 438–39 (D.N.J. 2001) (same). Indeed, courts have specifically found that plaintiffs who failed to plead fraudulent concealment in support of equitable

tolling could nonetheless rely on a sufficiently alleged continuing violation. E.g., In re Niaspan Litigation, 42 F. Supp. 3d at 746–49.

The Third Circuit, in Cunningham, spoke only to the application of equitable tolling to RESPA's statute of limitations. However, the Third Circuit has never spoken on the continuing violations doctrine's applicability to RESPA. Cunningham did not address whether RESPA may be violated each time there is an illegal kickback, fee, or referral. As stated above, this question is independent from the well-settled principle that the limitations period begins to run at the closing of the loan.

Based on all the foregoing, I conclude that the continuing violations doctrine applies to plaintiffs' RESPA claims.[16]

### 4.   Undue Delay and Prejudice

Having found that the continuing violations doctrine supports plaintiffs' RESPA claims, I still must decide whether the instant motion to amend was unduly delayed or will prejudice defendants. I find that the plaintiffs' motion, with respect to their RESPA

---

[16] There has been some confusion in the use of the phrase "continuing violations." Kyle Graham, *The Continuing Violations Doctrine*, 43 Gonz. L. Rev. 271, 280–81 (2008). For example, in the CFPB's decision, it stated that it did not believe the continuing violations doctrine applied to the RESPA claims. However, it then held that the enforcement action was timely because the defendant "violated RESPA every time it accepted a reinsurance payment." In the Matter of PHH Corp., at 22. As explained by commentators, there are two different types of "continuing violation" theories that courts refer to. Graham, supra, at 280–81. With the first type of theory, "the limitations period on a claim does not necessarily begin to run as soon as its essential elements first fall into place, or when the plaintiff becomes aware that he or she has the makings of a valid cause of action. Instead, a claim subject to this approach will continue to build and absorb new wrongful acts for so long as the defendant perpetuates its misconduct." Id. With the second type of theory, the limitations period begins to run again and again "on a day-by-day, act-by-act, or similarly parsed basis." Id. at 281. Viewed in this light, the CFPB's decision endorsed one form (the second) of the continuing violations doctrine without calling it the "continuing violations doctrine;" the CFPB found that the defendants violated RESPA on an "act-by-act . . . basis" each time there was a kickback. Thus, its rejection of what it referred to as *the* "continuing violation" doctrine was really just a rejection of one form of the doctrine.

claims, is not unduly delayed and that the defendants would not be prejudiced by amendment.

Defendants argue that plaintiffs have known about the legal basis for their modified RESPA claims since June 2015 when the CFPB decision was issued. Because plaintiffs did not present me with this legal theory (continuing violations) until now, defendants argue the plaintiffs have exhibited undue delay. I disagree. The last stay in this case was imposed on March 11, 2015. The purpose of this stay was to await the Third Circuit's decision in Cunningham, which related solely to equitable tolling. It was not until months after this stay was entered that the CFPB issued its decision, which for the first time—defendants admit—provided the plaintiffs with their continuing violations argument. (Doc. No. 227 at 11) ("Plaintiffs' counsel has known about the purported legal basis for their 'modified RESPA claim' since June 2015"). Simply because the plaintiffs waited until the Third Circuit decided Cunningham to assert their new legal argument (which they acquired during the stay) does not mean they unduly delayed. At the time the CFPB handed down its decision, neither plaintiffs nor defendants had any idea how the Cunningham case would turn out. Hindsight is twenty-twenty for the defendants who now argue the plaintiffs should have prematurely disrupted the stay to assert a new legal argument. Such a premature tactical move would have been a waste of the court's—and the parties'—time and resources, especially if Cunningham had come out differently.[17]

---

[17] Under defendants' logic, the plaintiffs should have moved to lift the stay thereby prompting a new scheduling order with briefing and motions on the continuing violations issue. Given the unique procedural posture of this case, and for all the reasons I have already stated, plaintiffs' decision not to do so was a fair exercise of discretion—not undue delay.

Contrary to defendants' arguments, delay alone is not sufficient to warrant denial of leave to amend. Adams, 739 F.2d at 868. It is only when delay becomes "undue" that it forms an adequate basis, on its own, for denial of a motion to amend. Bjorgung, 550 F.3d at 266. "Delay becomes 'undue,' and thereby creates grounds for the district court to refuse leave, when it places an unwarranted burden on the court or when the plaintiff has had previous opportunities to amend." Id. Thus, an undue delay analysis requires courts to focus on "the movant's reasons for not amending sooner." Id. Here, the plaintiffs have offered an adequate explanation for not amending sooner: there was a stay imposed in the case, which both parties had jointly entered into, at the time plaintiffs learned of the viability of their newfound legal argument. The plaintiffs' "delay"—if one can even call it that—was not "undue."

Precedent strongly weighs in favor of allowing amendment of the plaintiffs' RESPA claims in this situation. In relying on U.S. Supreme Court precedent, the Third Circuit has cautioned that a district court may err by "not allowing plaintiffs an opportunity to allege a new legal theory after the original theory was dismissed on a [Rule] 12(b)(6) motion." Adams v. Gould Inc., 739 F.2d 858, 868–69 (3d Cir. 1984) (citing Foman v. Davis, 371 U.S. 178 (1962)). In Adams v. Gould Inc., the Third Circuit extended this logic to an even later stage in the litigation: "Where the legal theory of a complaint is rejected by the district court on a motion for summary judgment, but where an alternative theory has been raised which, on the same facts, is legally sufficient, it would be unusual for a district court not to allow the plaintiff leave to amend because of 'undue delay.'" 739 F.2d 858, 868 (3d Cir. 1984). The Third Circuit in Adams reversed

25

the district court for depriving the plaintiffs of an opportunity to amend their complaint even after summary judgment had been granted. Id. at 869.  In this case, the parties have not even proceeded to discovery. Even though the plaintiffs' "original theory was dismissed," I will not deny "the plaintiffs an opportunity to allege a new legal theory." Id. at 868.

Amendment of plaintiffs' RESPA claims would not prejudice defendants. Like in Gould, the defendants here "assert no particular prejudice except for additional counsel fees, but argue there must be 'finality' in the litigation process." Id. at 869. This argument does not demonstrate prejudice. Id. Defendants also conflate the concept of a new legal theory with that of a new legal claim. Plaintiffs' underlying factual allegations in support of their RESPA claims will stay the same. Consequently, defendants will not undertake any new burden in grappling with new facts. They simply will be required to litigate a different legal issue regarding the same claims. In addition, prejudice is typically found only where a plaintiff moves to amend his or her complaint during or after discovery. See, e.g., Cureton, 252 F.3d at 274–76 (affirming district court's denial of leave to amend when amendment would require the opposing party to "engage in burdensome new discovery and significant new trial preparation"). In sum, the plaintiffs did not unduly delay in moving to amend their complaint to make a new legal argument in support of their RESPA claims. Defendants have similarly failed to show that amendment would cause them prejudice.

For all the above reasons, I will grant plaintiffs' motion to amend their complaint to modify their RESPA claims.[18]

### B.    *Plaintiffs' Proposed RICO Claims*

Unlike with their RESPA claims, plaintiffs have unduly delayed moving to amend to add claims under RICO. The new RICO claims also do not relate back to the original complaint under Rule 15(c). For both of these reasons, I will deny plaintiffs' motion to amend their complaint to add new RICO claims.

### 1.    Undue Delay

As noted above, the "undue delay" analysis focuses on the plaintiff's reasons for not moving to amend sooner. With their RESPA claims, the plaintiffs are merely asserting a new legal argument in support of the same claims—based on the same facts— that have been asserted throughout this litigation. The assertion of entirely new RICO claims, however, is much different because it involves the addition of brand new causes of action.

Plaintiffs do not offer any reason for why they did not bring the RICO claims in their original complaint. As noted by the plaintiffs, delay becomes undue "when the plaintiff has had previous opportunities to amend." Bjorgung, 550 F.3d at 266. In this case, the plaintiffs have filed three complaints: (1) the original complaint in 2011; (2) the amended complaint in 2012; and (3) the second amended complaint in 2013. Plaintiffs

---

[18] Although I am granting the motion to amend, the plaintiffs' second amended complaint, as written, is sufficiently pled to support their continuing violations theory.

did not assert—or attempt to assert—RICO claims in any of these previous three pleadings.

In arguing that they have not unduly delayed in moving to add their RICO claims, plaintiffs point out that this case has been stayed several times. Although this is true, it does not explain why the plaintiffs did not bring RICO claims against the defendants in their original complaint, amended complaint, or second amended complaint. The stays were certainly relevant to plaintiffs' reasons for not amending their RESPA claims since the stays related to the RESPA claims. But the stays had no bearing on plaintiffs' ability, at any point, to assert RICO claims.

In considering whether to allow amendment, "[t]actical decisions and dilatory motives may lead to a finding of undue delay." Synthes, Inc. v. Marotta, 281 F.R.D. 217, 225 (E.D. Pa. 2012). Plaintiffs' proposal of brand new RICO claims suggests a purely tactical decision. Without a doubt, Cunningham foreclosed the plaintiffs' equitable tolling argument in support of their RESPA claims. As already explained, their subsequent assertion of the continuing violations theory was not unduly delayed or based on dilatory motives because the plaintiffs first became aware—as defendant concede—of this theory during the Cunningham stay in June 2015. (Doc. No. 227 at 11) ("Plaintiffs' counsel has known about the purported legal basis for their 'modified RESPA claim' since June 2015"). Plaintiffs cannot be said to have unduly delayed with respect to amending their RESPA claims simply because they vigorously litigated the equitable tolling issue and discovered a possible continuing violations argument (via the CFPB's decision) at the eleventh hour during the stay. On the contrary, plaintiffs have known about the existence

of the RICO statute from the very start of this case, but offer no reason for why they never used it earlier.[19]

Simply put, plaintiffs have provided no reason explaining why they now assert brand new RICO claims five years into this litigation when it has already had three opportunities to assert these claims. While the mere passage of time does not amount to undue delay, I conclude that the passage of five years coupled with the plaintiffs' inability to offer any reason for this delay, does.

### 2.   **Relation Back**

Even if the plaintiffs had not unduly delayed, their RICO claims would not relate back to their original complaint. For this reason alone, denial of the motion to amend to add RICO claims is warranted.

The Third Circuit has made clear that "where the original pleading does not give a defendant fair notice of what the plaintiff's [amended] claim is and the grounds upon which it rests, the purpose of the statute of limitations has not been satisfied and it is not an original pleading that [can] be rehabilitated by invoking Rule 15(c)." Glover, 698 F.3d at 146. A proposed amended claim only relates back if a party is given some sort of notice—in the original pleading—of the legal basis upon which the proposed amended claim is based. Id. (alterations in original). As here with plaintiffs' proposed RICO claims, "amendments that significantly alter the nature of a proceeding by injecting new and unanticipated claims are treated far more cautiously." Id. Here, plaintiffs' proposed

---

[19] Plaintiffs argue that they brought a RICO claim based upon a captive reinsurance scheme in an unrelated action as recent as 2015. This argument is unavailing because it does not explain why the plaintiffs did not assert a RICO claim until now.

RICO claims are surely "new" and "unanticipated" since there was never a hint they would be brought in the last five years. Plaintiffs' original complaint did not put defendants on fair notice that plaintiffs could or would assert RICO claims. The original complaint is void of any language suggesting an "enterprise" or any of the other buzz words that attend a RICO claim.[20]

Accordingly, I find plaintiffs' proposed RICO claims do not relate back under Rule 15(c).

## V.    CONCLUSION

Defendants violated RESPA—assuming the veracity, at this stage, of plaintiffs' allegations—each time an allegedly illegal kickback, fee, or referral was given or received. This captive reinsurance scheme, as pled, constitutes a continuing violation of RESPA. Because I find the continuing violations doctrine applicable, the statute of limitations runs from the date of the last RESPA violation rather than the first. Burnette, 2003 WL 21293682, at *2 (citing Cowell, 293 F.3d at 292).[21] The amendment with respect to RESPA was not unduly delayed and would not prejudice defendants. For the reasons discussed above, I find that plaintiffs unduly delayed in moving to add RICO claims and that these proposed RICO claims do not relate back to the original complaint.

An appropriate Order follows.

---

[20] This problem is not present with the RESPA claims. The plaintiffs' current use of a new legal argument (continuing violations) does not change the fact that the defendants have had notice all along of the legal basis for plaintiffs' RESPA claims since these claims have been pled all along. Unlike the continuing violations theory, though, plaintiffs' proposed RICO claims are not new legal "theories"—they are new legal *claims*.

[21] The parties have not briefed the exact filing dates that apply to plaintiffs' RESPA claims under the continuing violations doctrine. Thus, I will not decide, at this juncture, the exact filing dates that apply to plaintiffs' RESPA claims. Such a decision at this stage would be premature. In re Niaspan Litig., 42 F. Supp. 3d at 747 n.7.